UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| JUAN A. VARGAS, Individually and on Behalf of All Others Similarly Situated,<br><br>Plaintiff,<br><br>v.<br><br>CITRIX SYSTEMS, INC., ROBERT M. CALDERONI, NANCI E. CALDWELL, MURRAY J. DEMO, THOMAS E. HOGAN, MOIRA A. KILCOYNE, ROBERT E. KNOWLING, JR., PETER J. SACRIPANTI, and J. DONALD SHERMAN,<br><br>Defendants. | Case No.<br><br>**COMPLAINT FOR VIOLATIONS OFSECTIONS 14(a) AND 20(a) OF THE SECURITIES EXCHANGE ACT OF 1934**<br><br>**CLASS ACTION**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Juan A. Vargas ("Plaintiff"), by his undersigned attorneys, alleges as follows based (i) upon personal knowledge with respect to himself and his own acts, and (ii) upon information and belief as to all other matters based on the investigation conducted by his attorneys, which included, among other things, a review of relevant U.S. Securities and Exchange Commission ("SEC") filings, and other publicly available information.[1]

## NATURE OF THE ACTION

1.      Plaintiff brings this action on behalf of himself and other former shareholders of Citrix Systems, Inc. ("Citrix" or the "Company") against Citrix and the members of the Citrix's board of directors ("Board") for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a) and § 78t(a), and Securities and Exchange

---

[1] All emphasis in quoted language below is added unless otherwise noted.

Commission ("SEC") Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9(a) ("Rule 14a-9").

2.      Plaintiff's claims arise out of the Board's deliberate use of false projections to conceal the true value of Citrix from Citrix shareholders, and thereby secure the approval of such shareholders to sell Citrix to Vista Equity Partners ("Vista") and Elliott Investment Management L.P. ("Elliott") for the inadequate and unfair price of $104.00 per share in cash ("Merger Consideration"), pursuant to a merger ("Merger") under which Citrix became a wholly-owned subsidiary of TIBCO Software, Inc. ("TIBCO"), a portfolio company of Vista.

3.      Citrix sells digital workspace solutions designed to provide an organization's employees with unified, reliable and secure access to all of their work resources (applications, content, etc.) across all of the organization's computing devices and locations. Originally, Citrix mostly (i) sold its workspace solutions to customers based on perpetual software licenses pursuant to which customers paid upfront for lifetime access and support based on a certain number of users, and (ii) installed its workspace solutions in data centers located on the premises of its customers. But as the software industry shifted from perpetual licenses to subscriptions (featuring an annual recurring cost), and from on-premise computing to cloud computing (pursuant to which software is delivered over the Internet by a third-party hosting company), Citrix sought to change its business model to deliver its workspace solution to customers via the cloud pursuant to Software-as-a-Service ("SaaS") licenses featuring annual recurring revenue (or "ARR") (under which newly booked business is ratably recorded as revenue over a longer period of time).

4.      In January 2021, as part of its transition to a cloud-based business, Citrix agreed to pay $2.25 billion in cash to Vista to acquire Wrike, Inc. ("Wrike"), a provider of cloud-based collaborative work management programs. According to the press release announcing the deal,

Wrike was *expected* to grow its SaaS ARR by 30 percent to between $180 million and $190 million in 2021. Citrix thus paid Vista approximately *12.1x expected* 2021 SaaS ARR for Wrike.

5.      By early 2021, Citrix was experiencing accelerated momentum in transitioning its customers to the cloud. On April 29, 2021, Citrix announced its Q1 2021 results. In a letter to shareholders ("Q1 2021 Letter"), then CEO David Henshall ("Henshall") wrote that our first quarter results "reflect *accelerated* momentum in our cloud transition with more of our installed base moving to the cloud, driving an *increased* mix shift towards SaaS and *acceleration* of SaaS ARR." Among other metrics, Henshall highlighted that "[i]nclusive of Wrike's contribution, total SaaS ARR was *$943 million*, *up 70% year-over-year*."

6.      On July 29, 2021, Citrix announced its Q2 2021 results. In a letter to shareholders ("Q2 2021 Letter"), Henshall reported that, inclusive of Wrike, "SaaS ARR [was] *more than $1B*, *up 74% year-over-year*." Henshall further shared that as "we progress through this transition, we continue to believe that SaaS ARR is *the best way* to measure the progress we are making in transitioning our business to the cloud."

7.      On September 9, 2021, as Citrix was experiencing dramatic growth in SaaS ARR, Elliott submitted a written, non-binding indication of interest ("IOI") proposing to acquire Citrix for $124.00 to $130.00 per share in cash. On October 6, 2021—in the midst of negotiations with Elliott and other potential bidders over the sale of Citrix—the Board abruptly replaced Henshall as CEO with Defendant Robert M. Calderoni ("Calderoni") who had been serving as Chairman of the Board). As detailed below, Calderoni had long and deep ties to Elliott as a consultant to Elliott, and from his service at Citrix and other companies in which Elliott had invested.

8.      On October 18, 2021, Elliott submitted an updated non-binding IOI to acquire Citrix for $125.00 per share in cash ("October 18 Proposal"). A few days later, on October 21,

2021, the Board formed a Transaction Committee to negotiate with Elliott, Vista and other prospective buyers, and advise the Board concerning any proposed transaction. A majority of the Transaction Committee members, however, had prior ties to Elliott or Vista.

9.      On November 4, 2021—while the Transaction Committee was meeting and speaking with Elliott, Vista and other bidders—Citrix announced superior Q3 2021 results. In a letter to shareholders ("Q3 2021 Letter"), Calderoni wrote that "the third quarter was the *fourth consecutive quarter* of *accelerating* organic SaaS ARR growth – a clear sign that our SaaS offerings are *resonating with customers*." Among other metrics, Calderoni reported that, inclusive of Wrike, "SaaS ARR [was] *$1.1 billion*, *up 75% year-over-year*." Thus, after the first three quarters of 2021, Citrix had reported approximately $3 billion of SaaS ARR.

10.     Like Henshall, Calderoni opined that "Total ARR is the *best metric* to measure the underlying health of our business," and thus the Q3 2021 Letter made clear that Citrix was hitting on all cylinders with respect to its cloud transition. And despite some past execution challenges, Calderoni reassured investors that (i) "the revenue headwinds from declining perpetual licenses are now largely behind us;" (ii) "[o]ver time, as we emerge from our cloud transition, *we would expect to see reported revenues grow more in line with Total ARR*;" and (iii) 2021 would "be a trough in terms of both operating margin and cash flow." Calderoni also explained that "[o]ur transition to a subscription model, and ultimately a cloud-delivered model, focuses on growing *higher value recurring revenue streams* that result in more of the business booked in the current period being recognized in future periods." He also referenced a margin improvement plan for Q4.

11.     Equally noteworthy, in Q3 2021, Citrix reported $778 million in revenue, which *beat* the guidance of $765 million to $775 million in GAAP revenue for Q3 2021 projected on July 29, 2021 in the Q2 2021 Letter. Citrix then *beat* guidance again by an even wider margin with its

Q4 2021 results, reporting $851 million in GAAP revenue on January 31, 2022—the same day the Merger was announced—versus the $825 million to $835 million in GAAP revenue for Q4 2021 projected on November 4, 2021 in the Q3 2021 Letter.

12.     On November 19, 2021, the Transaction Committee's financial advisor, Qatalyst Partner LP ("Qatalyst"), authorized Vista to work with Elliott on a joint bid. Thereafter, on December 5, 2021, Elliott and Vista submitted a new non-binding IOI of just $110.00 per share ("December 5 Proposal")—12% lower than Elliott's October 18 Proposal of $125.00 per share, despite the continued growth in SaaS ARR reported in Q3 2021.

13.     On January 15, 2022, after Calderoni shared preliminary results for Q4 2021 (which, as noted, *beat* guidance), the Transaction Committee responded to Elliott's and Vista's December 5 Proposal of $110.00 per share with a counterproposal of $120.00 per share.

14.     On January 18, 2022, Elliott and Vista responded that they would not go higher than $110.00 per share. When the Transaction Committee then promptly proposed a $2.00 increase to $112.00 per share, Elliott and Vista mocked them by submitting a "best and final offer" of $103.51 per share on January 28, 2022—a further 6% drop from the December 5 Proposal. The Transaction Committee then essentially begged Elliott and Vista to come up $0.49—less than ½ a percent—to at least $104.00 per share. Elliott and Vista "generously" agreed, and on January 31, 2022, Citrix announced its sale to Vista and Elliott for $104.00 per share in cash (amounting to approximately $13 billion based on approximately 125.9 million shares outstanding). According to the announcement, the total deal was valued at $16.5 billion, including the assumption of Citrix debt.

15.     To justify the inadequate and unfair price of $104.00 per share, the Transaction Committee relied on false projections from Citrix management that deliberately disregarded the

accelerating growth in SaaS ARR and positive momentum in Citrix's business model transition. These false projections, in turn, formed the basis for a false fairness opinion by Qatalyst concluding that a sale price of $104.00 per share was fair to Citrix shareholders ("Fairness Opinion").

16.     Based on what it knew was a false Fairness Opinion, the Transaction Committee recommended that the Board (i) declare that the Merger was "in the best interests of [Citrix] stockholders," and (ii) recommend that Citrix shareholders approve the Merger. The full Board accepted the Transaction Committee's recommendations and approved the Merger.

17.     On March 16, 2022, to solicit Citrix shareholders to vote in favor of the Merger, the Board authorized the filing of a false and misleading definitive proxy on Schedule 14A ("Proxy") with the SEC. The Proxy contained material misrepresentations and omissions, including without limitation, false projections and the false Fairness Opinion. These and other material misrepresentations and omissions rendered the Proxy false and misleading in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 thereunder.

18.     The false and misleading Proxy authorized by Defendants caused the consummation of the Merger at an unfair price per share that did not adequately value Citrix, and thus caused economic harm to Citrix who were forced to sell their shares to Elliott and Citrix at an unfair and inadequate price.

## JURISDICTION AND VENUE

19.     This Court has subject matter jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

20.     This Court has personal jurisdiction over each of the Defendants because each defendant has sufficient minimum contacts with the United States so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

*See Sec. & Exch. Comm'n v. MintBroker Int'l, Ltd.*, 2022 WL 4204383, at \*2 (S.D. Fla. Jan. 12, 2022) (for purposes of establishing personal jurisdiction under the Exchange Act, the applicable forum for minimum contacts purposes is the United States).

21.     Venue is proper under 28 U.S.C. § 1391(b)(3) because all of the Defendants are subject to the Court's personal jurisdiction in this District. Moreover, Citrix has a business office in this District at 851 West Cypress Creek Road, Fort Lauderdale, Florida 33309.

## PARTIES

22.     Plaintiff has been at all relevant times a continuous stockholder of Citrix common stock.

23.     Defendant Citrix is a Delaware corporation with its principal executive offices located at 851 West Cypress Creek Road, Fort Lauderdale, Florida 33309.

24.     Defendant Calderoni has served as Chairman of the Board of Citrix since July 2015, and was appointed Interim President and CEO of Citrix on October 6, 2021, during the early stages of negotiations with Elliott and other potential bidders to acquire Citrix.

25.     Defendant Nanci E. Caldwell ("Caldwell") has served as a director of Citrix since July 2008. Defendant Caldwell served on the Transaction Committee formed on October 21, 2021, to advise the Board concerning any proposed transactions.

26.     Defendant Murray J. Demo ("Demo") has served as a director of Citrix since February 2005. Defendant Demo served on the Transaction Committee formed on October 21, 2021, to advise the Board concerning any proposed transactions.

27.     Defendant Thomas E. Hogan ("Hogan") has served as a director of Citrix since December 2018.

28.     Defendant Moira A. Kilcoyne ("Kilcoyne") has served as a director of Citrix since June 2018.

29.     Defendant Robert E. Knowling, Jr. has served as a director of Citrix since October 2020. Defendant Knowling served on the Transaction Committee formed on October 21, 2021, to advise the Board concerning any proposed transactions.

30.     Defendant Peter J. Sacripanti has served as a director of Citrix since December 2015. Defendant Sacripanti served on the Transaction Committee formed on October 21, 2021, to advise the Board concerning any proposed transactions.

31.     Defendant J. Donald Sherman has served as a director of Citrix since March 2020. Defendant Sherman served on the Transaction Committee formed on October 21, 2021, to advise the Board concerning any proposed transactions.

32.     Defendants identified in paragraphs 24 to 31 are collectively referred to herein as the "Individual Defendants," and together with Citrix, collectively, the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Cloud-Based Computing

33.     Cloud-based computing solutions—also known "software as a service," "SaaS," or "subscription software"—refers to software applications, storage, and other computing resources that users access on their desktop from remote computers via an Internet connection. The model is analogous to homes and businesses accessing electricity on their premises supplied by remote power plants.

### Citrix's Transition to Cloud-Based Solutions

34.     Citrix sells digital workspace solutions designed to provide an organization's employees with unified, reliable and secure access to all of their work resources (applications, content, etc.) across all of the organization's computing devices and locations. Originally, Citrix generally (i) sold its workspace solutions to customers based on perpetual software licenses pursuant to which customers paid upfront for lifetime access and support based on a certain number

of users, and (ii) installed its workspace solutions in data centers located on the premises of its customers. But as the software industry shifted from perpetual licenses to subscriptions (featuring an annual recurring cost), and from on-premise computing to cloud computing (pursuant to which software is delivered over the Internet by a third-party hosting company), Citrix sought to change its business model to deliver its workspace solution to customers via the cloud pursuant to SaaS subscriptions featuring ARR.

35.     Citrix has explained in its SEC filings that "ARR" is "an operating metric that represents the contracted recurring value of all termed subscriptions normalized to a one-year period. It is calculated at the end of a reporting period by taking each contract's recurring total contract value and dividing by the length of the contract. ARR includes only active contractually committed, fixed subscription fees." In turn, "SaaS ARR represents the contracted recurring value of all cloud subscriptions normalized to a one-year period."

**Elliott's Prior Relationship With Defendants**

36.     On June 11, 2015, Elliott wrote a letter to the then Citrix CEO and Board advocating for broad operational improvements at the Company, and disclosing that Elliott had acquired Citrix common stock and derivatives providing Elliott with aggregate economic exposure comparable to an interest in approximately 7.1% of Citrix common stock (later rising to 7.5%).

37.     On July 28, 2015, Citrix announced that it had entered into a cooperation agreement with Elliott pursuant to which it, *inter alia*, agreed to appoint Mr. Jesse Cohn ("Cohn"), a senior Elliott portfolio manager, to the Board, and commence a search for an additional independent Board member mutually agreeable to Citrix and Elliott.

38.     The same day, Citrix also announced that (i) Defendant Calderoni would assume the role of Chairman of the Board, and (ii) the Board had formed an operations committee ("Operations Committee") to work closely with Company management on a comprehensive

operational review focused on improving Citrix's margins, profitability and capital structure. Citrix advised that the Operations Committee would be led by Defendant Calderoni and be comprised of four directors, including Defendant Calderoni, Cohn, and the new independent director to be mutually agreed upon by Citrix and Elliott.

39.     Qatalyst served as a financial advisor to Citrix in connection with the foregoing developments. Notably, Qatalyst appears to regularly advise targets pursued by Elliott or Vista in their activist campaigns, raising serious questions about the independence of Qatalyst as an advisor to target boards such as the Citrix Board when negotiating with Elliott and/or Vista.[2]

40.     On October 21, 2015, Citrix named Defendant Calderoni interim President and CEO of Citrix. Defendant Calderoni previously served as a director of Juniper Networks, Inc. ("Juniper") where he worked with Elliott after Elliott reached an agreement with Juniper in February 2014 to obtain two seats on Juniper's board of directors and implement a plan to improve operations. Defendant Calderoni also served as a senior advisor to Silver Lake Partners, a private equity firm that announced in October 2015 it would participate in the $67 billion purchase by Dell Computers of EMC Corp., in which Elliott held a 2.2% stake and which Elliott had been pressuring since October 2014 to spin off assets.

---

[2] *See, e.g., Informatica to Go Private in $5.3 Billion Leveraged Buyout*, April 8, 2015, at: https://www.vox.com/2015/4/8/11561226/informatica-to-go-private-in-5-3-billion-leveraged-buyout (noting that "[a]ctivist hedge fund Elliott Management disclosed an 8 percent stake in Informatica in January" and that Informatica thereafter engaged Qatalyst as financial advisor); *Imperva Said to Be Working With Qatalyst to Explore a Sale*, Jul. 11, 2016, at: https://www.bloombergquint.com/business/imperva-said-to-be-working-with-qatalyst-to-explore-a-sale (noting that Elliott "targeted" the company, amassed a 10.9% stake, had started a dialogue with the company's board about strategic opportunities, and that the company had hired Qatalyst to explore a sale); *MINDBODY Enters into Definitive Agreement to be Acquired by Vista Equity Partners for $1.9 Billion*, December 24, 2018 at: https://www.globenewswire.com/news-release/2018/12/24/1678109/0/en/MINDBODY-Enters-into-Definitive-Agreement-to-be-Acquired-by-Vista-Equity-Partners-for-1-9-Billion.html (noting that Qatalyst advised MindBody in acquisition by Vista).

41.     In November 2015, Citrix announced plans to spin off its GoTo family of products into a separate, publicly traded company, and, in July 2016, Citrix announced that it had entered into an agreement with LogMeIn, Inc. ("LogMeIn") for LogMeIn to combine with Citrix's GoTo business. Notably, in connection with that transaction, Cohn, Henshall, and Defendants Calderoni and Sacripanti, were appointed to the LogMeIn board of directors, and served together until LogMeIn was acquired in early 2020 by Elliott and another private equity firm, Francisco Partners, for $86.05 in cash per share.

42.     It appears that, as early as 2017, and then again in April 2019, Elliott attempted to push Citrix into a whole Company sale, and it was reported that in April 2019 Citrix had engaged Goldman Sachs to explore a possible sale and had reached out to Vista to gauge its interest.[3] Elliott was ultimately unsuccessful, however, and in Q1 2020, exited its position in Citrix. Thereafter, on April 16, 2020, Citrix announced that Cohn would be leaving the Board. The press release announcing Cohn's departure, quoted Defendant Calderoni in his capacity as Chairman of the Board:

> We want to thank Jesse for his dedicated service to the board. His candor, insights and partnership have been valuable and appreciated as the company was executing a significant shift in our strategy, operations and business model. Today, with leadership from the board and executive team, and execution by our 8,500 plus employees, Citrix is stronger and more valuable than ever, and I want to thank Jesse for his many contributions to our success over the past five years.

---

[3] Josh Kosman, *Software giant Citrix hires Goldman to explore sale after Singer push*, New York Post (April 3, 2019), available at:
https://nypost.com/2019/04/03/software-giant-citrix-hires-goldman-to-explore-sale-after-singer-push/.

**Citrix Acquires Wrike from Vista for 12.1x *Expected* SaaS ARR for 2021**

43.     On January 16, 2021, consistent with its new focus on cloud-based solutions, Citrix announced it had agreed to pay $2.25 billion in cash to Vista to acquire Wrike, Inc. ("Wrike"), a provider of cloud-based collaborative work management programs.

44.     According to the press release announcing the acquisition, Wrike was expected to grow its SaaS ARR by 30 percent to between $180 million and $190 million in 2021. Citrix thus paid Vista approximately *12.1x expected* 2021 SaaS ARR (i.e., $2.25 billion/$185 million = 12.1) for a company growing SaaS ARR at just 30% per year.

**Citrix Links Performance-Based Equity Awards to ARR Growth**

45.     On April 16, 2021, Citrix filed its 2021 Meeting Notice. The 2021 Meeting Notice contained a letter from Defendant Calderoni, as Chairman of the Board, stating that the Board was linking future performance-based equity awards ("PRSUs") to ARR growth:

> During the second quarter of 2019 . . . Citrix gained significant momentum in its business transition to a subscription-based business. Given this increased momentum, the Compensation Committee determined that the company had a unique opportunity to increase the acceleration of its transition, which, if successful, would advance long-term value creation for shareholders. Accordingly, ***beginning in 2020, the Compensation Committee moved away from subscription bookings as a percentage of total subscription and product bookings and decided to link performance-based equity awards with annualized recurring revenue, or ARR, growth***, which, as we have discussed on our earnings calls, is the metric that we believe is best aligned with the company's business transition and strategy. In our view, ***ARR, in short, is the best indicator of the overall health and trajectory of the business*** because it captures the pace of Citrix's transition and is a forward-looking indicator of top line trends.

**Citrix's Q1 2021 Results**

46.     On April 29, 2021, Citrix announced its Q1 2021 results. In a letter to shareholders ("Q1 2021 Letter"), then CEO David Henshall ("Henshall") wrote concerning Citrix's transition of customers to cloud-based solutions that "[o]ur first quarter results ***reflect accelerated momentum in our cloud transition*** with more of our installed base moving to the cloud, driving

an increased mix shift towards SaaS and acceleration of SaaS ARR." He then highlighted the following successes:

- Excluding the impact of Wrike, first quarter SaaS ARR accelerated sequentially to $793 million, representing 43% year-over-year growth. ***Inclusive of Wrike's contribution, total SaaS ARR was $943 million, up 70% year-over-year***, and total Subscription ARR was $1.51 billion, up 81% year-over-year.

- The number of Citrix Cloud Paid Subscribers increased 34% year-of-year, to over 10.3 million.

47.     Henshall also explained that "[o]ur transition to a subscription model, and ultimately a cloud-delivered model, focuses on growing higher value recurring revenue streams that result in more of the business booked in the current period being recognized in future periods."

**Citrix's Q2 2021 Results**

48.     On July 29, 2021, Citrix announced its Q2 2021 results. In a letter to shareholders ("Q2 2021 Letter"), Henshall wrote that Citrix's transition of customers to cloud-based solutions was progressing strongly. Key takeaways regarding the SaaS business included:

- ***SaaS ARR of more than $1B, up 74% year-over-year***. Excluding Wrike, second quarter SaaS ARR accelerated for the third consecutive quarter to $868 million, ***up 47% year-over-year***.

- The number of Citrix Cloud Paid Subscribers ***increased 52% year-over-year***, to 11.4 million with growth accelerating from 34% year-over-year in Q1 2021.

- SaaS mix of subscription bookings was 63%, compared to guidance of 50-55%

49.     Total reported revenue of $812 million, however, fell short of the guidance of $840-850 million in the Q1 2021 Letter. Henshall elaborated that "[a]fter a slower-than-expected pace of transitioning our installed base to the cloud during the onset of the pandemic, ***the transition has since gained momentum and is now progressing well***. A faster pace of moving to the cloud is a net positive for the long-term success of Citrix; however, we have not delivered on our overall

expected recognized revenue this year. I want to explain the challenges we identified in reviewing the quarter and how we are responding."

50.     Henshall itemized "several significant and immediate actions" to address the various challenges impacting the cloud transition, which included "embracing [a] faster pace of cloud adoption and sales strategies to support this move." As a result of these actions, Henshall explained that SaaS as a percentage of subscription bookings would increase to 60-70%, "further impacting revenue as more is recognized ratably vs. up-front." In other words, prioritizing growth in ARR under more lucrative subscription-based licenses adversely impacts recognized revenue in the short-term because a greater percentage of new business is being recognized over time.

51.     Henshall concluded:

> ***As we progress through this transition, we continue to believe that <u>SaaS ARR is the best way to measure the progress we are making in transitioning our business to the cloud.</u>*** With year-over-year growth accelerating for the third consecutive quarter, both inclusive and exclusive of Wrike since the close of the acquisition, strong SaaS ARR growth demonstrates our focus on transitioning our installed base."

## Elliott Initiates Negotiations to Acquire Citrix

52.     On August 25, 2021, Elliott sent a letter to the Board recommending that Citrix engage with Elliott and other potentially interested parties regarding a "take-private" transaction ("August 25 Elliott Letter"). The August 25 Elliott Letter advised that Elliott had made an investment of approximately $1.3 billion in Citrix in the form of common stock and derivatives, which provided Elliott with aggregate economic exposure comparable to an interest in approximately 10% of the Company's common stock. The August 25 Elliott Letter criticized, among other things, "a cloud transition that had missed expectations." That criticism, however, was misplaced because it ignored the enormous growth in SaaS ARR to date in 2021, as per the Q1 2021 and Q2 2021 Letters.

53.     On September 2, 2021, after receiving the August 25 Elliott Letter, the Board met

and retained Qatalyst to contact other potential buyers consisting of three strategic buyers and nine

financial sponsors, including Vista. The Board also discussed the possibility of negotiating a "go

shop" provision (i.e., the right to actively solicit alternative acquisition proposals for a specified

period following execution of a definitive agreement in connection with any agreement to sell the

Company).

54.     At the meeting, the Board also discussed past and current business relationships

that certain directors had with Elliott, Vista and other potential participants in a strategic process,

and reached certain conclusions, which the Proxy described as follows (including material added

via supplemental disclosures):

> **Moira J. Kilcoyne was currently a director of Elliott Opportunity II Corp., a special purpose acquisition company sponsored by an affiliate of Elliott**, and Thomas E. Hogan was currently a Managing Director of Vista, which was among the financial sponsors that the Citrix Board determined to potentially contact in connection with the strategic process given Vista's investment focus in enterprise software, data and technology enabled organizations and in light of Vista's prior ownership of Wrike. **It was determined that, given Ms. Kilcoyne's current relationship with an Elliott affiliate and Mr. Hogan's current relationship with Vista and the potential conflicts or the appearance of potential conflicts that could arise as a result of these relationships, Ms. Kilcoyne and Mr. Hogan would recuse themselves from further Board meetings or deliberations regarding a potential transaction with Elliott or Strategic Buyer A or alternatives thereto**. As a result, Ms. Kilcoyne and Mr. Hogan (who were not in attendance for any portion of this meeting related to the strategic process) did not participate in further Board or committee meetings or deliberations regarding a potential transaction with Elliott or Strategic Buyer A or any alternatives thereto.

> In addition, the Citrix Board discussed **certain past relationships identified by the directors, including the past service of Mr. Cohn on the Citrix Board including service on the operations committee and nominating and corporate governance committee, and on a CEO search committee (disbanded in January 2016), which overlapped with certain of Citrix's current directors**, the past service of Mr. Cohn on the Board of Directors of LogMeIn, Inc. (the company that acquired Citrix's GoTo family of service offerings) which overlapped with certain of Citrix's current directors, **<u>and a prior 18-month consulting relationship between Mr. Calderoni and Elliott that occurred during 2018 and 2019</u>. It also was noted that a family**

***member of Mr. Calderoni works for Elliott in a non-investment, administrative role***. The Citrix Board determined that these relationships did not present a conflict with respect to the consideration of a potential strategic transaction with Elliott or any alternatives thereto.

55.     The above description of the Board's deliberations concerning conflicts failed to fully disclose Defendant Calderoni's more extensive past working relationship with Elliott after Elliott acquired substantial stakes in Juniper (where Defendant Calderoni was a board member) and EMC (where Defendant Calderoni advised the private equity firm that ultimately acquired EMC with Dell). Despite these additional past ties to Elliott (which the Board ignored), Defendant Calderoni did not recuse himself from further Board meetings or deliberations regarding a potential transaction with Elliott, and the Board did not subject Defendant Calderoni to the same restrictions as Defendants Kilcoyne and Hogan. To the contrary, aside from Defendant Calderoni remaining Chairman of the Board, the Board announced on October 6, 2021, that it had appointed Defendant Calderoni to the positions of Interim CEO and President of Citrix. Thereafter, "[t]hroughout Citrix's evaluation of potential strategic alternatives," Defendant Calderoni concededly "had conversations with representatives of the various potential acquirers and financial sponsors, *including Elliott and Vista*."

**Elliott's Initial Indication of Interest of $124.00-$130.00 Per Share in Cash**

56.     On September 9, 2021, Elliott submitted a written, non-binding indication of interest proposing to acquire all of the outstanding shares of Citrix for $124.00 to $130.00 per share in cash.

57.     The Board met same day. At the meeting, the Board authorized Qatalyst to begin contacting the 12 parties previously identified by the Board that might be interested in a transaction with Citrix. As a result of that outreach, Vista and five other financial sponsors indicated that they would like to enter into a confidentiality agreement with Citrix to facilitate discussions regarding

a potential transaction. Additionally, discussions were held and due diligence was shared with Strategic Buyer A, a company that had previously held discussions with Citrix in 2019 concerning a possible transaction. Subsequently, other strategic buyers and financial sponsors reached out to discuss potential transactions. None of these other potential buyers, however, ever subsequently submitted indications of interest to acquire Citrix. Thus, the only bids ever received were those submitted by Elliott and Vista.

**The September 2021 Projections**

58.     On September 23, 2021, the Board reviewed preliminary financial projections ("September 2021 Projections") for the remainder of fiscal year 2021 and fiscal years 2022 through 2026 prepared by senior management. Ignoring the accelerating growth in SaaS ARR in 2021, members of senior management reviewed with the Citrix Board "the related methodology, underlying assumptions (including the launch of a strategic cost improvement/restructuring program), and potential risks in achieving the projections, including the execution challenges that Citrix is facing, the risks associated with Citrix's business model transition, and market dynamics." Following discussion of these matters, the Citrix Board authorized use of the September 2021 Projections in discussions with participants in the strategic process.

59.     The Proxy shared the September 2021 Projections in the following table:

| ($ in millions) | 2021E(1) | 2022E | 2023E | 2024E | 2025E | 2026E |
|---|---|---|---|---|---|---|
| Revenue | $ 3,267 | $3,494 | $3,938 | $4,209 | $4,465 | $4,692 |
| Non-GAAP Gross Profit (2) | $ 2,730 | $2,931 | $3,305 | $3,542 | $3,749 | $3,944 |
| Non-GAAP Operating Income (3) | $  850 | $1,048 | $1,263 | $1,405 | $1,525 | $1,644 |
| Non-GAAP Net Income (4) | $  647 | $ 779 | $ 958 | $1,086 | $1,187 | $1,291 |
| EBITDA (5) | $ 1,050 | $1,259 | $1,478 | $1,626 | $1,750 | $1,875 |

60.     On September 28, 2021, Vista advised Qatalyst that it was not interested in further discussions with Citrix concerning a transaction. As discussed below, however, Vista later joined Elliott's bid.

61.     On October 6, 2021, Citrix abruptly announced that Defendant Calderoni was replacing Henshall and had been appointed Interim Chief Executive Officer and President. In addition, Citrix announced that the Company expected to report revenue at the midpoint to the high end of its previously announced guidance range of $765 million to $775 million for the third quarter of fiscal year 2021. As noted below, the Company subsequently *beat* its revenue guidance for Q3 2021.

**Elliott's Revised Indication of Interest of $125.00 Per Share in Cash**

62.     On October 18, 2021, Elliott submitted a revised written, non-binding indication of interest with respect to acquiring all of the outstanding shares of Citrix for $125.00 per share in cash ("October 18 Proposal").

**The Board Forms a Conflicted Transaction Committee**

63.     On October 21, 2021, the Board formed a Transaction Committee of purportedly independent and disinterested directors to (i) monitor and direct the process and procedures related to the review and evaluation of the October 18 Proposal and any other proposals that the Company might receive with respect to a strategic transaction, as well as other potential strategic alternatives that may be available to enhance shareholder value (including continuing to operate as an independent company), and (ii) make a recommendation to the Board regarding the advisability of any such transaction or other alternatives. Following its formation, the Transaction Committee was actively involved in negotiating the Merger with Elliott and Vista, including directing price negotiations. The Transaction Committee consisted of Defendants Caldwell, Demo, Knowling, Sacripanti and Sherman.

64.     The Proxy failed to disclose, however, that Defendant Knowling served as a director of Convergys Corporation from late 2017 until late 2018 when Convergys Corporation was sold to SYNNEX Corporation for $2.43 billion in cash and stock shortly after Elliott acquired

a 4.9% ownership stake in Convergys. Further, the Proxy failed to disclose that Defendant

Caldwell previously served as a director of TIBCO, one of Vista's portfolio companies since 2014.

Finally, as noted, Defendant Sacripanti had served alongside Cohn on the LogMeIn board. Thus,

a majority of the members of the Transaction Committee had past ties to either Elliott or Vista.

**Citrix's Q3 2021 Results**

65.      On November 3, 2021, the Board held a meeting at which senior management

reviewed the Company's results of operations for the third quarter of 2021 and proposed earnings

guidance for the fourth quarter of the year.

66.      On November 4, 2021, Citrix announced its Q3 2021 results. In a letter to

shareholders ("Q3 2021 Letter"), Defendant Calderoni, wrote concerning Citrix's transition of

customers to cloud-based solutions:

> ***In the third quarter of 2021, Citrix made significant progress on its transition to the cloud.*** This quarter, Total ARR grew organically 13% year-over-year, excluding Wrike, despite tough comparisons due to strong demand tailwinds from COVID-related purchases in the prior year. Total ARR also grew faster year-over-year than the prior quarter, demonstrating a continued acceleration of our subscription transition. SaaS ARR is now greater than $1 billion. ***Organic SaaS ARR grew 48% year-over-year, and the third quarter was the fourth consecutive quarter of accelerating organic SaaS ARR growth – a clear sign that our SaaS offerings are resonating with customers***.
>
> Key takeaways include:
>
> - ***SaaS ARR of $1.1 billion***, ***up 75% year-over-year***. Excluding Wrike, third quarter SaaS ARR accelerated to $934 million, ***up 48% year-over-year***.
>
> - The number of Citrix Cloud Paid Subscribers ***increased 47% year-over-year***, to 12.2 million.
>
> - ***SaaS mix of subscription bookings was 64%***, towards the high-end of our guidance range of 60-65% and up from 48% at the beginning of the year.

67.      Defendant Calderoni added:

*Despite achieving more than $1 billion in SaaS ARR in the third quarter of 2021, we are still in the early innings of our cloud transition with less than 15% of our current installed base having transitioned to cloud products. This continues to represent an enormous opportunity and provides a strong tailwind to support our SaaS ARR growth for year*s. Customers making the transition are realizing greater value as they shift to our cloud solutions, and we consistently see an uplift in price that exceeds our target 33% premium as customers derive added value, greater agility, and reduced total cost of ownership (TCO) as they migrate to SaaS from our on-premise perpetual Workspace offerings. ***Finally, the revenue headwinds from declining perpetual licenses are now largely behind us in our Workspace business as we reach the anniversary of the end of broad availability of perpetual Citrix Workspace licenses. <u>We believe Total ARR is the best metric to measure the underlying health of our business. Over time, as we emerge from our cloud transition, we would expect to see reported revenues grow more in line with Total ARR</u>***.

68.     Concerning past execution challenges, Calderoni reassured investors that (i) "the revenue headwinds from declining perpetual licenses are now largely behind us;" (ii) "[o]ver time, as we emerge from our cloud transition, we would expect to see reported revenues grow more in line with Total ARR;" and (iii) 2021 would "be a trough in terms of both operating margin and cash flow." In particular, Calderoni explained that "[o]ur transition to a subscription model, and ultimately a cloud-delivered model, focuses on growing *higher value recurring revenue streams* that result in more of the business booked in the current period being recognized in future periods." He also referenced a margin improvement plan for Q4.

69.     Equally noteworthy, in Q3 2021, Citrix reported $778 million in revenue, which *beat* the guidance of $765 million to $775 million in GAAP revenue for Q3 2021 projected on July 29, 2021 in the Q2 2021 Letter.

70.     Finally, the Q3 2021 Letter forecast for full year 2021 (i) GAAP Operating Margin of approximately 10%, (ii) Non-GAAP Operating Margin of approximately 25%, (iii) GAAP Diluted EPS of $1.81 to $1.87 per share, and (iv) Non-GAAP Diluted EPS of $4.90 to $4.95 per share. All of these metrics showed improvement over the forecasts in the Q2 2021 Letter for full

year 2021 of (i) GAAP Operating Margin of approximately 8-9%, (ii) Non-GAAP Operating Margin of approximately 24-25%, (iii) GAAP Diluted EPS of $1.45 to $1.66 per share, and (iv) Non-GAAP Diluted EPS of $4.75 to $4.95 per share. Only projected full year 2021 revenue of $3.19 billion to $3.20 billion in the Q3 2021 Letter remained below the projected full 2021 revenue of $3.22 billion to $3.25 billion in the Q2 2021 Letter. But as discussed, the actual full year revenue for 2021 hit $3.22 billion, and thus beat the guidance shared as part of the Q3 2021 results.

71.    Notwithstanding the superior and improving results in Q3 2021, the Proxy misrepresented those results by excluding any mention of the rapid growth in SaaS ARR and focusing exclusively on negative items: "On November 4, 2021, Citrix reported its results of operations for the third quarter of 2021 and moderated its fourth quarter revenue expectations, *noting that the Company had underperformed its expectations during the year as it continued to face execution challenges*." In particular, the statement that "the Company had underperformed its expectations," was misleading to the extent that Citrix had *beat* prior revenue guidance.

**Elliott's and Vista's Revised Indication of Interest of $110.00 Per Share in Cash**

72.    On November 19, 2021, Qatalyst authorized Elliott to work with Vista, and on December 5, 2021, Vista and Elliott submitted a written, non-binding indication of interest proposing to acquire all of the outstanding shares of Citrix for $110.00 per share in cash ("December 5 Proposal")—12% lower than Elliott's October 18 Proposal of $125.00 per share.

**The December 2021 Projections**

73.    On December 7, 2021, the Transaction Committee met with senior management and its financial and legal advisors to review the updated projections ("December 2021 Projections") prepared by senior management for use in the strategic process for the remainder of fiscal year 2021 and fiscal years 2022 through 2026. The December 2021 Projections purportedly rolled forward the September 2021 Projections to reflect Citrix's actual results for Q3 2021, an

updated forecast for the Q4 2021, and implementation of a strategic cost improvement/restructuring program.

74.     During the meeting, senior management reviewed with the Transaction Committee the related methodology, underlying assumptions, and potential opportunities and risks in achieving the December 2021 Projections, and the Transaction Committee purported to consider the execution challenges that Citrix is facing, the risks associated with Citrix's business model transition, and market dynamics. The Transaction Committee, however, did not discuss the rapid growth in SaaS ARR reflected in the Q3 20221 results.

75.     Following these discussions, the Transaction Committee approved the December 2021 Projections for use by Qatalyst in preparing its fairness opinion ("Fairness Opinion"). Unlike the September 2021 Projections, it appears from the Proxy that the December 2021 Projections were not shared with any participants in the strategic process other than Elliott and Vista at a presentation and dinner on December 15, 2021, as discussed further below.

76.     The Proxy shared the December 2021 Projections in the following table:

| ($ in millions) | 2021E(1) | 2022E | 2023E | 2024E | 2025E | 2026E |
|---|---|---|---|---|---|---|
| Revenue | $ 3,212 | $3,409 | $3,765 | $4,040 | $4,241 | $4,423 |
| Non-GAAP Gross Profit (2) | $ 2,687 | $2,878 | $3,186 | $3,439 | $3,609 | $3,766 |
| Non-GAAP Operating Income (3) | $ 836 | $1,008 | $1,194 | $1,350 | $1,451 | $1,548 |
| Non-GAAP Net Income (4) | $ 644 | $ 746 | $ 902 | $1,041 | $1,126 | $1,213 |
| EBITDA (5) | $ 1,033 | $1,216 | $1,407 | $1,567 | $1,673 | $1,775 |

77.     Citrix management then used the December 2021 Projections to calculate unlevered free cash flows ("December 2021 Cash Flows"), and directed Qatalyst to use the December 2021 Cash Flows to prepare an *Illustrative Discounted Cash Flow Analysis* ("DCF Analysis") as part of its Fairness Opinion. The December 2021 Cash Flows were disclosed in the following table:

| ($ in millions) | 2022E | 2023E | 2024E | 2025E | 2026E |
|---|---|---|---|---|---|
| Revenue | $3,409 | $3,765 | $4,040 | $4,241 | $4,423 |
| Non-GAAP Operating Income (1) | $1,008 | $1,194 | $1,350 | $1,451 | $1,548 |
| Net Operating Profit After Tax (2) | $ 905 | $1,056 | $1,186 | $1,271 | $1,351 |
| Less: Capital Expenditures | (90) | (90) | (90) | (90) | (90) |
| Plus: Depreciation and Amortization | 83 | 85 | 87 | 88 | 90 |
| Plus: Other Amortization (3) | 125 | 127 | 130 | 133 | 137 |
| Less: Change in Working Capital | (96) | (168) | (87) | (8) | 40 |
| Less: Other (4) | (44) | (19) | (19) | (19) | (19) |
| Unlevered Free Cash Flow | $ 883 | $ 992 | $1,208 | $1,375 | $1,509 |

78.     Based on the December 2021 Cash Flows, and using a discount rate range of 8.0% to 9.5%, Qatalyst's DCF Analysis calculated a range of per share values for Citrix common stock of approximately $96.08 to $141.80. The Merger Consideration of $104.00 in cash per share fell at the bottom of that range.

79.     Given that revenue in Q3 2021 *beat* guidance, and that the Q3 2021 Letter projected *higher* margins and earnings per share for full year 2021 than the Q2 2021 Letter had projected, there was no reason to further depress the December 2021 Projections. Yet, Qatalyst nevertheless took the already depressed December 2021 Projections and created sensitivity cases ("December 2021 Sensitivity Cases"), which purported to reflect "*lower* revenue growth rates and operating margin assumptions *approved by senior management of the Company*," and were designed to "allow the Transaction Committee to consider the December 2021 Projections in light of the execution challenges facing the Company." In plain English, Qatalyst devised even more pessimistic analyses—completely contradicted by the Q3 2021 results (which reported *rising* revenue that *beat* guidance and projected *improving* margins and earnings per share)—to help the Transaction Committee justify what it knew it would ultimately agree upon—a sale of Citrix to Elliott and Vista at an inadequate and unfair price.

80.     The December 2021 Sensitivity Cases were used to calculate even more depressed unlevered free cash flows ("December 2021 Sensitivity Cash Flows"), as per the following table:

| ($ in millions) | 2022E | 2023E | 2024E | 2025E | 2026E |
|---|---|---|---|---|---|
| Revenue | $3,344 | $3,626 | $3,819 | $3,932 | $4,022 |
| Non-GAAP Operating Income (1) | $ 988 | $1,099 | $1,185 | $1,249 | $1,307 |
| Net Operating Profit After Tax (2) | $ 888 | $ 971 | $1,041 | $1,094 | $1,141 |
| Less: Capital Expenditures | (88) | (87) | (85) | (83) | (82) |
| Plus: Depreciation and Amortization | 82 | 82 | 82 | 82 | 82 |
| Plus: Other Amortization (3) | 123 | 123 | 123 | 124 | 124 |
| Less: Change in Working Capital | (94) | (162) | (82) | (8) | 36 |
| Less: Other (4) | (44) | (19) | (19) | (19) | (19) |
| Unlevered Free Cash Flow | $ 866 | $ 909 | $1,060 | $1,189 | $1,283 |

81.     Based on the December 2021 Sensitivity Cash Flows, and using a discount rate range of 8.0% to 9.5%, Qatalyst performed a second DCF Analysis that calculated a range of per share values for Citrix common stock of approximately $80.04 to $118.94.

82.     The Proxy does not indicate that the December 2021 Sensitivity Cases were shared with any outside third parties.

**The Transaction Committee Capitulates to Elliott and Vista on Price**

83.     On December 15, 2021, at a dinner attended by members of Citrix senior management and representatives of Elliott and Vista, Citrix's senior management presented the December 2021 Projections to Elliott and Vista.

84.     On December 28, 2021, the Transaction Committee held a meeting at which senior management provided an updated forecast regarding the financial results for the fourth quarter of 2021. As discussed below, the Q4 2021 results *beat* GAAP revenue guidance by a significantly wider margin than the Q3 2021 results had beat guidance. Thus, as of December 28, 2021, the Transaction Committee knew that, aside from the rapid growth in SaaS ARR, even GAAP revenue was improving, and given that knowledge, should have advised Qatalyst that the December 2021 Projections were outdated and needed to be updated. Instead, the Transaction Committee allowed Qatalyst to continue preparing its Fairness Opinion using the outdated and depressed December 2021 Projections and December 2021 Sensitivity Case.

85.     At the December 28 meeting participants also discussed a counter to the December 5 Proposal of Elliott and Vista, and adopting a defeatist attitude, concluded that Elliott and Vista were unlikely to go higher than $110.00 per share. Nevertheless, as a so-called "tactical negotiation matter," the Transaction Committee authorized Qatalyst to make a counterproposal of $120.00 per share in cash.

86.     On January 7, 2022, Calderoni shared preliminary results for Q4 2021 with the Transaction Committee. As discussed below, the Q4 2021 results *beat* GAAP revenue guidance by a significantly wider margin than the Q3 2021 results had beat guidance. Thus, if not earlier, then no later than January 7, 2022, the Transaction Committee knew that, aside from the rapid growth in SaaS ARR, even GAAP revenue was improving, and given that knowledge, should have advised Qatalyst that the December 2021 Projections were outdated and needed to be updated. Instead, the Transaction Committee allowed Qatalyst to continue preparing its Fairness Opinion using the outdated and depressed December 2021 Projections.

87.     On January 15, 2022, Qatalyst presented Elliott and Vista with the Transaction Committee's counterproposal of $120.00 per share in cash.

88.      On January 18, 2022, Elliott and Vista responded that they would not go higher than $110.00 per share. They also advised they were unwilling to agree to a "go shop" period (which as noted above, is a term that the Board had originally wanted). During subsequent calls, Qatalyst asked Eliott and Vista to raise their bid by $2.00 per share in cash.

89.     On January 28, 2022, Elliott and Vista not only rejected the Transaction Committee's requested increase, but mocked the Transaction Committee by reducing their bid further to $103.51 per share in cash, and indicated this was their "best and final offer" (as Cohn later confirmed for Calderoni in a call).

90.     Later that day, the Transaction Committee essentially begged Elliott and Vista to increase their bid to $104.00 per share in cash, a miniscule increase of $0.49—less than ½ percent. Elliott and Vista "generously" agreed.

91.     The $104.00 per share in cash at which the Board agreed to sell Citrix to Elliott and Vista represented only *4.1x* of Citrix's *trailing* 2021 SaaS ARR (i.e., $16.5 billion/$4 billion in SaaS ARR for all of 2021, conservatively estimated based on the results in the first three quarters in 2021) as compared to the *12.1x in expected* 2021 SaaS ARR at which Citrix agreed to buy Wrike from Vista when Wrike was growing SaaS ARR at an annual rate of only 30%. Since Citrix had been growing SaaS ARR at annual rate of 75% (as per the Q3 2021 Letter), $104.00 per share as a multiple of Citrix's *expected* SaaS ARR would have been considerably lower than 4.1x, thus making the price at which the Board agreed to sell to Elliott and Vista even more egregious when compared to the price paid to Vista for Wrike.

92.     On January 30, 2022, Qatalyst reviewed its various analyses of the Merger Consideration with the Transaction Committee and other members of the Board, including Qatalyst's DCF analyses based on the December 2021 Projections and one of the December 2021 Sensitivity Cases, purportedly based on the execution challenges facing Citrix (again ignoring the dramatic growth in SaaS ARR in 2021).

93.     Qatalyst thereafter presented its Fairness Opinion concluding that Merger Consideration was fair to Citrix Shareholders from a financial point of view. But based as it was on the false December 2021 Projections and false December 2021 Sensitivity Cases, Qatalyst's Fairness Opinion was also false. Nevertheless, concededly based in part on what it knew was a false Fairness Opinion, the Transaction Committee recommended that the Board (i) declare that the Merger was "in the best interests of [Citrix] stockholders," and (ii) recommend that Citrix

shareholders approve the Merger. With Defendants Kilcoyne and Hogan (but not Defendant Calderoni) recusing themselves, the full Board accepted the Transaction Committee's recommendations.

94.     On January 31, 2022, Citrix, Elliott and Vista executed the Merger Agreement, and issued a joint press release announcing the Merger.

**Citrix's Q4 2021 Results**

95.     On the same day that the Merger was announced, Citrix reported Q4 2021 and full year 2021 results. In Q4 2021, Citrix achieved revenue of $851 million, compared to $810 million in the fourth quarter of fiscal year 2020, representing 5 percent revenue growth. The $851 million revenue also *beat* guidance in the Q3 2021 Letter of $825 million to $835 million in revenue for Q4 2021.

96.     For fiscal year 2021, Citrix reported annual revenue of $3.22 billion. This result also *beat* guidance in the Q3 2021 Letter of $3.19 billion to $3.20 billion in revenue for full year 2021.

97.     In sum, Q4 2021 results showed that in addition to enormous growth in SaaS ARR, Citrix was also growing its overall revenue as the business model transition successfully proceeded.

98.     The Q4 2021 results reported by Citrix noticeably failed to discuss SaaS ARR growth. This omission is highly suspicious given that (i) both Henshall and Calderoni had both identified "ARR" as the "best metric" to measure Citrix's business success in the Q2 2021 and Q3 2021 Letter, respectively, and (ii) the Board was linking future performance-based equity awards ("PRSUs") to ARR growth. It is reasonable to infer that SaaS ARR continued to experience explosive growth in Q4 2021, and was therefore omitted because it would have only highlighted the unfairness of the Merger Consideration.

99.     The Merger closed on September 30, 2022, and Vista and Elliott have since combined Citrix and TIBCO into a new entity called Cloud Software Group.

**Receipt of Different Consideration by Officers and Directors**

100.     The Proxy acknowledges that "Citrix's non-employee directors and executive officers have interests in the Merger that may be different from, or in addition to, the interests of Citrix shareholders generally." Among those differing and additional interests was the acceleration and conversion of all Citrix equity awards (i.e., RSUs, PRSUs and DSUs), whether vested or unvested, into a right to receive the Merger Consideration based on the number of shares underlying each such award.

101.     The acceleration of the PRSU's granted was particularly attractive to senior Citrix executives since, according to the Proxy, the PRSU's were deemed to satisfy maximum performance levels and thus pay up to 200% upon a Change of Control. Holders of the PRSU's would therefore receive $208.00 in cash (instead of just $104.00 in cash) for each share underlying such awards without actually having to satisfy the maximum performance levels to obtain such payout. Since the holders of PRSUs were Citrix's most senior executives, it is reasonable to infer that at least some of these executives were involved in the preparation of the false December 2021 Projections (which, according to the Proxy, were prepared by members of Citrix's senior management). The opportunity to receive $208.00 per share in cash for each PRSU (without actually having to satisfy the maximum performance level) would have provided a powerful incentive for such executives to help justify the Merger Consideration.

**Defendants Solicited Citrix Shareholders With a False and Misleading Proxy**

102.     The December 2021 Projections included in the Proxy and used by Qatalyst to prepare its Fairness Opinion were subjectively and objectively false because they deliberately disregarded the accelerating growth in SaaS ARR in 2021, and Citrix's positive momentum in its

business model transition towards higher value subscription-based revenue (which as both Henshall and Calderoni explained, would necessarily reduce GAAP revenue in the short-term because a subscription-based model results in more of the business booked in the current period being recognized in future periods). Likewise, the December 2021 Sensitivity Cases used by Qatalyst to prepare its Fairness Opinion were subjectively and objectively false because they assumed deteriorating metrics in terms of revenue and margin when, in fact, (i) improving revenue had been reported, and improving margins projected, in the Q3 2021 Letter, and (ii) the Q4 2021 results reported improving revenue. Nevertheless, as detailed below, the Board authorized (i) the inclusion of the false December 2021 Projections in the Proxy, and (ii) the use by Qatalyst of the false December 2021 Projections and one of the false December 2021 Sensitivity Cases to prepare the Fairness Opinion upon which the Board relied in part to approve the Merger and recommend that Citrix shareholders vote to approve the Merger. The Board did not genuinely believe the accuracy of the December 2021 Projections and the December 2021 Sensitivity Cases, but authorized their use by Qatalyst to justify the unfair and inadequate price at which the Board agreed to sell Citrix to Elliott and Vista.

***The December 2021 Projections and December 2021 Sensitivity Case Contained in the Proxy Were Subjectively and Objectively False***

103.    On November 4, 2021, in the Q3 2021 Letter, Defendant Calderoni stated:

> ***Despite achieving more than $1 billion in SaaS ARR in the third quarter of 2021, we are still in the early innings of our cloud transition with less than 15% of our current installed base having transitioned to cloud products. This continues to represent an <u>enormous opportunity</u> and provides a <u>strong tailwind</u> to support our SaaS ARR growth for year***s. Customers making the transition are realizing greater value as they shift to our cloud solutions, and we consistently see an uplift in price that exceeds our target 33% premium as customers derive added value, greater agility, and reduced total cost of ownership (TCO) as they migrate to SaaS from our on-premise perpetual Workspace offerings. ***Finally, the revenue headwinds from declining perpetual licenses are now largely behind us in our Workspace business as we reach the anniversary of the end of broad availability of perpetual Citrix Workspace licenses***. <u>***We believe Total ARR is the best metric to measure***</u>

*__the underlying health of our business__. __Over time, as we emerge from our cloud__*
*__transition, we would expect to see reported revenues grow more in line with Total__*
*__ARR__*.

104.     Concerning past execution challenges, Calderoni reassured investors that (i) "the revenue headwinds from declining perpetual licenses are now largely behind us;" (ii) "[o]ver time, as we emerge from our cloud transition, we would expect to see reported revenues grow more in line with Total ARR;" and (iii) 2021 would "be a trough in terms of both operating margin and cash flow." In particular, Calderoni explained that "[o]ur transition to a subscription model, and ultimately a cloud-delivered model, focuses on growing *higher value recurring revenue streams* that result in more of the business booked in the current period being recognized in future periods."

105.     Despite Calderoni's statements above, the Board—chaired by Calderoni—directed Citrix management to create the December 2021 Projections, which disregarded the accelerating growth in SaaS ARR. Given Calderoni's statements above, however, concerning accelerating SaaS ARR growth, projection that such growth would continue "for years," and the expectation that "reported revenues [would] grow more in line with Total ARR," the Board—especially Calderoni himself—could not have genuinely believed projections that ignored the accelerating SaaS ARR growth. Therefore, the December 2021 Projections were subjectively false.

106.     Additionally, the December 2021 Projections were objectively false because they ignored what Henshall and Calderoni had stated was the "best metric" to measure Citrix's business prospects, i.e., the accelerating growth in SaaS ARR. The December 2021 Projections also ignored that any execution challenges had been or were being addressed. As Calderoni explained, (i) "the revenue headwinds from declining perpetual licenses are now largely behind us;" (ii) "[o]ver time, as we emerge from our cloud transition, we would expect to see reported revenues grow more in

line with Total ARR;" and (iii) 2021 would "be a trough in terms of both operating margin and cash flow."

107.    Qatalyst further depressed the already false December 2021 Projections by presenting the even more pessimistic December 2021 Sensitivity Cases to the Transaction Committee purporting to reflect "**_lower revenue growth rates and operating margins_**," purportedly to "allow the Transaction Committee to consider the December 2021 Projections in light of the execution challenges facing the Company." As noted, however, in Q3 2021, Citrix reported $778 million in revenue, which _beat_ the guidance of $765 million to $775 million in GAAP revenue for Q3 2021 projected on July 29, 2021 in the Q2 2021 Letter. Thus, there was no basis for Qatalyst to assume "**_lower revenue growth_**" in the December 2021 Sensitivity Cases.

108.    Moreover, on December 28, 2021, senior management provided an updated forecast to the Transaction Committee regarding the financial results for the fourth quarter of 2021. As discussed above, the Q4 2021 results _beat_ GAAP revenue guidance by a significantly wider margin than the Q3 2021 results had beat guidance. Thus, as of December 28, 2021, the Transaction Committee knew that, aside from the rapid growth in SaaS ARR, even GAAP revenue was improving, and given that knowledge, should have advised Qatalyst that the December 2021 Projections were outdated and needed to be updated.

109.    Further, in the Q3 2021 Letter, Calderoni had stated that he expected 2021 would "be a trough in terms of both _operating margin_ and cash flow." The Q3 2021 Letter also forecast for full year 2021 (i) GAAP Operating Margin of approximately 10%, (ii) Non-GAAP Operating Margin of approximately 25%, (iii) GAAP Diluted EPS of $1.81 to $1.87 per share, and (iv) Non-GAAP Diluted EPS of $4.90 to $4.95 per share. All of these metrics showed improvement over the forecasts in the Q2 2021 Letter for full year 2021 of (i) GAAP Operating Margin of

approximately 8-9%, (ii) Non-GAAP Operating Margin of approximately 24-25%, (iii) GAAP Diluted EPS of $1.45 to $1.66 per share, and (iv) Non-GAAP Diluted EPS of $4.75 to $4.95 per share. Thus, there was no basis for Qatalyst to assume "***lower operating margins***" in the December 2021 Sensitivity Cases.

110.    Finally, it is telling that Qatalyst did not perform any sensitivity analysis to illustrate the potential *upside* to the December 2021 Projections from continued strong progress in transitioning to cloud-based solutions, and the continued enormous growth in SaaS ARR.

111.    Given the failure of senior management to consider Citrix's enormous progress in transitioning to cloud-based solutions, and enormous growth in SaaS ARR during 2021, when formulating the December 2021 Projections, it is clear that neither the December 2021 Projections nor the December 2021 Sensitivity Cases created by Qatalyst reflected the legitimately held opinion of senior Citrix management regarding Citrix's prospects. Instead, it is plain that (i) the optimistic statements concerning SaaS ARR growth shared by Henshall in the Q1 2021 Letter and Q2 2021 Letter, and Defendant Calderoni in the Q3 2021 Letter, represented the legitimately held opinion of Citrix management concerning the future prospects for Citrix, and (ii) the unduly pessimistic December 2021 Projections and December 2021 Sensitivity Cases were created solely for the improper purpose of engineering a DCF Analysis that would allow Qatalyst to conclude that the Merger Consideration was fair to Citrix shareholders.

***The Qatalyst Fairness Opinion Was False and Misleading***

112.    Since the DCF Analysis performed by Qatalyst and incorporated into the Qatalyst Fairness Opinion was based on the false December 2021 Projections and December 2021 Sensitivity Case, the Qatalyst Fairness Opinion was itself false and misleading. Had the DCF Analysis used reasonable and accurate projections that Citrix management genuinely believed (instead of using the false December 2021 Projections, false December 2021 Cash Flows, false

December 2021 Sensitivity Case, and false December 2021 Sensitivity Case Cash Flows), the low end of value per share ranges derived from the DCF Analysis would have exceeded the Merger Consideration and indicated that the Merger Consideration was not fair.

113.    Additionally, the Qatalyst Fairness Opinion used an inflated discount rate range of 8.0% to 9.5% (based on a methodology not fully disclosed in the Proxy) to further depress the value of Citrix. Notably, a DCF analysis performed by online research firm Simply Wall Street uses a discount rate of 6.77% (based on a fully disclosed methodology).

114.    The higher discount rate of 8.0% to 9.5% used by Qatalyst (according to an undisclosed methodology) depressed the value range for Citrix's shares. *See In re Topps Co. S'holders Litig.*, 926 A.2d 58, 76 (Del. Ch. 2007) (raising discount rates drives down the resulting value range). Citrix Shareholders are entitled to further disclosure on how Qatalyst derived its excessively high discount rate range. *See Topps*, 926 A.2d at 76 (subjective judgments regarding discount rates are not scientific, "but highly-paid valuation advisors should be able to rationally explain them.").

115.    With respect to Qatalyst's *Selected Transactions Analysis*, Qatalyst failed to include Citrix's purchase of Wrike from Vista in January 2021. As noted, Citrix acquired Wrike from Vista for $2.25 billion when Wrike was projected to grow its SaaS ARR by 30 percent to between $180 million and $190 million in 2021, yielding a multiple of 12.1x *expected* annual SaaS recurring revenue. That omission was likely intentional since it indicates that selling Citrix to Elliott and Vista for only $16.5 billion (including the assumption of Citrix debt)—a multiple of only 4.1x Citrix's *trailing* SaaS ARR in 2021—is highly unfair and inadequate.

**Loss Causation Allegations**

116.    Defendants' material misrepresentations and omissions in the Proxy caused actual economic loss to Citrix shareholders as measured by the difference between the inadequate and

unfair Merger Consideration and the higher true value of Citrix's shares based on, among other things, the accelerating growth in SaaS ARR in 2021, and the higher multiple that should have been assigned to Citrix based on such growth (as illustrated by the *12.1x expected* 2021 SaaS ARR that Citrix paid to Vista for Wrike in January 2021).

117.    In the Proxy, the Board recommended that Citrix stockholders approve the Merger based in material part on the false and misleading Fairness Opinion, which was premised in material part on the false December 2021 Projections and a false December 2021 Sensitivity Case, as well as inflated discount rates.  Had the projections prepared by Citrix senior management taken into account accelerating SaaS ARR growth, improving GAAP revenue and other positive trends in Citrix's financial performance in 2021, those projections would have yielded more accurate cash flows. In turn, had accurate cash flows been used as inputs in Qatalyst's DCF Analysis (instead of the false December 2021 Cash Flows and false December 2021 Sensitivity Cash Flows), and had Qatalyst used reasonable discount rates, the DCF Analysis would have indicated that the value of Citrix's shares substantially exceeded $104.00 per share, and Qatalyst could not have opined that the Merger Consideration was fair. In turn, if Qatalyst could not opine that the Merger Consideration was fair, the Board could not have recommended that Citrix shareholders approve the Merger, and Citrix, Elliott and Vista could not have consummated the Merger unless Elliott and Vista were willing to submit a bid higher than $104.00 per share. That is to say, but for the false December 2021 Projections and December 2021 Sensitivity Case, and inflated discounted rates used by Qatalyst, Qatalyst would not have issued the Fairness Opinion; the Board could and would not have recommended that Citrix shareholders vote for the Merger; the requisite percentage of Citrix shareholders would not have voted for the Merger; and Citrix shareholders would not have been cashed out of their shares for the inadequate and unfair Merger Consideration.

## CLASS ACTION ALLEGATIONS

118.     Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class ("Class") consisting of all individuals and entities that were Citrix common shareholders of record as of the close of business on September 30, 2022 ("Class Period"), when the Merger closed. Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

119.     Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

120.     The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, the Proxy discloses that, as of the close of business on March 8, 2022, there were 125,913,152 shares of Citrix common stock outstanding and eligible to vote on the Merger. All members of the Class may be identified from records maintained by Citrix or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

121.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws specified above.

122.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests antagonistic to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in securities class action litigation of this nature.

123.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

>     (i)     Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

>     (ii)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

>     (iii)     Whether Plaintiff and the other members of the Class are entitled to damages, and in what amount.

124.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

125.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class as a whole is appropriate.

## CLAIMS FOR RELIEF

### COUNT I

**Against All Defendants**
**for Violations of Section 14(a) of the Exchange Act and Rule 14a-9**

126.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

127.     SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any Proxy, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is

made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

128.   By virtue of their positions within the Company, and/or roles in the process of preparing, reviewing, and/or disseminating the Proxy, Defendants were or should have been aware of their duty not to make false and misleading statements in the Proxy, and not to omit material facts from the Proxy necessary to make statements made therein—in light of the circumstances under which they were made—not misleading.

129.   Yet, as specified above, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, Defendants filed a Proxy that (i) made untrue statements of material fact in the Proxy, and (ii) omitted material facts necessary to make statements therein— in light of the circumstances under which they were made—not misleading, in order to induce Citrix shareholders to vote in favor of the Merger and related proposals. Defendants were at least negligent in filing the Proxy with these material misrepresentations and omissions.

130.   The Proxy was an essential link in the accomplishment of the Merger since it solicited Citrix shareholders to vote to approve the Merger, and the solicitation of such votes enabled Defendants to consummate the Merger.

131.   The misrepresentations and omissions in the Proxy specified above are material insofar as there is a substantial likelihood that a reasonable Citrix stockholder would consider them important in deciding whether to vote in favor of the Merger and related proposals. In addition, a reasonable Citrix stockholder would view disclosures of the omitted facts specified above as significantly altering the "total mix" of information made available to Citrix shareholders.

132.     As a direct result of the Defendants' dissemination of the false and misleading Proxy, Plaintiff and other members of the Class were deprived of their right to be presented with accurate proxy materials while asked to vote on the Merger, were caused to vote in favor of the Merger, were caused to not exercise their appraisal rights, and were caused to sell their shares for less than the fair value of those shares.

133.     By reason of the misconduct detailed herein, the Defendants are liable pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

## COUNT II

**Against the Individual Defendants for
Violations of Section 20(a) of the Exchange Act**

134.     Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein

135.     The Individual Defendants acted as controlling persons of Citrix within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their positions as officers and/or directors of Citrix, and participation in, and/or awareness of Citrix's operations, and/or intimate knowledge of the contents of the Proxy filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Citrix with respect to the Proxy, including the content and dissemination of the various statements in the Proxy that Plaintiff contends are materially false and misleading, and the omission of material facts specified above.

136.     Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

137.    Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Citrix, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised same. In particular, the Proxy at issue references the unanimous recommendation of the Board to approve the Merger, and recommend that Citrix shareholders vote for the Merger. The Individual Defendants were thus directly involved in the making of the Proxy.

138.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered in connection with such negotiation, review and approval. The Individual Defendants thus directly participated in the drafting of the Proxy.

139.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a), by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**<u>PRAYER FOR RELIEF</u>**

WHEREFORE, Plaintiff prays for judgment and relief as follows:

A.      Preliminarily Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure; appointing Plaintiffs as the Class Plaintiffs; and appointing Lead Counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and other Class Members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including reasonable attorneys' fees and expert fees; and

D.      Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all claims and issues so triable.

Dated: December 12, 2022                          Respectfully submitted,

**MILLER SHAH LLP**

*/s/ Jayne A. Goldstein*
Jayne A. Goldstein (FBN 144088)
1625 N. Commerce Pkwy, Suite 320
Fort Lauderdale, FL 33326
Telephone: (954) 903-3170
Facsimile: (866) 300-7367
jagoldstein@millershah.com

**POMERANTZ LLP**
Emma Gilmore
(*pro hac vice* application forthcoming)
600 Third Avenue, 20th Floor
New York, NY 10016
Telephone: (212) 661-1100
Facsimile: (917) 463-1044
egilmore@pomlaw.com

**WOHL & FRUCHTER LLP**
Joshua E. Fruchter
(*pro hac vice* application forthcoming)
25 Robert Pitt Drive, Suite 209G
Monsey, NY 10952
Telephone: (845) 290-6818
Facsimile: (718) 504-3773
jfruchter@wohlfruchter.com

*Attorneys for Plaintiff*

DocuSign Envelope ID: A217801B-501C-471C-8053-87DAC0ACADC2

## CERTIFICATION PURSUANT
## TO FEDERAL SECURITIES LAWS

1.     I, Juan A. Vargas, make this declaration pursuant to the Private Securities Litigation Reform Act of 1995.

2.     I have reviewed a Complaint against Citrix Systems, Inc. and other defendants ("Citrix" or the "Company") and authorize the filing of a comparable complaint on my behalf.

3.     I did not purchase or acquire Citrix securities at the direction of plaintiffs' counsel or in order to participate in any private action arising under the federal securities laws.

4.     I am willing to serve as a representative party on behalf of a Class of investors who purchased or otherwise acquired Citrix securities during the Class Period, including providing testimony at deposition and trial, if necessary.  I understand that the Court has the authority to select the most adequate lead plaintiff in this action.

5.     The attached sheet lists all of my transactions in Citrix securities during the Class Period specified in the Complaint.

6.     During the three-year period preceding the date on which this Certification is signed, I have not served or sought to serve as a representative party on behalf of a class under the federal securities laws.

7.     I agree not to accept any payment for serving as a representative party on behalf of the class as set forth in the Complaint, beyond my *pro rata* share of any recovery, except such reasonable costs and expenses directly relating to the representation of the class as ordered or approved by the Court.

8.      I declare under penalty of perjury under the laws of the United States of America

that the foregoing is true and correct.

**Executed** _____
12/9/2022

                              **(Date)**



_____

                    **(Signature)**


                    <u>Juan A. Vargas</u>
                    **(Type or Print Name)**

**Citrix Systems, Inc.**                                                                                    **Juan A. Vargas**

### List of Purchases and Sales

| Transaction Type | Date | Number of Shares/Unit | Price Per Share/Unit |
|---|---|---|---|
| Purchase | 8/1/2017 | 50 | $67.6700 |
| Purchase | 2/1/2018 | 52 | $69.2200 |
| Purchase | 8/1/2018 | 48 | $76.4700 |
| Purchase | 2/1/2019 | 40 | $88.2300 |
| Purchase | 8/1/2019 | 53 | $80.1200 |
| Purchase | 1/31/2020 | 41 | $85.7300 |
| Purchase | 7/31/2020 | 47 | $99.3500 |
| Purchase | 2/1/2021 | 30 | $112.6400 |
| Purchase | 7/30/2021 | 48 | $85.6400 |
| Purchase | 2/1/2022 | 41 | $87.0100 |
| Sale | 10/9/2017 | (50) | $80.0000 |
| Sale | 3/20/2018 | (52) | $95.0000 |
| Sale | 8/22/2018 | (48) | $112.0000 |
| Sale | 1/8/2020 | (134) | $114.0000 |
| Sale | 4/2/2020 | (77) | $145.0000 |
| RSU* | 3/29/2019 | 41 | |
| RSU* | 3/7/2020 | 36 | |
| RSU* | 3/29/2021 | 37 | |
| RSU* | 4/1/2021 | 9 | |

*Restricted Stock Units