UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
**------------------------------------------------------------**

GEORGE MESSIHA and JUAN A. VARGAS,
Individually and on Behalf of All Others
Similarly Situated,

               Plaintiff,

       v.

CITRIX SYSTEMS, INC., ROBERT M.
CALDERONI, NANCI E. CALDWELL,
MURRAY J. DEMO, THOMAS E. HOGAN,
MOIRA A. KILCOYNE, ROBERT E.
KNOWLING, JR., PETER J. SACRIPANTI,
and J. DONALD SHERMAN.

               Defendants.

Case No. 1:22-cv-62327-RAR

**AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

**CLASS ACTION**

**JURY TRIAL DEMANDED**

**TABLE OF CONTENTS**

I.      NATURE OF THE ACTION ................................................................................. 4

II.     JURISDICTION AND VENUE ........................................................................... 17

III.    PARTIES .............................................................................................................. 17

IV.     SUBSTANTIVE ALLEGATIONS ...................................................................... 19

        A.      Company Background .............................................................................. 19

                1.      Cloud-Based Computing................................................................ 19

                2.      Citrix's Transition to Cloud-Based Solutions.............................. 19

                3.      Elliott's Prior Relationship with Defendants ............................... 20

        B.      Relevant Events at Citrix Prior to the Merger ...................................... 23

                1.      Citrix Acquired Wrike from Vista for 16.1x Trailing SaaS ARR for 2020................................................................................................. 23

                2.      Citrix Links Performance-Based Equity Awards to ARR Growth........... 23

                3.      Citrix's Q1 2021 Results............................................................... 24

                4.      Citrix's Q2 2021 Results............................................................... 25

        C.      Merger Negotiations and the Merger ...................................................... 26

                1.      Elliott Initiates Negotiations to Acquire Citrix ........................... 26

                2.      Elliott's Initial Indication of Interest of $124.00-$130.00 Per Share in Cash............................................................................................... 28

                3.      The September 2021 Projections ................................................... 29

                4.      Elliott's Revised Indication of Interest of $125.00 Per Share in Cash ..... 30

                5.      The Board Forms a Conflicted Transaction Committee .......................... 31

                6.      Citrix's Q3 2021 Results............................................................... 32

                7.      Elliott's and Vista's Revised Indication of Interest of $110.00 Per Share in Cash .......................................................................................... 36

                8.      The December 2021 Projections ................................................... 36

                9.      The Transaction Committee Capitulates to Elliott and Vista on Price ..... 39

                10.     Citrix's Q4 2021 Results............................................................... 42

        D.      Events After Announcement of the Merger.......................................... 43

        E.      Receipt of Different Consideration by Officers and Directors ............................. 44

V.  DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE PROXY STATEMENT ............................................................ 48

    A.  Misstatements and Omissions That Rendered Statements in the Proxy About the Q2 and Q3 2021 Results Misleading ............................................. 50

    B.  Misstatements and Omissions That Rendered Statements in the Proxy About the Q2 2021 Results Misleading ...................................................... 51

    C.  Misstatements and Omissions in the Proxy About the Q3 2021 Results Were Misleading ........................................................................ 53

    D.  The December 2021 Projections and December 2021 Sensitivity Case Contained in the Proxy Were Subjectively and Objectively False and Misleading ........................................................................................ 54

    E.  The Qatalyst Fairness Opinion Was False and Misleading ................................. 58

    F.  Statements in the Proxy That the Transaction Committee Consisted of Independent and Disinterested Directors Were False and Misleading ................ 61

    G.  Omissions in the Proxy Concerning Past Ties Between Defendant Calderoni and Elliott Rendered Statements Misleading ....................................... 62

    H.  Statements in the Proxy That the Merger Was "In the Best Interests" of Citrix Shareholders Were False and Misleading ............................................ 63

    I.  Misstatement in the Proxy That the December 2021 Projections Represented Management's Best Currently Available Estimate of Citrix's Future Financial Performance Were False and Misleading ............................ 64

VI.  LOSS CAUSATION ........................................................................... 65

VII.  CLASS ACTION ALLEGATIONS ....................................................... 67

COUNT I
(Against All Defendants for Violations of Section 14(a) of the Exchange Act  and Rule 14a-9) ............................................................................... 69

COUNT II
(Against the Individual Defendants for Violations of  Section 20(a) of the Exchange Act) ............................................................................................. 70

PRAYER FOR RELIEF ............................................................................ 72

JURY DEMAND .................................................................................... 73

Lead Plaintiffs George Messiha and Juan A. Vargas ("Plaintiffs"), on behalf of a class of all individuals and entities that were Citrix common shareholders of record as of September 30, 2022 when the Merger closed ("Class"), bring this Amended Complaint for Violations of the Federal Securities Laws ("Complaint") against Citrix Systems, Inc. ("Citrix" or the "Company"), and former members of Citrix's board of directors Robert M. Calderoni, Nanci E. Caldwell, Murray J. Demo, Thomas E. Hogan, Moira A. Kilcoyne, Robert E. Knowling, Jr., Peter J. Sacripanti, and J. Donald Sherman (collectively, the "Board" or the "Individual Defendants," and together with Citrix, "Defendants").[1]

Lead Plaintiffs' claims are based on personal knowledge as to their own acts, and on information and belief as to all other matters, based upon, among other things, a review and analysis of: (1) reports and documents filed by Citrix with the Securities and Exchange Commission ("SEC"); (2) press releases, news articles, transcripts, videos, and other public statements issued by Citrix or the Individual Defendants about Citrix's business; and (3) other publicly available information concerning Citrix, its business, and the allegations in this Complaint. Lead Plaintiffs believe that substantial additional evidentiary support exists for the allegations in this Complaint.[2]

## I.   NATURE OF THE ACTION

1.     Plaintiffs bring this action on behalf of themselves and other former shareholders of Citrix against the Company and the Board for violations of Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. § 78n(a) and § 78t(a), and

---

[1] Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

[2] All emphasis in quotes below is added unless otherwise noted.

Securities and Exchange Commission ("SEC") Rule 14a-9 promulgated thereunder, 17 C.F.R. § 240.14a-9(a) ("Rule 14a-9").

2.      Plaintiffs' claims arise out of the Board's dissemination of false projections and other false and misleading statements and omissions that misled Citrix stockholders concerning the future financial prospects of Citrix and the true value of Citrix stock, and thereby secured the approval of such stockholders to sell Citrix to Vista Equity Partners ("Vista") and Elliott Investment Management L.P. ("Elliott") for the inadequate and unfair price of $104.00 per share in cash ("Merger Consideration"), pursuant to a merger ("Merger") under which Citrix became a wholly-owned subsidiary of TIBCO Software, Inc. ("TIBCO"), a portfolio company of Vista.

3.      Citrix sells digital workspace solutions that provide an organization's employees with unified, reliable and secure access to all of their work resources (applications, content, etc.) across all of the organization's computing devices and locations. Originally, Citrix mostly (i) sold its workspace solutions to customers based on perpetual software licenses pursuant to which customers paid upfront for lifetime access and support based on a certain number of users, and (ii) installed its workspace solutions in data centers located on the premises of its customers. But as the software industry evolved and shifted from perpetual licenses to subscriptions (featuring an annual recurring fee), and from on-premise computing to cloud computing (pursuant to which software is delivered over the Internet by a third-party hosting company), Citrix sought to change its business model to deliver its workspace solution to customers via the cloud pursuant to Software-as-a-Service ("SaaS") licenses featuring Annual Recurring Revenue (or "ARR").[3]

---

[3] Citrix explained in its SEC filings that "ARR" is "an operating metric that represents the contracted recurring value of all termed subscriptions normalized to a one-year period. It is calculated at the end of a reporting period by taking each contract's recurring total contract value and dividing by the length of the contract. ARR includes only active contractually committed,

4.      On January 19, 2021, as part of its transition to a cloud-based business, Citrix announced that it had agreed to pay $2.25 billion in cash to Vista to acquire Wrike, Inc. ("Wrike"), a provider of cloud-based collaborative work management programs. According to the press release announcing the deal, Wrike was expected to grow its $140 million in 2020 SaaS ARR by 30 percent to between $180 million and $190 million SaaS ARR in 2021. Citrix thus acquired Wrike from Vista for a multiple of approximately *16.1x trailing* 2020 SaaS ARR (i.e., 16.1 x $140M = $2.25B), and *12.2x expected* 2021 SaaS ARR (i.e., 12.2 x $185M (midpoint) = $2.25B).

5.      By early 2021, Citrix was experiencing accelerated momentum in transitioning its customers to the cloud.  In an April 16, 2021 letter to Citrix shareholders accompanying Citrix's 2021 Notice of Annual Meeting ("April 2021 Meeting Notice"), Defendant Calderoni, in his capacity as Board Chairman, explained that ARR "*is the metric that we believe is best aligned with the company's business transition and strategy,*" and "the best indicator of the overall health and trajectory of the business because it captures the pace of Citrix's transition and is a *forward-looking indicator of top line trends*." Calderoni further advised that as a result of Citrix's continued focus on transitioning customers to the cloud, "the Compensation Committee decided to link performance-based equity awards granted during fiscal year 2021 with Software-as-a-Service ARR, or SaaS ARR, growth, rather than ARR growth [as had been the case in 2020], to further drive our business model transition to the cloud." This was a highly significant change since Citrix had a compensation policy providing for at least 60% of annual equity awards to senior executives to be awarded as Performance-Based Restricted Stock Units ("PRSUs").

---

fixed subscription fees." In turn, "SaaS ARR represents the contracted recurring value of all *cloud* subscriptions normalized to a one-year period." As discussed below, Defendant Calderoni publicly referred to ARR as the "*best metric*" to measure the momentum and success of Citrix's business.

6.      On April 29, 2021, Citrix announced its Q1 2021 results. In a letter to shareholders ("Q1 2021 Letter"), then CEO David Henshall ("Henshall") wrote that our first quarter results "reflect *accelerated* momentum in our cloud transition with more of our installed base moving to the cloud, driving an *increased* mix shift towards SaaS and *acceleration* of SaaS ARR." Among other metrics, Henshall highlighted that "[i]nclusive of Wrike's contribution, total SaaS ARR was *$943 million*, *up 70% year-over-year*." Further, SaaS revenue accounted for 22% of total revenue, up from 14% in Q1 2020.

7.      On July 29, 2021, Citrix announced its Q2 2021 results. In a letter to shareholders ("Q2 2021 Letter"), Henshall reported that, inclusive of Wrike, "SaaS ARR [was] *more than $1B*, *up 74% year-over-year*." Additionally, SaaS revenue accounted for 26% of total revenue, up from 16% in Q2 2020. Commenting on SaaS ARR growth, Henshall shared that as "we progress through this transition, we continue to believe that SaaS ARR is *the best way* to measure the progress we are making in transitioning our business to the cloud."

8.      On September 9, 2021, Elliott submitted a written, non-binding indication of interest ("IOI") proposing to acquire Citrix for $124.00 to $130.00 per share in cash.

9.      With an offer on the table, the Board needed projections to provide to its financial advisor, Qatalyst Partner LP ("Qatalyst"), to undertake financial analyses and prepare a formal opinion ("Fairness Opinion") opining on the fairness to Citrix stockholders of any sales price ultimately agreed upon. To that end, on September 23, 2021, the Board reviewed and approved projections ("September 2021 Projections") prepared by senior management for revenue, and non-GAAP gross profit, operating income, net income, and EBITDA, for the remainder of fiscal year 2021, and fiscal years 2022 through 2026. The September 2021 Projections were shared with Qatalyst and potential bidders.

10.     Then suddenly, on October 6, 2021—in the midst of discussions with Elliott and other potential bidders over the sale of Citrix—Henshall abruptly resigned as CEO and was replaced by Defendant Calderoni (who had been serving as Chairman of the Board). As detailed further below, Calderoni has long and deep ties to Elliott from his service at Citrix and other companies in which Elliott had invested, and as a consultant to Elliott. A relative of Calderoni even worked for Elliott.

11.     On October 18, 2021, Elliott submitted an updated non-binding IOI to acquire Citrix for $125.00 per share in cash. A few days later, on October 21, 2021, the Board formed a Transaction Committee to negotiate with Elliott, Vista and other potential bidders, and advise the Board concerning any proposed transaction. A majority of the members of the Transaction Committee, however, had prior ties to Elliott or Vista, and thus suffered from potential conflicts of interest (which were never disclosed to Citrix stockholders). Notably, of all the potential bidders, only Elliott and Vista ever submitted bids to acquire Citrix from which it can be reasonably inferred that such other bidders perceived that the playing field was tilted in favor of Elliott and Vista because of the past ties between them and Calderoni and other Citrix Board members.

12.     On November 4, 2021, in the midst of its sales process, Citrix announced superior Q3 2021 results. In a letter to shareholders ("Q3 2021 Letter"), Calderoni wrote that "the third quarter was the *fourth consecutive quarter* of *accelerating* organic SaaS ARR growth – a clear sign that our SaaS offerings are *resonating with customers*." Among other metrics, Calderoni

reported that, inclusive of Wrike, "SaaS ARR [was] *$1.1 billion*, *up 75% year-over-year*." Thus, after the first three quarters of 2021, Citrix had reported slightly over $3 billion of SaaS ARR:[4]

| Quarter | SaaS ARR |
|---|---|
| Q1 2021 | $943 million |
| Q2 2021 | $1 billion |
| Q3 2021 | $1.1 billion |
| Totals | **$3 billion** |

13.     With SaaS ARR growth accelerating, Citrix was easily on track to report more than $4 billion in SaaS ARR for the full  year 2021. Indeed, yet again, SaaS revenue grew as a percentage of total revenue, to 29% (up from 18% in Q3 2020). The Q3 2021 Letter thus made clear that Citrix was hitting on all cylinders with respect to the best metric—SaaS ARR—to measure the success of its cloud transition.

14.     In the Q3 2021 letter, Calderoni further observed that "Total ARR also grew faster year-over-year than the prior quarter, demonstrating a continued acceleration of our subscription transition," and stressed that "Total ARR is the *best metric* to measure the underlying health of our business."  Moreover, despite some recent execution challenges, Calderoni reassured investors that (i) "the revenue headwinds from declining perpetual licenses are now largely behind us;" (ii) "[o]ver time, as we emerge from our cloud transition, *we would expect to see reported revenues grow more in line with Total ARR*;" and (iii) 2021 would "be a trough in terms of both operating margin and cash flow" (with Calderoni announcing a margin improvement program).

---

[4] During the first three quarters of 2021, Citrix had recognized total GAAP revenue of $2.37 billion. SaaS ARR exceeded total GAAP revenue because, as noted above, ARR looks at the total value of a contract, which can be several years in duration, and then normalizes that value to a one-year period.

15.     Calderoni further explained that "[o]ur transition to a subscription model, and ultimately a cloud-delivered model, focuses on growing *higher value recurring revenue streams* that result in more of the business booked in the current period being recognized in future periods." Yet, even with more revenue being recognized in future periods as a result of the transition to cloud-based subscriptions, Citrix reported $778 million in revenue in Q3 2021, which *beat* the guidance of $765 million to $775 million in GAAP revenue for Q3 2021 projected in the Q2 2021 Letter. Citrix then *beat* revenue guidance again by an even wider margin with its Q4 2021 results, reporting $851 million in GAAP revenue on January 31, 2022—the same day the Merger was announced—versus the $825 million to $835 million in GAAP revenue for Q4 2021 projected on in the Q3 2021 Letter.[5]

16.     In sum, by the final two quarters of 2021, Citrix's financial performance was moving in an unmistakably positive direction as SaaS ARR continued to accelerate, revenue was beating guidance, and margin was forecasted to improve. Indeed, on the last analyst conference call held on November 4, 2021, to discuss the Q3 2021 results ("Q3 2021 Conference Call"), Calderoni told analysts that "[t]his is a business with a lot of tailwinds," that "should fuel growth for quite some time;" reported strong and improving renewal rates and "*a lot of metrics . . . that are very, very encouraging;*" and dismissed as "misinformed" any narrative "questioning the health and the strength of the business."

17.     Yet, the Transaction Committee and the Board inexplicably failed to take these positive trends into account during the sales process. On November 19, 2021, Qatalyst authorized Vista to work with Elliott on a joint bid. Thereafter, on December 5, 2021, Elliott and Vista

---

[5] Notably absent from the press release announcing Q4 2021 results on the same day the Merger was any mention of SaaS ARR growth.

submitted a new non-binding IOI of just $110.00 per share ("December 5 Proposal")—12% lower than Elliott's October 18 Proposal of $125.00 per share.

18.     Given its awareness of the accelerating growth in SaaS ARR, improving GAAP revenue, and the overall positive direction of Citrix's financial performance, the Transaction Committee had to find a way to justify the fairness of the substantially lower price at which Elliott and Vista were now offering to buy Citrix if there was going to be a deal. In particular, the Transaction Committee was confronted with the very uncomfortable fact that the Board had agreed in January 2021 to pay *16.1x trailing* 2020 SaaS ARR to Vista for Wrike (when it was expected to grow SaaS ARR by 30% in 2021), but was now contemplating selling *the entire Citrix* (*including* Wrike) to Elliott and Vista at an *enormous* discount to that multiple. Specifically, with 125.9 million shares outstanding, a price of $110.00 per share valued Citrix's equity at approximately $13.8 billion, and yielded a total transaction value of approximately $17.2 billion, including Citrix's debt. Despite Citrix's improving GAAP revenue and accelerating growth in SaaS ARR— which at greater than 70% *was more than double* the 30% growth rate in Wrike's SaaS ARR when it was acquired by Citrix—$110.00 per share thus represented a multiple of only *4.3x trailing* 2021 SaaS ARR (i.e., $17.2 billion/$4 billion in projected SaaS ARR for full year 2021)—approximately 25% of the multiple the Board had agreed to pay Vista for Wrike at the start of 2021. In short, the Board was confronted with the prospect of buying high and selling low—a sure path to destruction of shareholder value.

19.     A truly independent Board would have outright declined Elliott and Vista's offer. But the Board, as well as the Transaction Committee, were conflicted, and instead asked Citrix senior management to quickly prepare a new set of depressed projections. Specifically, on December 7, 2022—amazingly, just *two* days *after* Elliott's and Vista's sharply reduced joint bid

of $110.00 per share—Citrix management presented a whole new set of projections ("December 2021 Projections") to the Board that substantially reduced the projected revenue and other metrics in the September 2021 Projections by increasingly larger percentages (thus evidencing a purportedly deteriorating business). For example, the December 2021 Projections reduced projected revenue in the September 2021 Projections by:

- 1.7% in 2021
- 2.4% in 2022
- 4.4% in 2023
- 4.0% in 2024
- 5.0% in 2025
- 5.7% in 2026

*See* Exhibit A hereto.

20.     The December 2021 Projections also forecast lower margins, reducing Non-GAAP Operating Income in the September 2021 Projections by:

- 1.6% in 2021
- 3.8% in 2022
- 5.5% in 2023
- 3.9% in 2024
- 4.9% in 2025
- 5.8% in 2026

*See* Exhibit A hereto.

21.     Worse, Qatalyst—a curiously common fixture on the target side in Elliott and Vista deals—took the already depressed December 2021 Projections and prepared sensitivity analyses ("December 2021 Sensitivity Cases") that modeled a "downside case" of even *lower* revenue growth and *lower* operating margins, which further reduced the revenue and Non-GAPP Operating Income forecast in the September 2021 Projections. Specifically, the December 2021 Sensitivity Cases ultimately used by Qatalyst in preparing the Fairness Opinion slashed revenue in the September 2021 Projections by:

- 4.3% for 2022
- 7.9% for 2023
- 9.3% for 2024
- 11.9% for 2025
- 14.3% for 2026

*See* Exhibit B hereto.

22.    Qatalyst cut Non-GAAP Operating Income even more sharply in the December 2021 Sensitivity Case as compared to the September 2021 Projections with reductions of:

- 5.7% in 2022
- 13.0% in 2023
- 15.7% in 2024
- 18.1% in 2025
- 20.5% in 2026

*See* Exhibit B hereto.

23.    In light of the robust results reported for Q3 2021—*beating* revenue guidance and reporting *accelerating* SaaS ARR—the assumptions of *falling* revenue and *falling* margins underlying the December 2021 Projections and December 2021 Sensitivity Cases made no sense, and were flatly contradicted by Calderoni's positive and optimistic public statements to investors and analysts in connection with reporting Q3 2021 results. For example:

- In the April 2021 Meeting Notice, Calderoni stated that ARR growth was a "*forward-looking indicator of top line trends*," which meant that with accelerating SaaS ARR accounting for an increasingly larger percentage of total revenue each quarter, revenue growth would accelerate in future years, and yet the December 2021 Projections and the December 2021 Sensitivity Case assumed *lower* revenue growth rates,

- In the Q3 2021, Calderoni stated that "revenue headwinds from declining perpetual licenses are now largely behind us," which also contradicted the assumption of *lower* revenue growth rates in the December 2021 Projections and December 2021 Sensitivity Cases

- In the Q3 2021 Letter, Calderoni stated that 2021 would "be a trough in terms of both operating margin and cash flow" (in part due to a new margin improvement program), and yet the December 2021 Projections and December 2021 Sensitivity Cases assumed *deteriorating* margins; and

- On the Q3 2021 Conference Call, Calderoni told analysts that "[t]his is a business with a lot of tailwinds," that "should fuel growth for quite some time;" reported strong and

improving renewal rates and "***a lot of metrics . . . that are very, very encouraging***;" and dismissed as "misinformed" any narrative "questioning the health and the strength of the business;" and yet the December 2021 Projections and December 2021 Sensitivity Case adopted a highly *pessimistic* narrative that focused *solely* on downside risks and challenges.

24.     In short, the highly pessimistic December 2021 Projections and the December 2021 Sensitivity Cases had no connection to reality, and thus were plainly created solely to help the conflicted Transaction Committee justify what it knew it would ultimately agree upon—a sale of Citrix to Elliott and Vista at an inadequate and unfair price. For its services in facilitating this outcome, Qatalyst was paid $83 million—of which $77.5 million is payable only upon consummation of the Merger. Qatalyst's motivations were thus quite clear.

25.     But even with the December 2021 Projections and December 2021 Sensitivity Cases in hand, the Transaction Committee still had to put on a show of pretending to negotiate. On January 15, 2022, after Calderoni shared preliminary results for Q4 2021 (which, as noted, *beat* revenue guidance), the Transaction Committee responded to Elliott's and Vista's December 5 Proposal of $110.00 per share with a counterproposal of $120.00 per share.

26.     On January 18, 2022, Elliott and Vista responded that they would not go higher than $110.00 per share. When the Transaction Committee then promptly proposed a $2.00 increase to $112.00 per share, Elliott and Vista mocked them by submitting a "best and final offer" of $103.51 per share on January 28, 2022—a further 6% drop from the December 5 Proposal. The Transaction Committee then essentially begged Elliott and Vista to come up $0.49—less than ½ a percent—to at least $104.00 per share. Elliott and Vista "generously" agreed, and on January 31, 2022, Citrix announced its sale to Vista and Elliott for $104.00 per share in cash, which amounted to an equity value of approximately $13.1 billion (based on approximately 125.9 million shares), and a total transaction value of $16.5 billion, including the assumption of Citrix debt. As compared to the multiple paid for Wrike—16.1x trailing 2020 SaaS ARR—the Board sold Citrix for just *4.1x*

trailing 2021 SaaS ARR (i.e., $16.5 billion/$4 billion in projected SaaS ARR for full year 2021). Classic buy high, and sell low.

27.     To justify the inadequate and unfair price paid by Elliott and Vista, Qatalyst used the false December 2021 Projections and one of the false December 2021 Sensitivity Cases—as well as inflated discount rates—to opine in the Fairness Opinion that the sales price of $104.00 per share was fair to Citrix shareholders. In particular, the Fairness Opinion contained two sets of Illustrative Discounted Cash Flow ("DCF") Analyses purporting to value Citrix at ranges of (i) $96.08 to $141.80 per share (based on the December 2021 Projections) and (ii) $80.04 to $118.94 (based on one of the December 2021 Sensitivity Cases). Based as they were on the false December 2021 Projections and false December 2021 Sensitivity Cases, however, the Illustrative Discounted Cash Flow Analyses were false, and thus Qatalyst's Fairness Opinion was also false.

28.     Nevertheless, based on what it knew or should have known was a false Fairness Opinion, the Transaction Committee recommended that the Board (i) declare that the Merger was "in the best interests of [Citrix] stockholders," and (ii) recommend that Citrix shareholders approve the Merger. With Defendants Kilcoyne and Hogan (but not Defendant Calderoni) recusing themselves, the full Board accepted the Transaction Committee's recommendations and approved the Merger.

29.     While the Transaction Committee (and by extension, the full Board), aided and abetted by Qatalyst, found a way to justify acceptance of Elliott's and Vista's "best and final offer" (subject to *de minimis* $0.49 bump), it is clear that neither the Transaction Committee nor the Board genuinely believed that the December 2021 Projections and the December 2021 Sensitivity Case were accurate, and instead knew that they were false given how inconsistent they were with, among other things, (i) accelerating SaaS ARR, (ii) Q3 and Q4 2021 revenue beating guidance,

and (iii) the numerous optimistic pronouncements of Calderoni to investors in the Q3 2021 Letter and to analysts on the Q3 2021 Earnings Call.

30.     Yet, on March 16, 2022, the Board authorized the filing of a false and misleading definitive proxy on Schedule 14A ("Proxy") with the SEC to solicit Citrix shareholders to vote in favor of the Merger. The Proxy contained material misrepresentations and omissions, including without limitation: (i) the false December 2021 Projections and the December 2021 Sensitivity Case; (ii) the false Qatalyst Fairness Opinion (based on using the false December 2021 Projections and the false December 2021 Sensitivity Case, as well as inflated discount rates, as inputs); and (iii) false statements that the Merger was "in the best interests" of Citrix shareholders (when the Transaction Committee and Board knew or should have known that it was not) and that the December 2021 Projections "had been reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of Citrix of the future financial performance of Citrix" (which was false since Citrix management had access to all of the data underlying the positive and optimistic statements of Calderoni in the Q3 2021 Letter and on the Q3 2021 Conference Call). These and other material misrepresentations and omissions rendered the Proxy false and misleading in violation of Sections 14(a) and 20(a) of the Exchange Act and Rule 14a-9 thereunder.

31.     Had Qatalyst used accurate projections in its DCF analyses that aligned accelerating SaaS ARR and other positive trends reported in 2021 (instead of the false December 2021 Projections and the December 2021 Sensitivity Case that Citrix management created and the Transaction Committee authorized solely to justify the fairness of the Merger Consideration), then (i) the lower end of the per share valuation range in a DCF analysis would have substantially exceeded the $104.00 per share being paid by Elliott and Vista, (ii) Qatalyst could not have opined

that the Merger Consideration was fair, (iii) the full Board could not have recommended that Citrix shareholders vote in favor of the Merger, and (iv) Elliott and Vista could not have acquired Citrix except by offering a higher price to Citrix shareholders. The false and misleading Proxy authorized by Defendants thus caused the consummation of the Merger at an unfair price per share that did not adequately value Citrix, and caused economic harm to Citrix who were misled into approving the sale of their shares to Elliott and Citrix at an unfair and inadequate price.

## II.   JURISDICTION AND VENUE

32.   This Court has subject matter jurisdiction over the claims asserted herein for violations of Sections 14(a) and 20(a) of the Exchange Act pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa, and 28 U.S.C. § 1331 (federal question jurisdiction).

33.   This Court has personal jurisdiction over each of the Defendants because each defendant has sufficient minimum contacts with the United States so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice. *See Sec. & Exch. Comm'n v. MintBroker Int'l, Ltd*., 2022 WL 4204383, at *2 (S.D. Fla. Jan. 12, 2022) (for purposes of establishing personal jurisdiction under the Exchange Act, the applicable forum for minimum contacts purposes is the United States).

34.   Venue is proper under 28 U.S.C. § 1391(b)(3) because all of the Defendants are subject to the Court's personal jurisdiction in this District. Moreover, Citrix has a business office in this District at 851 West Cypress Creek Road, Fort Lauderdale, Florida 33309.

## III.   PARTIES

35.   Lead Plaintiff George Messiha is, and has been at all relevant times, a continuous stockholder of Citrix common stock.

36.   Lead Plaintiff Juan A. Vargas is, and has been at all relevant times, a continuous stockholder of Citrix common stock.

37.     Additional Plaintiff Brandon Nuckel is, and has been at all relevant times, a continuous stockholder of Citrix common stock.

38.     Defendant Citrix is a Delaware corporation with its principal executive offices located at 851 West Cypress Creek Road, Fort Lauderdale, Florida 33309.

39.     Defendant Robert M. Calderoni ("Calderoni") has served as Chairman of the Board of Citrix since July 2015, and was appointed Interim President and Chief Executive Officer of Citrix on October 6, 2021, during the early stages of negotiations with Elliott and other potential bidders to acquire Citrix. Defendant Calderoni signed the Proxy in his capacity as Chairman of the Board of Directors and Interim Chief Executive Officer and President.

40.     Defendant Nanci E. Caldwell ("Caldwell") has served as a director of Citrix since July 2008. Defendant Caldwell served on the Transaction Committee formed on October 21, 2021, to advise the Board concerning any proposed transactions.

41.     Defendant Murray J. Demo ("Demo") has served as a director of Citrix since February 2005. Defendant Demo served on the Transaction Committee formed on October 21, 2021, to advise the Board concerning any proposed transactions.

42.     Defendant Thomas E. Hogan ("Hogan") has served as a director of Citrix since December 2018.

43.     Defendant Moira A. Kilcoyne ("Kilcoyne") has served as a director of Citrix since June 2018.

44.     Defendant Robert E. Knowling, Jr. has served as a director of Citrix since October 2020. Defendant Knowling served on the Transaction Committee formed on October 21, 2021, to advise the Board concerning any proposed transactions.

45.     Defendant Peter J. Sacripanti has served as a director of Citrix since December 2015. Defendant Sacripanti served on the Transaction Committee formed on October 21, 2021, to advise the Board concerning any proposed transactions.

46.     Defendant J. Donald Sherman has served as a director of Citrix since March 2020. Defendant Sherman served on the Transaction Committee formed on October 21, 2021, to advise the Board concerning any proposed transactions.

47.     Defendants identified in paragraphs 40 to 47 are collectively referred to herein as the "Individual Defendants," and together with Citrix, collectively, the "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     Company Background

#### 1.     *Cloud-Based Computing*

48.     Cloud-based computing solutions—also known "software as a service," "SaaS," or "subscription software"—refers to software applications, storage, and other computing resources that users access on their desktop from remote computers via an Internet connection. The model is analogous to homes and businesses accessing electricity on their premises supplied by remote power plants.

#### 2.     *Citrix's Transition to Cloud-Based Solutions*

49.     Citrix sells digital workspace solutions that provide an organization's employees with unified, reliable and secure access to all of their work resources (applications, content, etc.) across all of the organization's computing devices and locations. Originally, Citrix generally (i) sold its workspace solutions to customers based on perpetual software licenses pursuant to which customers paid upfront for lifetime access and support based on a certain number of users, and (ii) installed its workspace solutions in data centers located on the premises of its customers. But as the software industry evolved and shifted from perpetual licenses to subscriptions (featuring

an annual recurring cost), and from on-premise computing to cloud computing (pursuant to which software is delivered over the Internet by a third-party hosting company), Citrix sought to change its business model to deliver its workspace solution to customers via the cloud pursuant to SaaS subscriptions featuring Annual Recurring Revenue, or ARR.

50.     Citrix has explained in its SEC filings that "ARR" is "an operating metric that represents the contracted recurring value of all termed subscriptions normalized to a one-year period. It is calculated at the end of a reporting period by taking each contract's recurring total contract value and dividing by the length of the contract. ARR includes only active contractually committed, fixed subscription fees." In turn, "SaaS ARR represents the contracted recurring value of all cloud subscriptions normalized to a one-year period." Thus, reported ARR for a particular year may substantially exceed *recognized* revenue for that year because the ARR represents contracted revenue over several years concentrated within a single year.

### 3.     *Elliott's Prior Relationship with Defendants*

51.     On June 11, 2015, Elliott wrote a letter to the then Citrix CEO and Board advocating for broad operational improvements at the Company, and disclosing that Elliott had acquired Citrix common stock and derivatives providing Elliott with aggregate economic exposure comparable to an interest in approximately 7.1% of Citrix common stock (later rising to 7.5%).

52.     On July 28, 2015, Citrix announced that it had entered into a cooperation agreement with Elliott pursuant to which it, *inter alia*, agreed to appoint Mr. Jesse Cohn ("Cohn"), a senior Elliott portfolio manager, to the Board, and commence a search for an additional independent Board member mutually agreeable to Citrix and Elliott.

53.     The same day, Citrix also announced that (i) Defendant Calderoni would assume the role of Chairman of the Board, and (ii) the Board had formed an operations committee ("Operations Committee") to work closely with Company management on a comprehensive

operational review focused on improving Citrix's margins, profitability and capital structure. Citrix advised that the Operations Committee would be led by Defendant Calderoni and be comprised of four directors, including Defendant Calderoni, Cohn, and the new independent director to be mutually agreed upon by Citrix and Elliott.

54.     Qatalyst served as a financial advisor to Citrix in connection with the foregoing developments. Notably, Qatalyst appears to regularly advise targets pursued by Elliott or Vista in their activist campaigns, raising serious questions about the independence of Qatalyst as an advisor to target boards such as the Citrix Board.[6]

55.     On October 21, 2015, Citrix named Defendant Calderoni interim President and CEO of Citrix. Defendant Calderoni previously served as a director of Juniper Networks, Inc. ("Juniper") where he worked with Elliott after Elliott reached an agreement with Juniper in February 2014 to obtain two seats on Juniper's board of directors and implement a plan to improve operations. Defendant Calderoni also served as a senior advisor to Silver Lake Partners, a private equity firm that announced in October 2015 it would participate in the $67 billion purchase by

---

[6] *See, e.g., Informatica to Go Private in $5.3 Billion Leveraged Buyout*, April 8, 2015, at: https://www.vox.com/2015/4/8/11561226/informatica-to-go-private-in-5-3-billion-leveraged-buyout (noting that "[a]ctivist hedge fund Elliott Management disclosed an 8 percent stake in Informatica in January" and that Informatica thereafter engaged Qatalyst as financial advisor); *Imperva Said to Be Working With Qatalyst to Explore a Sale*, Jul. 11, 2016, at: https://www.bloombergquint.com/business/imperva-said-to-be-working-with-qatalyst-to-explore-a-sale (noting that Elliott "targeted" the company, amassed a 10.9% stake, had started a dialogue with the company's board about strategic opportunities, and that the company had hired Qatalyst to explore a sale); *MINDBODY Enters into Definitive Agreement to be Acquired by Vista Equity Partners for $1.9 Billion*, December 24, 2018 at: https://www.globenewswire.com/news-release/2018/12/24/1678109/0/en/MINDBODY-Enters-into-Definitive-Agreement-to-be-Acquired-by-Vista-Equity-Partners-for-1-9-Billion.html (noting that Qatalyst advised MindBody in acquisition by Vista); *Pluralsight Enters into Definitive Agreement to be Acquired by Vista Equity Partners for $3.5 Billion*, December 13, 2020 at: https://www.pluralsight.com/newsroom/press-releases/pluralsight-enters-into-definitive-agreement-to-be-acquired-by-v (noting that Qatalyst advised Pluralsight in acquisition by Vista).

Dell Computers of EMC Corp., in which Elliott held a 2.2% stake and which Elliott had been pressuring since October 2014 to spin off assets.

56.     In November 2015, Citrix announced plans to spin off its GoTo family of products into a separate, publicly traded company, and, in July 2016, Citrix announced that it had entered into an agreement with LogMeIn, Inc. ("LogMeIn") for LogMeIn to combine with Citrix's GoTo business. Notably, in connection with that transaction, Cohn, Henshall, and Defendants Calderoni and Sacripanti, were appointed to the LogMeIn board of directors, and served together until LogMeIn was acquired in early 2020 by Elliott and another private equity firm, Francisco Partners, for $86.05 in cash per share.

57.     It appears that, as early as 2017, and then again in April 2019, Elliott attempted to push Citrix into a whole Company sale, and it was reported that in April 2019 Citrix had engaged Goldman Sachs to explore a possible sale and had reached out to Vista to gauge its interest.[7]

58.     Elliott was ultimately unsuccessful, however, and in Q1 2020, exited its position in Citrix. Thereafter, on April 16, 2020, Citrix announced that Cohn would be leaving the Board. The press release announcing Cohn's departure shared the following heartfelt message to Cohn from Defendant Calderoni in his capacity as Chairman of the Board:

> We want to thank Jesse for his dedicated service to the board. His candor, insights and partnership have been valuable and appreciated as the company was executing a significant shift in our strategy, operations and business model. Today, with leadership from the board and executive team, and execution by our 8,500 plus employees, Citrix is stronger and more valuable than ever, and I want to thank Jesse for his many contributions to our success over the past five years.

---

[7] Josh Kosman, *Software giant Citrix hires Goldman to explore sale after Singer push*, New York Post (April 3, 2019), available at: https://nypost.com/2019/04/03/software-giant-citrix-hires-goldman-to-explore-sale-after-singer-push/.

B.     **Relevant Events at Citrix Prior to the Merger**

1.     *Citrix Acquired Wrike from Vista for 16.1x Trailing SaaS ARR for 2020*

59.     On January 16, 2021, consistent with its new focus on cloud-based solutions, Citrix announced it had agreed to pay $2.25 billion in cash to Vista to acquire Wrike, Inc. ("Wrike"), a provider of cloud-based collaborative work management programs.

60.     According to the press release announcing the acquisition, Wrike was expected to grow its $140 million in 2020 SaaS ARR by 30 percent to between $180 million and $190 million in 2021. Citrix thus paid Vista approximately 16.1x *trailing* 2020 SaaS ARR (i.e., $2.25 billion/$140 million), and 12.2x *expected* 2021 SaaS ARR (i.e., $2.25 billion/$185 million = 12.2) for a company growing SaaS ARR at 30% per year. In contrast, as discussed below, Citrix was growing its SaaS ARR by over 70% in 2022, and yet the Board agreed to sell Citrix to Elliott and Vista for a total transaction value of $16.5 billion, which is a multiple of just 4.1x Citrix's *trailing* 2021 SaaS ARR of approximately $4 billion (i.e., 25% of the multiple it paid for Wrike in a classic case of "buy high, sell low").

2.     *Citrix Links Performance-Based Equity Awards to ARR Growth*

61.     On April 16, 2021, Citrix filed the April 2021 Meeting Notice, which contained a letter from Defendant Calderoni, as Chairman of the Board, stating that, starting in 2021, the Board was linking future performance-based equity awards ("PRSUs") to SaaS ARR growth:

> During the second quarter of 2019 . . . Citrix gained significant momentum in its business transition to a subscription-based business. Given this increased momentum, the Compensation Committee determined that the company had a unique opportunity to increase the acceleration of its transition, which, if successful, would advance long-term value creation for shareholders. Accordingly, *beginning in 2020, the Compensation Committee moved away from subscription bookings as a percentage of total subscription and product bookings and decided to link performance-based equity awards with annualized recurring revenue, or ARR, growth*, which, as we have discussed on our earnings calls, is the metric that we believe is best aligned with the company's business transition and strategy. In our view, *ARR, in short, is the best indicator of the overall health and trajectory of*

*the business* because it captures the pace of Citrix's transition and is a forward-looking indicator of top line trends.

As we enter fiscal year 2021 with a portion of our subscription model transition complete, we continue to focus on transitioning our customers to the cloud. *As a result, the Compensation Committee decided to link performance-based equity awards granted during fiscal year 2021 with Software-as-a-Service ARR, or SaaS ARR, growth, rather than ARR growth, to further drive our business model transition to the cloud.*

62.    This was a highly significant change since Citrix had a compensation policy providing for at least 60% of annual equity awards to senior executives to be awarded as PRSUs. It is reasonable to infer that senior Citrix executives would not tie to their compensation to a metric that was deteriorating.

### 3.    *Citrix's Q1 2021 Results*

63.    On April 29, 2021, Citrix announced its Q1 2021 results. In a letter to shareholders ("Q1 2021 Letter"), then CEO Henshall wrote concerning Citrix's transition of customers to cloud-based solutions that "[o]ur first quarter results *reflect accelerated momentum in our cloud transition* with more of our installed base moving to the cloud, driving an increased mix shift towards SaaS and acceleration of SaaS ARR." He then highlighted the following successes:

- Excluding the impact of Wrike, first quarter SaaS ARR accelerated sequentially to $793 million, representing 43% year-over-year growth. *Inclusive of Wrike's contribution, total SaaS ARR was $943 million, up 70% year-over-year*, and total Subscription ARR was $1.51 billion, up 81% year-over-year.

- The number of Citrix Cloud Paid Subscribers increased 34% year-of-year, to over 10.3 million.

- SaaS revenue accounted for 22% of total revenue, up from 14% in Q1 2020

64.    Henshall also explained that "[o]ur transition to a subscription model, and ultimately a cloud-delivered model, focuses on growing higher value recurring revenue streams that result in more of the business booked in the current period being recognized in future periods."

### 4.      *Citrix's Q2 2021 Results*

65.      On July 29, 2021, Citrix announced its Q2 2021 results. In a letter to shareholders

("Q2 2021 Letter"), Henshall wrote that Citrix's transition of customers to cloud-based solutions

was progressing strongly. Key takeaways regarding the SaaS business included:

- *SaaS ARR of more than $1B, up 74% year-over-year*. Excluding Wrike, second quarter SaaS ARR accelerated for the third consecutive quarter to $868 million, *up 47% year-over-year*.

- The number of Citrix Cloud Paid Subscribers *increased 52% year-over-year*, to 11.4 million with growth accelerating from 34% year-over-year in Q1 2021.

- SaaS mix of subscription bookings was 63%, compared to guidance of 50-55%

- SaaS revenue accounted for 26% of total revenue, up from 16% in Q2 2020.

66.      Total reported revenue of $812 million, however, fell short of the guidance of $840-

850 million in the Q1 2021 Letter. Henshall elaborated that "[a]fter a slower-than-expected pace

of transitioning our installed base to the cloud during the onset of the pandemic, *the transition has

since gained momentum and is now progressing well*. A faster pace of moving to the cloud is a net

positive for the long-term success of Citrix; however, we have not delivered on our overall

expected recognized revenue this year. I want to explain the challenges we identified in reviewing

the quarter and how we are responding."

67.      Henshall itemized "several significant and immediate actions" to address the

various challenges impacting the cloud transition, which included "embracing [a] faster pace of

cloud adoption and sales strategies to support this move." As a result of these actions, Henshall

explained that SaaS as a percentage of subscription bookings would increase to 60-70%, "further

impacting revenue as more is recognized ratably vs. up-front."

68.      Henshall concluded:

*As we progress through this transition, we continue to believe that SaaS ARR is the best way to measure the progress we are making in transitioning our business to the cloud.* With year-over-year growth accelerating for the third consecutive quarter, both inclusive and exclusive of Wrike since the close of the acquisition, strong SaaS ARR growth demonstrates our focus on transitioning our installed base."

## C. Merger Negotiations and the Merger

### 1. Elliott Initiates Negotiations to Acquire Citrix

69.    On August 25, 2021, Elliott sent a letter to the Board recommending that Citrix engage with Elliott and other potentially interested parties regarding a "take-private" transaction ("August 25 Elliott Letter"). The August 25 Elliott Letter advised that Elliott had made an investment of approximately $1.3 billion in Citrix in the form of common stock and derivatives, which provided Elliott with aggregate economic exposure comparable to an interest in approximately 10% of the Company's common stock. The August 25 Elliott Letter criticized, among other things, "a cloud transition that had missed expectations." This criticism, however, was completely unfounded insofar as it ignored the enormous growth in SaaS ARR to date in 2021, as per the Q1 2021 and Q2 2021 Letters.

70.    The Board did not push back against Elliott's criticism, and instead launched a process to sell the Company. On September 2, 2021, after receiving the August 25 Elliott Letter, the Board met and retained Qatalyst to contact other potential buyers consisting of three strategic buyers and nine financial sponsors, including Vista. The Board also discussed the possibility of negotiating a "go shop" provision (i.e., the right to actively solicit alternative acquisition proposals for a specified period following execution of a definitive agreement) in connection with any agreement to sell the Company.

71.    At the meeting, the Board also discussed past and current business relationships that certain directors had with Elliott, Vista and other potential participants in a strategic process,

and reached certain conclusions, which the Proxy described as follows (including material added via supplemental disclosures):

> *Moira J. Kilcoyne was currently a director of Elliott Opportunity II Corp., a special purpose acquisition company sponsored by an affiliate of Elliott*, and Thomas E. Hogan was currently a Managing Director of Vista, which was among the financial sponsors that the Citrix Board determined to potentially contact in connection with the strategic process given Vista's investment focus in enterprise software, data and technology enabled organizations and in light of Vista's prior ownership of Wrike. *It was determined that, given Ms. Kilcoyne's current relationship with an Elliott affiliate and Mr. Hogan's current relationship with Vista and the potential conflicts or the appearance of potential conflicts that could arise as a result of these relationships, Ms. Kilcoyne and Mr. Hogan would recuse themselves from further Board meetings or deliberations regarding a potential transaction with Elliott or Strategic Buyer A or alternatives thereto*. As a result, Ms. Kilcoyne and Mr. Hogan (who were not in attendance for any portion of this meeting related to the strategic process) did not participate in further Board or committee meetings or deliberations regarding a potential transaction with Elliott or Strategic Buyer A or any alternatives thereto.
>
> In addition, the Citrix Board discussed *certain past relationships identified by the directors, including the past service of Mr. Cohn on the Citrix Board including service on the operations committee and nominating and corporate governance committee, and on a CEO search committee (disbanded in January 2016), which overlapped with certain of Citrix's current directors*, *the past service of Mr. Cohn on the Board of Directors of LogMeIn, Inc. (the company that acquired Citrix's GoTo family of service offerings) which overlapped with certain of Citrix's current directors*, *and a prior 18-month consulting relationship between Mr. Calderoni and Elliott that occurred during 2018 and 2019. It also was noted that a family member of Mr. Calderoni works for Elliott in a non-investment, administrative role*. The Citrix Board determined that these relationships did not present a conflict with respect to the consideration of a potential strategic transaction with Elliott or any alternatives thereto.

Proxy at 23-24.

72.     The above description of the Board's deliberations concerning conflicts failed to fully disclose Defendant Calderoni's more extensive past working relationship with Elliott after Elliott acquired substantial stakes in Juniper (where Defendant Calderoni was a board member) and EMC (where Defendant Calderoni advised the private equity firm that ultimately acquired EMC with Dell). Despite these additional past ties to Elliott (which the Board ignored), Defendant

Calderoni did not recuse himself from further Board meetings or deliberations regarding a potential transaction with Elliott, and the Board did not subject Defendant Calderoni to the same restrictions as Defendants Kilcoyne and Hogan. To the contrary, aside from Defendant Calderoni remaining Chairman of the Board, the Board announced on October 6, 2021, that it had appointed Defendant Calderoni to the positions of Interim CEO and President of Citrix. Thereafter, "[t]hroughout Citrix's evaluation of potential strategic alternatives," Defendant Calderoni concededly "had conversations with representatives of the various potential acquirers and financial sponsors, *including Elliott and Vista*."

### 2. *Elliott's Initial Indication of Interest of $124.00-$130.00 Per Share in Cash*

73.     On September 9, 2021, Elliott submitted a written, non-binding indication of interest proposing to acquire all of the outstanding shares of Citrix for $124.00 to $130.00 per share in cash, subject to due diligence and the negotiation of a definitive agreement.

74.     That same day the Board met. At the meeting, senior management presented a potential framework for the Company's long-range plan that included a new licensing model for its branded Workspace solutions (which, according to the Q2 2021 Letter, were rapidly migrating to the cloud). After discussion, the Citrix Board determined not to pursue this framework or make any changes to the Company's current licensing model and requested that senior management prepare preliminary financial projections to reflect the Citrix Board's strategy of focusing on margin expansion and improvements in cash flows rather than a new licensing model.

75.     It is reasonable to infer that the new licensing model referred to in the Proxy was the subscription-based licensing model to which Citrix had been transitioning since there was no other new licensing model that had been publicly disclosed by the Company. In which case, the Board's direction to senior management to disregard Citrix's new licensing model when preparing

projections was extremely odd insofar as Citrix had already been proceeding with its transition to a new subscription-based model for some time, and was making enormous progress with the transition, as evidenced by the enormous growth in SaaS ARR in 2021. Indeed, the Board had previously (i) authorized the purchase of Wrike in January 2021, in connection with this transition, and (ii) decided to link performance-based equity awards with SaaS ARR growth based on the belief that SaaS ARR growth was the best indicator of success and progress in the ongoing transition to a cloud-based model.

76.     At the same meeting, the Board also authorized Qatalyst to begin contacting the 12 parties identified at the Board's September 2, 2021 meeting that might be interested in a transaction with Citrix. As a result of that outreach, Vista and five other financial sponsors indicated that they would like to enter into confidentiality agreements with Citrix to facilitate discussions regarding a potential transaction. Additionally, discussions were held and due diligence was shared with Strategic Buyer A, a company that had previously held discussions with Citrix in 2019 concerning a possible transaction. Subsequently, other strategic buyers and financial sponsors reached out to discuss potential transactions. None of these other potential buyers, however, ever subsequently submitted indications of interest to acquire Citrix. Instead the only bids ever received were those submitted by Elliott and Vista. The reasonable inference is that other potential buyers perceived that the playing field was tilted in favor of Elliott and Vista given the past ties between Calderoni and Elliott, and the past ties between members of the Transaction Committee and Elliott and Vista (as further detailed below).

### 3.     The September 2021 Projections

77.     On September 23, 2021, the Board reviewed the September 2021 Projections for the remainder of fiscal year 2021, and fiscal years 2022 through 2026, prepared by senior management based on the Board's feedback at the September 9, 2021 meeting (which as noted,

strangely directed management to ignore Citrix's transition to a subscription-based licensing model when preparing projections). Members of senior management reviewed with the Citrix Board "the related methodology, underlying assumptions (including the launch of a strategic cost improvement/restructuring program), and potential risks in achieving the projections, including the execution challenges that Citrix is facing, the risks associated with Citrix's business model transition, and market dynamics." Following discussion of these matters, the Citrix Board authorized use of the September 2021 Projections in discussions with participants in the strategic process.

78.     The Proxy shared the September 2021 Projections in the following table:

| ($ in millions) | 2021E(1) | 2022E | 2023E | 2024E | 2025E | 2026E |
|---|---|---|---|---|---|---|
| Revenue | $ 3,267 | $3,494 | $3,938 | $4,209 | $4,465 | $4,692 |
| Non-GAAP Gross Profit (2) | $ 2,730 | $2,931 | $3,305 | $3,542 | $3,749 | $3,944 |
| Non-GAAP Operating Income (3) | $  850 | $1,048 | $1,263 | $1,405 | $1,525 | $1,644 |
| Non-GAAP Net Income (4) | $  647 | $ 779 | $ 958 | $1,086 | $1,187 | $1,291 |
| EBITDA (5) | $ 1,050 | $1,259 | $1,478 | $1,626 | $1,750 | $1,875 |

79.     On September 28, 2021, Vista advised Qatalyst that it was not interested in further discussions with Citrix concerning a transaction. As discussed below, however, Vista later joined Elliott's bid.

80.     On October 6, 2021, Citrix announced the abrupt resignation of Henshall as CEO, and appointment of Defendant Calderoni as Interim Chief Executive Officer and President effective immediately. In addition, Citrix announced that the Company expected to report revenue at the midpoint to the high end of its previously announced guidance range of $765 million to $775 million for the third quarter of fiscal year 2021. As noted below, however, the Company subsequently *beat* its revenue guidance for Q3 2021.

### 4.     *Elliott's Revised Indication of Interest of $125.00 Per Share in Cash*

81.     On October 18, 2021, Elliott submitted a revised written, non-binding indication of interest with respect to acquiring all of the outstanding shares of Citrix for $125.00 per share in

cash, subject to the completion of due diligence and the negotiation of a definitive agreement (the "October 18 Proposal").

### 5. *The Board Forms a Conflicted Transaction Committee*

82.     On October 21, 2021, the Board formed a Transaction Committee of purportedly "independent and disinterested directors" to (i) monitor and direct the process and procedures related to the review and evaluation of the October 18 Proposal and any other proposals that the Company might receive with respect to a strategic transaction, as well as other potential strategic alternatives that may be available to enhance shareholder value (including continuing to operate as an independent company), and (ii) make a recommendation to the Board regarding the advisability of any such transaction or other alternatives. Following its formation, the Transaction Committee was actively involved in negotiating the Merger with Elliott and Vista, including directing price negotiations.

83.     The Transaction Committee consisted of Defendants Caldwell, Demo, Knowling, Sacripanti and Sherman. The Proxy failed to disclose, however, that Defendant Knowling served as a director of Convergys Corporation from late 2017 until late 2018 when Convergys Corporation was sold to SYNNEX Corporation for $2.43 billion in cash and stock shortly after Elliott acquired a 4.9% ownership stake in Convergys. Further, the Proxy failed to disclose that Defendant Caldwell previously served as a director of TIBCO, one of Vista's portfolio companies since 2014. Finally, as noted, Defendant Sacripanti had served alongside Cohn on the LogMeIn board. The Proxy did not disclose this relationship even though it disclosed the exact same relationship with respect to Calderoni, and thus plainly considered the association with Cohn via service on the LogMeIn Board to present a conflict. Thus, a majority of the members of the Transaction Committee had past ties to either Elliott or Vista, and contrary to the statement in the Proxy, were not "independent and disinterested."

### 6. Citrix's Q3 2021 Results

84.     On November 3, 2021, the Board held a meeting at which senior management reviewed the Company's results of operations for the third quarter of 2021 and proposed earnings guidance for the fourth quarter of the year.

85.     On November 4, 2021, Citrix announced its Q3 2021 results. In a letter to shareholders ("Q3 2021 Letter"), Defendant Calderoni, wrote concerning Citrix's transition of customers to cloud-based solutions:

> *In the third quarter of 2021, Citrix made significant progress on its transition to the cloud.* This quarter, Total ARR grew organically 13% year-over-year, excluding Wrike, despite tough comparisons due to strong demand tailwinds from COVID-related purchases in the prior year. Total ARR also grew faster year-over-year than the prior quarter, demonstrating a continued acceleration of our subscription transition. SaaS ARR is now greater than $1 billion. *Organic SaaS ARR grew 48% year-over-year, and the third quarter was the fourth consecutive quarter of accelerating organic SaaS ARR growth – a clear sign that our SaaS offerings are resonating with customers.*

> Key takeaways include:

> - *SaaS ARR of $1.1 billion*, *up 75% year-over-year*. Excluding Wrike, third quarter SaaS ARR accelerated to $934 million, *up 48% year-over-year*.

> - The number of Citrix Cloud Paid Subscribers *increased 47% year-over-year*, to 12.2 million.

> - *SaaS mix of subscription bookings was 64%*, towards the high-end of our guidance range of 60-65% and up from 48% at the beginning of the year.

86.     Defendant Calderoni added:

> *Despite achieving more than $1 billion in SaaS ARR in the third quarter of 2021, we are still in the early innings of our cloud transition with less than 15% of our current installed base having transitioned to cloud products. This continues to represent an enormous opportunity and provides a strong tailwind to support our SaaS ARR growth for year*s. Customers making the transition are realizing greater value as they shift to our cloud solutions, and we consistently see an uplift in price that exceeds our target 33% premium as customers derive added value, greater agility, and reduced total cost of ownership (TCO) as they migrate to SaaS from our on-premise perpetual Workspace offerings. *Finally, the revenue headwinds*

*from declining perpetual licenses are now largely behind us in our Workspace business as we reach the anniversary of the end of broad availability of perpetual Citrix Workspace licenses. We believe Total ARR is the best metric to measure the underlying health of our business. Over time, as we emerge from our cloud transition, we would expect to see reported revenues grow more in line with Total ARR.*

87.    The Q3 2021 Letter also reported that SaaS revenue grew as a percentage of total revenue to 29%, up from 18% in Q3 2020.

88.    Concerning past execution challenges, Calderoni reassured investors that (i) "the revenue headwinds from declining perpetual licenses are now largely behind us;" (ii) "[o]ver time, as we emerge from our cloud transition, we would expect to see reported revenues grow more in line with Total ARR;" and (iii) 2021 would "be a trough in terms of both operating margin and cash flow." In particular, Calderoni explained that "[o]ur transition to a subscription model, and ultimately a cloud-delivered model, focuses on growing *higher value recurring revenue streams* that result in more of the business booked in the current period being recognized in future periods." He also referenced a margin improvement plan for Q4.

89.    Equally noteworthy, in Q3 2021, Citrix reported $778 million in revenue, which *beat* the guidance of $765 million to $775 million in GAAP revenue for Q3 2021 projected on July 29, 2021 in the Q2 2021 Letter.

90.    Finally, the Q3 2021 Letter forecast improvement for full year 2021 in a number of key profitability metrics:

- GAAP Operating Margin of 9.8%-10% (up from 8.0%-8.5% in the Q2 2021 Letter)

- Non-GAAP Operating Margin of 25.2%-25.4% (up from 24.3%-24.8% in the Q2 2021 Letter)

- GAAP Diluted EPS of $1.81 to $1.87 per share (up from $1.45-$1.66 in the Q2 2021 Letter), and

- Non-GAAP Diluted EPS of $4.90 to $4.95 per share (up from $4.75-$4.95 per share in the Q2 2021 Letter).

91.     Only projected full year 2021 revenue of $3.19 billion to $3.20 billion in the Q3 2021 Letter remained below the projected full 2021 revenue of $3.22 billion to $3.25 billion in the Q2 2021 Letter (which was to be expected since, as explained by Henshall and Defendant Calderoni, the transition to a cloud-based model pushed the recognition of a certain of revenue further into the future). But as discussed, the actual full year revenue for 2021 ultimately hit $3.22 billion, and thus beat guidance in the Q3 2021 Letter.

92.     Likewise, in the Company's November 4, 2021 investor conference call to discuss Q3 2021 results, Calderoni touted the Company's successful transition to a SaaS ARR business model and the Company's growth in ARR:

> We've proven success in our transition to the cloud with over a billion dollars of SaaS ARR, and we have largely transitioned our model to recurring revenues with over $3 billion of ARR.

Q3 2021 Conference Call at 1.

93.     Calderoni also noted that the Compnay's renewal rates are "strong and improving."

> Another important metric signaling the health of any recurring revenue business is renewal rates. And while we do not disclose our renewal rates, I can say the rates are both strong and improving.

*Id*.

94.     Calderoni also reiterated why the shift to subscription-based revenue might be accompanied by "noise in reported revenue":

> [T]he focus should be on ARR because the duration [of licenses] goes up or down. I mean, obviously, duration, I'd rather sign longer-term deals than shorter term deals, but if duration goes up or down, it creates noise in reported revenues. And we could be having a good quarter, but have less duration and that could be a misleading indicator and vice versa. So I would increasingly point everybody to ARR as the metric that normalizes all of that, and I think that's going to be a better indicator of our underlying health and velocity . . . .

*Id.* at 4.

95.     *Four* times during the call, Calderoni stressed that Citrix was a business with a lot of tailwinds: (i) "And our important VDI DaaS business *has some strong secular tailwinds* with trends supporting secure, remote hybrid work;" (*id.* at 1); (ii) "Strategies intact. *This is a business that has a lot of tailwinds*. I think remote hybrid is here to stay. *I think there is a lot of secular tailwinds that should fuel growth for quite some time.* I feel really good about that. I don't think the strategy needs to be overhauled at all," (*id.* at 5), and (iii) " So [security] is *a secular tailwind* [for Citrix]." (*Id.* at 8).

96.     Finally, Calderoni dismissed any narrative "questioning the health and strength of the business" as "misinformed":

> *I think look, there's a narrative out there right now that's questioning the health and the strength of the business out there and I think it's misinformed. I think we've got a business here that's very healthy.* I think you can see that reflected in the growth in our ARR at 13%. I think you can see it in the fact that we have very strong renewal rates and they're getting better, that's a sign of a very healthy business in a very healthy, competitive environment . . . So I think there's a lot of metrics here that are very, very encouraging, that are inconsistent with a narrative out there…"

*Id.* at 7.

97.     Notwithstanding the superior and improving results in Q3 2021, the Proxy misrepresents those results by excluding any mention of the rapid growth in SaaS ARR and focusing exclusively on negative items: "On November 4, 2021, Citrix reported its results of operations for the third quarter of 2021 and moderated its fourth quarter revenue expectations, *noting that the Company had underperformed its expectations during the year as it continued to face execution challenges*." In particular, the statement that "the Company had underperformed its expectations," was false and misleading to the extent that it omitted that Citrix had reported

accelerating SaaS ARR, *beat* prior revenue guidance, and forecast improved results in a number of key profitability metrics.

### 7. *Elliott's and Vista's Revised Indication of Interest of $110.00 Per Share in Cash*

98. On November 19, 2021, Qatalyst authorized Elliott to work with Vista, and on December 5, 2021, Vista and Elliott submitted a written, non-binding IOI proposing to acquire all of the outstanding shares of Citrix for $110.00 per share in cash, subject to the completion of due diligence and the negotiation of a definitive agreement. This new bid represented a 12% drop from Elliott's October 18 Proposal of $125.00 per share.

### 8. *The December 2021 Projections*

99. On December 7, 2021—a *mere two days* after submission of the December 5 Proposal—the Transaction Committee met with senior management and its financial and legal advisors to review the updated December 2021 Projections prepared by senior management for the remainder of fiscal year 2021 and fiscal years 2022 through 2026. The December 2021 Projections purportedly rolled forward the September 2021 Projections to reflect Citrix's actual results for Q3 2021, an updated forecast for the Q4 2021, and implementation of a strategic cost improvement/restructuring program. But as explained below, by materially reducing the projections in the September 2021 Projections across the board, the December 2021 Projections completely ignored the robust and improving results reported for Q3 2021 across multiple key metrics.

100. During the meeting, senior management reviewed with the Transaction Committee the related methodology, underlying assumptions, and potential opportunities and risks in achieving the December 2021 Projections, and the Transaction Committee purported to consider "the execution challenges that Citrix is facing, the risks associated with Citrix's business model

transition, and market dynamics." The Transaction Committee, however, ignored the rapid growth in SaaS ARR, the beat in revenue guidance, and forecasted improvement in key profitability metrics, reflected in the Q3 20221 results.

101.    Following these discussions, the Transaction Committee approved the December 2021 Projections for use by Qatalyst in preparing the Fairness Opinion. Unlike the September 2021 Projections, the Proxy does not indicate that the December 2021 Projections were shared with any other counterparties involved in the sales process other than Elliott and Vista (at a presentation and dinner on December 15, 2021, as discussed further below).

102.    The Proxy shared the December 2021 Projections in the following table:

| ($ in millions) | 2021E(1) | 2022E | 2023E | 2024E | 2025E | 2026E |
|---|---|---|---|---|---|---|
| Revenue | $ 3,212 | $3,409 | $3,765 | $4,040 | $4,241 | $4,423 |
| Non-GAAP Gross Profit (2) | $ 2,687 | $2,878 | $3,186 | $3,439 | $3,609 | $3,766 |
| Non-GAAP Operating Income (3) | $ 836 | $1,008 | $1,194 | $1,350 | $1,451 | $1,548 |
| Non-GAAP Net Income (4) | $ 644 | $ 746 | $ 902 | $1,041 | $1,126 | $1,213 |
| EBITDA (5) | $ 1,033 | $1,216 | $1,407 | $1,567 | $1,673 | $1,775 |

103.    Despite the accelerating SaaS ARR growth, revenue beat, and improving profitability metrics reported for Q3 2021, the December 2021 Projections *reduced* the estimates in the September 2021 Projections for revenue and other metrics by increasingly larger percentages for the next *five* years. *See* Exhibit A. In fact, based on the robust Q3 2021 results, the December 2021 Projections should have *increased* the September 2021 Projections (which were created when management only had the benefit of the Q2 2021 results).

104.    Nevertheless, Citrix management used the depressed December 2021 Projections to calculate unlevered free cash flows ("December 2021 Cash Flows"), and directed Qatalyst to use the December 2021 Cash Flows to prepare an *Illustrative Discounted Cash Flow Analysis* ("DCF Analysis") as part of its Fairness Opinion. The December 2021 Cash Flows were disclosed in the following table:

| ($ in millions) | 2022E | 2023E | 2024E | 2025E | 2026E |
|---|---|---|---|---|---|
| Revenue | $3,409 | $3,765 | $4,040 | $4,241 | $4,423 |
| Non-GAAP Operating Income (1) | $1,008 | $1,194 | $1,350 | $1,451 | $1,548 |
| Net Operating Profit After Tax (2) | $ 905 | $1,056 | $1,186 | $1,271 | $1,351 |
| Less: Capital Expenditures | (90) | (90) | (90) | (90) | (90) |
| Plus: Depreciation and Amortization | 83 | 85 | 87 | 88 | 90 |
| Plus: Other Amortization (3) | 125 | 127 | 130 | 133 | 137 |
| Less: Change in Working Capital | (96) | (168) | (87) | (8) | 40 |
| Less: Other (4) | (44) | (19) | (19) | (19) | (19) |
| Unlevered Free Cash Flow | $ 883 | $ 992 | $1,208 | $1,375 | $1,509 |

105.    Based on the December 2021 Cash Flows, and using a discount rate range of 8.0% to 9.5%, Qatalyst's DCF Analysis calculated a range of per share values for Citrix common stock of approximately $96.08 to $141.80. The Merger Consideration of $104.00 in cash per share fell close to the bottom of that range. Had management created and Qatalyst used accurate projections that were consistent with the accelerating SaaS ARR, increasing revenue, and improving profitability metrics reflected in the Q3 2021 results, the bottom of the range of per share values would have exceeded the $104.00 in cash per share to which Elliott and Vista agreed (which can be reasonably inferred by the rushed creation of the depressed December 2021 Projections just two days after Elliott and Vista dropped their bid to $110.00 per share).

106.    Given that SaaS ARR continued to accelerate in Q3 2021, revenue in Q3 2021 *beat* guidance, and the Q3 2021 Letter projected *higher* margins and *higher* earnings per share for full year 2021 than the Q2 2021 Letter had projected, there was no reason to *further* depress the December 2021 Projections. To the contrary, as explained by Calderoni in the Q3 2021 Letter and the Q3 2021 Conference Call, all the key metrics were trending in a positive direction with (i) revenue headwinds from declining perpetual licenses . . . *now largely behind us*;" (ii) "reported revenues [expected to] grow more in line with Total ARR;" and (iii) 2021 being "a trough in terms of both operating margin and cash flow."

107.    Yet, Qatalyst nevertheless took the already depressed December 2021 Projections and created the December 2021 Sensitivity Cases, which purported to reflect "*lower* revenue

growth rates and operating margin assumptions *approved by senior management of the Company*,"

and were designed to "allow the Transaction Committee to consider the December 2021

Projections in light of the execution challenges facing the Company." That is, Qatalyst devised

even more pessimistic analyses—flatly contradicted by the Q3 2021 results (which reported *rising*

revenue that *beat* guidance and projected *improving* margins and earnings per share)—to help

the Transaction Committee justify what it knew it would ultimately agree upon—a sale of Citrix to

Elliott and Vista at an inadequate and unfair price.

108.    The December 2021 Sensitivity Cases were used to calculate even more depressed

unlevered free cash flows ("December 2021 Sensitivity Cash Flows"), as per the following table:

| ($ in millions) | 2022E | 2023E | 2024E | 2025E | 2026E |
|---|---|---|---|---|---|
| Revenue | $3,344 | $3,626 | $3,819 | $3,932 | $4,022 |
| Non-GAAP Operating Income (1) | $ 988 | $1,099 | $1,185 | $1,249 | $1,307 |
| Net Operating Profit After Tax (2) | $ 888 | $ 971 | $1,041 | $1,094 | $1,141 |
| Less: Capital Expenditures | (88) | (87) | (85) | (83) | (82) |
| Plus: Depreciation and Amortization | 82 | 82 | 82 | 82 | 82 |
| Plus: Other Amortization (3) | 123 | 123 | 123 | 124 | 124 |
| Less: Change in Working Capital | (94) | (162) | (82) | (8) | 36 |
| Less: Other (4) | (44) | (19) | (19) | (19) | (19) |
| Unlevered Free Cash Flow | $ 866 | $ 909 | $1,060 | $1,189 | $1,283 |

109.    Based on the December 2021 Sensitivity Cash Flows, and using a discount rate

range of 8.0% to 9.5%, Qatalyst performed a second DCF Analysis that calculated a range of per

share values for Citrix common stock of approximately $80.04 to $118.94.

110.    The Proxy does not indicate that the December 2021 Sensitivity Cases were shared

with any outside third parties.

### 9.    The Transaction Committee Capitulates to Elliott and Vista on Price

111.    On December 15, 2021, at a dinner attended by members of Citrix senior

management and representatives of Elliott and Vista, Citrix's senior management presented the

December 2021 Projections to Elliott and Vista.

112.    On December 28, 2021, the Transaction Committee held a meeting at which senior management provided an updated forecast regarding the financial results for the fourth quarter of 2021. As discussed below, the Q4 2021 results *beat* GAAP revenue guidance by a significantly wider margin than the Q3 2021 results had beat guidance. Thus, as of December 28, 2021, the Transaction Committee knew that, aside from the rapid growth in SaaS ARR, even GAAP revenue was improving, and given that knowledge, should have advised Qatalyst that the December 2021 Projections were outdated and needed to be updated. Instead, the Transaction Committee allowed Qatalyst to continue preparing its Fairness Opinion using the outdated and depressed December 2021 Projections and December 2021 Sensitivity Cases.

113.    Thereafter, the December 28 meeting participants discussed that the appropriate timing for discussing with Elliott and Vista a potential retention bonus program for Citrix employees and other compensation-related matters would be only after price was agreed to by the parties.

114.    Finally, the December 28 meeting participants discussed a counter to the December 5 Proposal of Elliott and Vista, and concluded that Elliott and Vista were unlikely to go higher than $110.00 per share. Nevertheless, as a so-called "tactical negotiation matter," the Transaction Committee authorized Qatalyst to make a counterproposal of $120.00 per share in cash. It can be reasonably inferred from this characterization that the Transaction Committee was not serious about the counteroffer.

115.    On January 7, 2022, Calderoni shared preliminary results for Q4 2021 with the Transaction Committee. As discussed below, the Q4 2021 results *beat* GAAP revenue guidance by a significantly wider margin than the Q3 2021 results had beat guidance. Thus, if not earlier, then no later than January 7, 2022, the Transaction Committee knew that, aside from the rapid

growth in SaaS ARR, even GAAP revenue was improving, and given that knowledge, should have advised Qatalyst that the December 2021 Projections were outdated and needed to be updated. Instead, the Transaction Committee allowed Qatalyst to continue preparing its Fairness Opinion using the outdated and depressed December 2021 Projections and December 2021 Sensitivity Cases.

116.   On January 15, 2022, Qatalyst presented Elliott and Vista with the Transaction Committee's counterproposal of $120.00 per share in cash.

117.    On January 18, 2022, Elliott and Vista responded that they would not go higher than $110.00 per share. They also advised they were unwilling to agree to a "go shop" period. During subsequent calls, Qatalyst asked Elliott and Vista to raise their bid by $2.00 per share in cash.

118.   On January 28, 2022, Elliott and Vista not only rejected the Transaction Committee's requested increase, but mocked the Transaction Committee by further reducing their bid to $103.51 per share in cash, and indicated this was their "best and final offer" (as Cohn later confirmed for Calderoni in a call).

119.   Later that day, the Transaction Committee asked Elliott and Vista to increase their bid to $104.00 per share in cash, a miniscule increase of $0.49—less than ½ percent. Elliott and Vista "generously" agreed.

120.   As noted, $104.00 per share in cash at which the Board agreed to sell Citrix to Elliott and Vista represented only *4.1x* of Citrix's *trailing* 2021 SaaS ARR (i.e., $16.5 billion/$4 billion in SaaS ARR for all of 2021, conservatively estimated based on the results in the first three quarters in 2021; *see* table *supra*) as compared to the *16.1x in trailing* 2020 SaaS ARR at which Citrix agreed to buy Wrike from Vista—even though Citrix's SaaS ARR was growing at over

70%—a rate that was more than double the rate at which Wrike's SaaS ARR had been growing when it was acquired by Citrix.

121.    Meanwhile, during discussions over the next two days, Citrix presented a proposal to Vista and Elliott regarding, *inter alia*, a *$20.0 million* retention bonus program *for unspecified Citrix employees*. The parties determined to defer further discussion of this item until after the execution of the Merger Agreement.

122.    On January 30, 2022, Qatalyst reviewed its various analyses of the Merger Consideration with the Transaction Committee and other members of the Board, including Qatalyst's DCF analyses based on the December 2021 Projections and one of the December 2021 Sensitivity Cases.

123.    Qatalyst thereafter presented its Fairness Opinion concluding that Merger Consideration of $104.00 in cash per share was fair to Citrix Shareholders from a financial point of view. But Qatalyst's Fairness Opinion was based on the false December 2021 Projections and false December 2021 Sensitivity Cases, the Fairness Opinion was also false. Nevertheless, concededly based in part on what it knew was a false Fairness Opinion, the Transaction Committee recommended that the Board (i) declare that the Merger was "in the best interests of [Citrix] stockholders," and (ii) recommend that Citrix shareholders approve the Merger. With Defendants Kilcoyne and Hogan (but not Defendant Calderoni) recusing themselves, the full Board accepted the Transaction Committee's recommendations.

124.    On January 31, 2022, Citrix, Elliott and Vista executed the Merger Agreement, and issued a joint press release announcing the Merger.

### 10.    *Citrix's Q4 2021 Results*

125.    On the same day that the Merger was announced, Citrix reported Q4 2021 and full year 2021 results. In Q4 2021, Citrix achieved revenue of $851 million, compared to $810 million

in the fourth quarter of fiscal year 2020, representing 5 percent revenue growth. The $851 million revenue also *beat* guidance in the Q3 2021 Letter of $825 million to $835 million in revenue for Q4 2021.

126.    For fiscal year 2021, Citrix reported annual revenue of $3.22 billion. This result also *beat* guidance in the Q3 2021 Letter of $3.19 billion to $3.20 billion in revenue for full year 2021.

127.    In sum, Q4 2021 results showed that in addition to enormous growth in SaaS ARR, Citrix was also growing its overall revenue as the business model transition successfully proceeded. This was indeed an extraordinary feat since both Henshall and Calderoni had warned that the shift to a subscription-based model with its *higher value recurring revenue streams* would result in more of the business booked in the current period being recognized in future periods. Yet, even with that handicap, Citrix still beat revenue guidance for Q4 2021 and full year 2021.

### D.    Events After Announcement of the Merger

128.    On February 8, 2022, representatives of Citrix contacted representatives of Vista and Elliott to discuss the proposed $20.0 million retention bonus program for unspecified Citrix employees. Representatives of Vista and Elliott indicated that they would be supportive of a retention bonus program, but did not formalize the amount of any such bonus pool or how it would be allocated. The parties agreed that they would formalize such bonus program at a later date, which occurred after the filing of the Proxy.

129.    The Proxy advised Citrix stockholders that the "Merger cannot be completed unless the Merger Agreement is adopted by stockholders holding a majority of the outstanding shares of Citrix common stock entitled to vote at the Special Meeting." On April 21, 2022, Citrix stockholders voted to approve the Merger. Thus, the Proxy containing false and misleading

statements that misled Citrix stockholders into believing that the Merger Consideration was fair was an essential link in the accomplishment of the Merger.

130.     The Merger closed on September 30, 2022, and Vista and Elliott have since combined Citrix and TIBCO into a new entity called Cloud Software Group.

### E.     Receipt of Different Consideration by Officers and Directors

131.     The Proxy acknowledges that "Citrix's non-employee directors and executive officers have interests in the Merger that may be different from, or in addition to, the interests of Citrix shareholders generally." Among those differing and additional interests was the acceleration and conversion of all Citrix equity awards (i.e., RSUs, PRSUs and DSUs), whether vested or unvested, into a right to receive the Merger Consideration based on the number of shares underlying each such award.

132.     The Proxy contained the following tables showing the amount of cash that Citrix's executive officers and non-employee directors could expect to receive for their Citrix RSU, PRSU and DSU awards under the Merger Agreement:

**Cash Payments to Executive Officers and Non-Employee Directors in Respect of Citrix RSUs**

| Name | No. of Citrix RSUs | Consideration ($)(1) |
|---|---|---|
| **Executive Officers:** | | |
| Robert M. Calderoni | 105,966 | 11,020,464 |
| Michael Arenth | 62,770 | 6,528,080 |
| Antonio G. Gomes | 22,599 | 2,350,296 |
| David J. Henshall (2) | — | — |
| Paul J. Hough | 22,340 | 2,323,360 |
| Woong Joseph Kim | 77,302 | 8,039,408 |
| Donna N. Kimmel | 20,146 | 2,095,184 |
| Hector Lima | 29,387 | 3,056,248 |
| Timothy A. Minahan | 20,146 | 2,095,184 |
| Mark J. Schmitz | 38,284 | 3,981,536 |
| Arlen R. Shenkman | 42,130 | 4,381,520 |
| Jason Smith | 34,209 | 3,557,736 |
| **Non-Employee Directors:** | | |
| Nanci E. Caldwell | 2,144 | 222,976 |
| Murray J. Demo | 2,144 | 222,976 |
| Thomas E. Hogan | 2,144 | 222,976 |
| Moira A. Kilcoyne | 2,144 | 222,976 |
| Robert E. Knowling, Jr. | — | — |
| Peter J. Sacripanti | 2,144 | 222,976 |
| J. Donald Sherman | 2,144 | 222,976 |

**Cash Payments to Executive Officers and Non-Employee Directors in Respect of Citrix DSUs (Vested and Unvested)**

| Name | No. of Citrix DSUs(1) | Consideration ($)(2) |
|------|------|------|
| **Executive Officers:** | | |
| Robert M. Calderoni | 17,685 | 1,839,240 |
| David J. Henshall(3) | 50,066 | 5,206,864 |
| **Non-Employee Directors:** | | |
| Nanci E. Caldwell | 32,496 | 3,379,584 |
| Murray J. Demo | — | — |
| Thomas E. Hogan | — | — |
| Moira A. Kilcoyne | — | — |
| Robert E. Knowling, Jr. | 3,502 | 364,208 |
| Peter J. Sacripanti | 12,278 | 1,276,912 |
| J. Donald Sherman | — | — |

**Cash Payments to Executive Officers in Respect of Citrix PRSUs**

| Name | No. of Citrix PRSUs(1) | Consideration ($) (2) |
|------|------|------|
| Robert M. Calderoni | — | — |
| Michael Arenth | | — |
| Antonio G. Gomes | 62,638 | 6,514,352 |
| David J. Henshall (3) | 86,324 | 8,977,696 |
| Paul J. Hough | 61,696 | 6,416,384 |
| Woong Joseph Kim | 31,513 | 3,277,352 |
| Donna N. Kimmel | 55,546 | 5,776,784 |
| Hector Lima | 37,078 | 3,856,112 |
| Timothy A. Minahan | 55,546 | 5,776,784 |
| Mark J. Schmitz | 74,403 | 7,737,912 |
| Arlen R. Shenkman (4) | — | — |
| Jason Smith | — | — |

133.    In particular, according to the Proxy, Defendant Calderoni will be eligible to receive a total of $20,248,022 in potential payments in connection with completion of the Merger, comprised of the equity awards described above, plus cash and other benefits:

**Potential Payments to Named Executive Officers**

| Named Executive Officer | Cash ($)(1) | Equity ($)(2) | Perquisites/ Benefits ($)(1) | Total ($) |
|---|---|---|---|---|
| Robert M. Calderoni | 7,314,041 | 12,859,704 | 74,277 | 20,248,022 |
| David J. Henshall | 8,750,000(3) | 8,977,696(4) | — | 17,727,696 |
| Arlen R. Shenkman | 1,800,000 | 12,166,232 | 82,514 | 14,048,746 |
| Antonio G. Gomes | 1,496,250 | 8,864,648 | 83,539 | 10,444,437 |
| Paul J. Hough | 1,496,250 | 8,739,744 | 83,539 | 10,319,533 |
| Woong Joseph Kim | 1,800,000 | 11,316,760 | 57,688 | 13,174,448 |

134.    Additionally, the Proxy discloses that Defendant Calderoni currently beneficially owns or has a pecuniary interest in 117,419 Citrix shares, which appears to include approximately 70,000 shares of Citrix stock owned outright or held in an affiliated trust (after excluding RSU's and DSU's already accounted for in the tables above). Such additional shares will result in the payment of additional cash to Defendant Calderoni (and an affiliated trust) of approximately $7.3 million upon consummation of the Merger, for total cash payments to Defendant Calderoni in excess of $27 million.

135.    Beyond the outsized economic benefits of the Merger to Calderoni, the acceleration of the PRSU's granted was particularly attractive to other senior Citrix executives since, according to the Proxy, the PRSU's were deemed to satisfy maximum performance levels and thus pay up to 200% upon a Change of Control. Holders of the PRSU's would therefore receive $208.00 in cash (instead of just $104.00 in cash) for each share underlying such awards without actually having to satisfy the maximum performance levels to obtain such payout. Since the holders of PRSUs were Citrix's most senior executives, it is reasonable to infer that at least some of these executives were involved in the preparation of the false December 2021 Projections (which, according to the Proxy, were prepared by members of Citrix's senior management). The opportunity to receive $208.00

per share in cash for each PRSU (without actually having to satisfy the maximum performance level) would have provided a powerful incentive for such executives to help justify the Merger Consideration.[8]

## V.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS AND OMISSIONS IN THE PROXY STATEMENT

136.   As detailed below, the Proxy (i) made false and misleading statements of material fact, and (ii) omitted material facts necessary to make statements therein—in light of the circumstances under which they were made—not misleading, in order to paint an unduly pessimistic picture of Citrix's prospects, and thereby induce Citrix shareholders to approve the sale of Citrix to Elliott and Vista at an unfair and inadequate price. Since the Merger could not have closed without an affirmative vote of a majority of Citrix stockholders in favor of the Merger, the Proxy with all of the false and misleading statements and omissions detailed below was an essential link in the accomplishment of the Merger.

137.   In particular, the December 2021 Projections included in the Proxy and used by Qatalyst to prepare its Fairness Opinion were objectively false because they disregarded the accelerating growth in SaaS ARR in 2021, revenue beat in Q3 2021, and forecast of improving profitability metrics for the balance of 2021. Likewise, the December 2021 Sensitivity Cases used by Qatalyst to prepare its Fairness Opinion were objectively false because they assumed *deteriorating* metrics in terms of revenue and margin when, in fact, (i) the Q3 2021 Letter reported

---

[8] As per the tables above, among the senior executives entitled to 200% cash payouts from PRSUs upon consummation of the Merger, *Antonio G. Gomes* served as Executive Vice President, Chief Legal Officer and Secretary; *Paul J. Hough* served as Executive Vice President and Chief Product Officer; *Woong Joseph Kim* served as Executive Vice President of Engineering and Chief Technology Officer; *Donna N. Kimmel* served as Executive Vice President and Chief People Officer; *Hector M. Lima* served as Executive Vice President of Customer Experience; *Timothy A. Minahan* served as Executive Vice President, Business Strategy and Chief Marketing Officer; and *Mark J. Schmitz* served Executive Vice President and Chief Operating Officer.

*improving* revenue and projected improving profitability metrics, and (ii) the Q4 2021 results reported improving revenue. In short, metrics were trending higher, while the December 2021 Sensitivity Cases assumed metrics would trend lower—the exact opposite.

138.    The December 2021 Projections and the December 2021 Sensitivity Cases were also subjectively false because the Board did not and could not have genuinely believed the accuracy of the December 2021 Projections and the December 2021 Sensitivity Cases in light of the Board's awareness of, among other trends, Citrix's accelerating growth in SaaS ARR in 2021, Citrix's revenue beats in Q3 2021 and Q4 2021, and projected improvement in 2021 in several profitability metrics. In particular, Defendant Calderoni was obviously aware of his own positive and optimistic statements in the Q3 2021 Letter and on the Q3 2021 Conference Call. Nevertheless, Defendant Calderoni and the rest of the Board authorized (i) the inclusion of the false December 2021 Projections in the Proxy, and (ii) the use by Qatalyst of the false December 2021 Projections and one of the false December 2021 Sensitivity Cases to prepare the Fairness Opinion in order to justify the unfair and inadequate price at which the Board agreed to sell Citrix to Elliott and Vista.

139.    The entire Board is liable for all of the false and misleading statements and omissions detailed below. Despite knowing that the December 2021 Projections and the December 2021 Sensitivity Cases were false, and therefore that the Fairness Opinion (which was based on the December 2021 Projections and the December 2021 Sensitivity Cases) was false, the *full* Board nevertheless approved the Merger, declared that it was "in the best interests of the Company's stockholders," and recommended "that stockholders vote "FOR" the proposal to adopt the Merger Agreement."

A.    **Misstatements and Omissions That Rendered Statements in the Proxy About the Q2 and Q3 2021 Results Misleading**

140.    The Proxy, as supplemented by the additional disclosures filed on April 13, 2022

("Supplemental Disclosures"), summarized its announcements of its results in Q1, Q2 and Q3 of

2022, respectively, using the following three similarly formulated paragraphs:

> On April 29, 2021, Citrix announced its results of operations for the first quarter of fiscal year 2021, which included *reported revenue below expectations despite year-over-year growth in Citrix's software-as-a-service annualized recurring revenue*. The Company noted that its results reflected supply chain challenges for certain components used in its networking products, which led to hardware shipment delays, and lower than anticipated on-premises term average contract duration. In addition, Citrix lowered its fiscal year 2021 earnings guidance to reflect the actual results for the first quarter, as well as the dilutive impact of the closing of the Wrike acquisition.

> [. . .]

> On July 29, 2021, Citrix announced its results of operations for the second quarter of fiscal year 2021, which again included *reported revenue below expectations, noting the difficulties associated with transitioning the business to a SaaS model* and the need to evolve the Company's sales strategy to deliver more predictable results. In addition, Citrix further lowered its fiscal year 2021 earnings guidance to reflect the actual results for the first half of 2021, as well as certain organizational changes that Citrix was making in the second half of the year to address recent execution challenges.

> [. . .]

> On November 4, 2021, Citrix reported its results of operations for the third quarter of 2021 and *moderated its fourth quarter revenue expectations*, *noting that the Company had underperformed its expectations* during the year as it continued to face execution challenges.

Proxy at 22, 31.

141.    The above sequence of italicized statements in the Proxy concerning Q1, Q2 and

Q3 2021 results was misleading because, while the company expressly stated that the Company

had experienced year-over-year growth in SaaS ARR in its statements about Q1, the Company

omitted that Citrix likewise had experienced year-over-year growth in SaaS ARR in its similarly

formulated statements about Q2 and Q3. In this way, the above statement implied that Citrix had only experienced year-over-year growth in SaaS ARR during Q1 2021. As set forth above, the quarterly letters issued by the Company for Q1, Q2 and Q3 2021 all reported accelerating SaaS ARR (i.e., growth of 70% in Q1 2021, 74% in Q2 2021, and 75% in Q3 2021). The Proxy, however, only mentions accelerating SaaS ARR when discussing the Q1 2021 results, and does not mention accelerating SaaS ARR in the statements discussing the Q2 and Q3 2021 results. Thus, the Proxy misled Citrix stockholders into concluding that SaaS ARR had not accelerated in Q2 2021 and Q3 2021, which would have misled Citrix stockholders into further mistakenly concluding that Citrix's cloud transition was stalling. But in fact, as shown, both Henshall and Calderoni reported in Q2 2021 and Q3 2021, respectively, that Citrix's cloud transition was making "strong" and "significant" progress (as evidenced by accelerating SaaS ARR in each of those quarters). The two statements above in the Proxy addressing the Q2 and Q3 2021 results were thus rendered misleading by omission.

### B. Misstatements and Omissions That Rendered Statements in the Proxy About the Q2 2021 Results Misleading

142.    Concerning Q2 2021 results, the Proxy stated:

On July 29, 2021, Citrix announced its results of operations for the second quarter of fiscal year 2021, which again included reported revenue below expectations, *noting the difficulties associated with transitioning the business to a SaaS model* and the need to evolve the Company's sales strategy to deliver more predictable results.

(Proxy at 22).

143.    In the above statement, the Proxy states only a half-truth in stating that the Company was experiencing "difficulties . . . with transitioning the business to a SaaS model," because in fact, the Company was experiencing accelerating SaaS ARR in Q2 2021 and other successes in its transition to a SaaS model, and so was not experiencing only difficulties with that

transition.  Reasonable Citrix stockholders would take from the above statement that the cloud transition was not going well. But in fact, Henshall had reported in the Q2 2021 Letter that (i) SaaS ARR had grown 74% year-over-year to more than $1 billion (up from $943 billion in Q1 2021), (ii) SaaS ARR had grown to 26% of total revenue, up from 16% in Q2 2020, and (iii) "[w]ith year-over-year [SaaS ARR] growth accelerating for the third consecutive quarter, both inclusive and exclusive of Wrike since the close of the acquisition, strong SaaS ARR growth demonstrates our focus on transitioning our installed base." Thus, notwithstanding any challenges identified by Henshall, the cloud transition was "*progressing well*," as Henshall stressed.

144.    The above statement in the Proxy concerning Q2 2021 results was also misleading because it omitted material facts that rendered it misleading. In particular, the above statement was misleading because it focused exclusively on *negative* factors, but failed to disclose any of the following *positive* factors: (i) the accelerating growth in SaaS ARR in Q2 2021 (as reported in the Q2 2021 Letter), (ii) the "positive momentum" in the business model transition (as reported in the Q2 2021 Letter), and (iii) the belief of former CEO Henshall (expressed in the Q2 2021 Letter) that "SaaS ARR is the *best way* to measure the progress we are making in transitioning our business to the cloud."

145.    Omission of the numerous *positive* aspects of the Q2 2021 results identified above rendered the above statement in the Proxy concerning the Q2 2021 results misleading insofar as Citrix shareholders reading that statement would take away from them that the Q2 2021 were exclusively disappointing. Moreover, given the Proxy's reference to "year-over-year growth in Citrix's [SaaS ARR]" in connection with its discussion of the Q1 2021 results, the omission of any reference to continued growth in SaaS ARR when discussing the Q2 2021 results would mislead

Citrix shareholders into believing that such growth had stopped. In fact, however, Citrix had experienced enormous growth in Q2 2021 with respect to SaaS ARR.

### C.   Misstatements and Omissions in the Proxy About the Q3 2021 Results Were Misleading

146.    Concerning Q3 2021 results, the Proxy stated:

Citrix reported its results of operations for the third quarter of 2021 . . . noting that *the Company had underperformed its expectations during the year* as it continued to face execution challenges.

(Proxy at 31).

147.    The above statement in the Proxy concerning Q3 2021 results was materially misleading because it stated that the Company had *underperformed* its expectations during the year, when in fact, the Company had *outperformed* its expectations in Q3 2021, i.e., in Q3 2021, Citrix reported $778 million in revenue, which *beat* the Company's guidance in the Q2 2021 Letter of $765 million to $775 million in GAAP revenue for Q3 2021.

148.    The above statement also omitted material facts that rendered it misleading because it failed to disclose that (i) the third quarter was the *fourth consecutive quarter of accelerating* organic SaaS ARR growth," which Calderoni stated in the Q3 2021 Letter was "a clear sign that our SaaS offerings are resonating with customers," and (ii) SaaS ARR growth accelerated in Q3 2021, and was up 75% year-over-year (as compared to 70% year-over-year in Q2 2021). The Proxy's discussion of Q3 2021 results was also unduly pessimistic since it ignored Calderoni's statements in the Q3 2021 Letter that negative factors were mitigating; namely, (i) "the revenue headwinds from declining perpetual licenses are now largely behind us;" (ii) "[o]ver time, as we emerge from our cloud transition, we would expect to see reported revenues grow more in line with Total ARR;" and (iii) 2021 would "be a trough in terms of both operating margin and cash

flow." The Proxy also ignored the improved outlook for key profitability metrics set forth in the Q3 2021 Letter, i.e., GAAP and Non-GAAP EPS, and GAAP and Non-GAAP operating margin.

149.    Omission of the numerous *positive* aspects of Q3 2021 results identified above rendered the above statement in the Proxy concerning the Q3 2021 results misleading insofar as Citrix shareholders reading that statement would take away from them that the Q3 2021 were exclusively disappointing. Moreover, given the Proxy's reference to "year-over-year growth in Citrix's [SaaS ARR]" in connection with its discussion of the Q1 2021 results, the omission of any reference to continued growth in SaaS ARR when discussing the Q3 2021 results would mislead Citrix shareholders into believing that such growth had stopped. In fact, however, Citrix had experienced accelerating growth in Q3 2021 with respect to a key metric—SaaS ARR—that Defendant Calderoni had identified as the "best way" to measure the progress of business model transition.

### D.    The December 2021 Projections and December 2021 Sensitivity Case Contained in the Proxy Were Subjectively and Objectively False and Misleading

150.    In the Proxy, Defendants included the following numerical summary of the December 2021 Projections:

*Summary of December Projections*

The following table is a summary of the December Projections:

| ($ in millions) | 2021E(1) | 2022E | 2023E | 2024E | 2025E | 2026E |
|---|---|---|---|---|---|---|
| Revenue | $3,212 | $3,409 | $3,765 | $4,040 | $4,241 | $4,423 |
| Non-GAAP Gross Profit (2) | $2,687 | $2,878 | $3,186 | $3,439 | $3,609 | $3,766 |
| Non-GAAP Operating Income (3) | $836 | $1,008 | $1,194 | $1,350 | $1,451 | $1,548 |
| Non-GAAP Net Income (4) | $644 | $746 | $902 | $1,041 | $1,126 | $1,213 |
| EBITDA (5) | $1,033 | $1,216 | $1,407 | $1,567 | $1,673 | $1,775 |

(1)    Included actual results for the first three quarters of fiscal year 2021 and projections for the fourth quarter of the fiscal year. Actual results for fiscal year 2021 are set forth in the Company's Annual Report on Form 10-K for the fiscal year ended December 31, 2021 as filed with the SEC on February 16, 2022. See the section of this proxy statement titled "*Where You Can Find Additional Information*".

(2)    Non-GAAP Gross Profit excludes the effects of stock-based compensation expense, amortization and impairment of acquired intangible assets and restructuring charges.

(3)    Non-GAAP Operating Income excludes the effects of stock-based compensation expense, amortization and impairment of acquired intangible assets, acquisition-related costs and restructuring charges.

(4)    Non-GAAP Net Income excludes the effects of stock-based compensation expense, amortization and impairment of acquired intangible assets, acquisition-related costs, charges and benefits related to tax reform, restructuring charges and the tax effects related to these items.

(5)    EBITDA is a non-GAAP financial measure calculated as Non-GAAP Operating Income plus depreciation and amortization and other amortization items.

151.    Further, the Proxy included the following calculations by Qatalyst of unlevered free cash flows based on based on the December Projections:

| ($ in millions) | 2022E | 2023E | 2024E | 2025E | 2026E |
|---|---|---|---|---|---|
| Revenue | $3,409 | $3,765 | $4,040 | $4,241 | $4,423 |
| Non-GAAP Operating Income (1) | $1,008 | $1,194 | $1,350 | $1,451 | $1,548 |
| Net Operating Profit After Tax (2) | $905 | $1,056 | $1,186 | $1,271 | $1,351 |
| Less: Capital Expenditures | (90) | (90) | (90) | (90) | (90) |
| Plus: Depreciation and Amortization | 83 | 85 | 87 | 88 | 90 |
| Plus: Other Amortization (3) | 125 | 127 | 130 | 133 | 137 |
| Less: Change in Working Capital | (96) | (168) | (87) | (8) | 40 |
| Less: Other (4) | (44) | (19) | (19) | (19) | (19) |
| Unlevered Free Cash Flow | $883 | $992 | $1,208 | $1,375 | $1,509 |

(1)   Non-GAAP Operating Income excludes the effects of stock-based compensation expense, amortization and impairment of acquired intangible assets, acquisition-related costs and restructuring charges.
(2)   Net Operating Profit After Tax is calculated as non-GAAP operating income less taxes calculated at an assumed cash tax rate of 10% in 2022, 12% in each of 2023, 2024 and 2025, and 13% in 2026.
(3)   Includes amortization of capitalized commissions and other operating lease related amortization.
(4)   Includes restructuring and other cash flow items.

152.    The Proxy also included the following calculations by Qatalyst of unlevered free cash flows based on one of the December 2021 Sensitivity Cases:

| ($ in millions) | 2022E | 2023E | 2024E | 2025E | 2026E |
|---|---|---|---|---|---|
| Revenue | $3,344 | $3,626 | $3,819 | $3,932 | $4,022 |
| Non-GAAP Operating Income (1) | $988 | $1,099 | $1,185 | $1,249 | $1,307 |
| Net Operating Profit After Tax (2) | $888 | $971 | $1,041 | $1,094 | $1,141 |
| Less: Capital Expenditures | (88) | (87) | (85) | (83) | (82) |
| Plus: Depreciation and Amortization | 82 | 82 | 82 | 82 | 82 |
| Plus: Other Amortization (3) | 123 | 123 | 123 | 124 | 124 |
| Less: Change in Working Capital | (94) | (162) | (82) | (8) | 36 |
| Less: Other (4) | (44) | (19) | (19) | (19) | (19) |
| Unlevered Free Cash Flow | $866 | $909 | $1,060 | $1,189 | $1,283 |

(1)   Non-GAAP Operating Income excludes the effects of stock-based compensation expense, amortization and impairment of acquired intangible assets, acquisition-related costs and restructuring charges.
(2)   Net Operating Profit After Tax is calculated as non-GAAP operating income less taxes calculated at an assumed cash tax rate of 10% in 2022, 12% in each of 2023, 2024 and 2025, and 13% in 2026.

153.    The above December Projections, and unlevered cash flows based on the December 2021 Projections and a December 2021 Sensitivity Case, were objectively false and misleading because they implied that the Company's current trajectory for revenue growth and financial performance was *negative* and *deteriorating*, when in fact the statements by Calderoni to investors in the Q3 2021 Letter and to analysts on the Q3 2021 Conference Calls made clear that that the Company's current trajectory for revenue growth and financial performance was *positive* and *improving* due to accelerating SaaS ARR growth (which Calderoni had stated in the April 2021 Meeting Notice was "a *forward-looking indicator of top line trends*."). And concerning past

execution challenges, Calderoni reassured investors that (i) "the revenue headwinds from declining perpetual licenses are now largely behind us;" (ii) "[o]ver time, as we emerge from our cloud transition, we would expect to see reported revenues grow more in line with Total ARR;" and (iii) 2021 would "be a trough in terms of both operating margin and cash flow."

154.     Moreover, the December 2021 Projections, and unlevered cash flows based on the December 2021 Projections and one of the December 2021 Sensitivity Cases, were also subjectively false. Specifically, given Calderoni's statements above in the Q3 2021 Letter and on the Q3 2021 Conference reporting, among other positive trends (i) accelerating SaaS ARR growth, (ii) "revenue headwinds . . . now largely behind us," with Q3 2021 revenue *beating* guidance; (iii) a business with "a lot of tailwinds" that "should fuel growth for some time," (iv) "a lot of metrics . . . that are very, very encouraging," and (v) any narrative "questioning the health and strength of the business" being "misinformed,"  the Board—and especially Calderoni (who was aware of his own positive and optimistic statements)—could not have genuinely believed the December 2021 Projections and December 2021 Sensitivity Cases, which forecast deteriorating revenue and other metrics.

155.     Moreover, on December 28, 2021, senior management provided an updated forecast to the Transaction Committee regarding the financial results for the fourth quarter of 2021. As discussed above, the Q4 2021 results *beat* GAAP revenue guidance by a significantly wider margin than the Q3 2021 results had beat guidance. Thus, as of December 28, 2021, the Transaction Committee knew that, aside from the rapid growth in SaaS ARR, even GAAP revenue was improving, and given that knowledge, could not have legitimately believed the forecasts of deteriorating revenue in the December 2021 Projections, and should have advised Qatalyst that the December 2021 Projections were outdated and needed to be updated.

156.     Further, in the Q3 2021 Letter, Calderoni had stated that he expected 2021 would "be a trough in terms of both *operating margin* and cash flow." The Q3 2021 Letter also forecast for full year 2021 (i) GAAP Operating Margin of approximately 10%, (ii) Non-GAAP Operating Margin of approximately 25%, (iii) GAAP Diluted EPS of $1.81 to $1.87 per share, and (iv) Non-GAAP Diluted EPS of $4.90 to $4.95 per share. All of these metrics showed improvement over the forecasts in the Q2 2021 Letter for full year 2021 of (i) GAAP Operating Margin of approximately 8-9%, (ii) Non-GAAP Operating Margin of approximately 24-25%, (iii) GAAP Diluted EPS of $1.45 to $1.66 per share, and (iv) Non-GAAP Diluted EPS of $4.75 to $4.95 per share. Thus, there was no basis for Qatalyst to assume "*lower operating margins*" in the December 2021 Sensitivity Cases.

157.     Finally, it is telling that Qatalyst did not perform any sensitivity analysis to illustrate the potential *upside* to the December 2021 Projections from continued strong progress in transitioning to cloud-based solutions, and the continued enormous growth in SaaS ARR.

158.     Given the failure of senior management to consider Citrix's enormous progress in transitioning to cloud-based solutions, and enormous growth in SaaS ARR during 2021, when formulating the December 2021 Projections——it is clear that neither the December 2021 Projections nor the December 2021 Sensitivity Cases created by Qatalyst, reflected the legitimately held opinion of senior Citrix management regarding Citrix's prospects. Instead, it is plain that (i) the positive and optimistic statements concerning SaaS ARR growth and "tailwinds" shared by Defendant Calderoni in the Q3 2021 Letter and on the Q3 2021 Conference Call, represented the legitimately held opinion of Citrix management as of December 2021 concerning the future prospects for Citrix, and (ii) the unduly pessimistic December 2021 Projections and December 2021 Sensitivity Cases were created solely for the improper purpose of engineering a DCF

Analysis that would allow Qatalyst to conclude that the Merger Consideration was fair to Citrix shareholders. Indeed, as noted, Defendant Calderoni expressly stated on the Q3 2021 Conference Call that any narrative "questioning the health and strength of the business" was "misinformed."

**E.     The Qatalyst Fairness Opinion Was False and Misleading**

159.    In Annex C in the Proxy, Defendants attached the "Opinion of Qatalyst Partners LP."  (Proxy at C-1.)

160.    The Qatalyst Fairness Opinion in the Proxy was false and misleading because the DCF Analysis performed by Qatalyst and incorporated into the Qatalyst Fairness Opinion was based on the December 2021 Projections and December 2021 Sensitivity Case, which were themselves false and misleading. Had the DCF Analysis used reasonable and accurate projections that Citrix management genuinely believed (instead of using the false December 2021 Projections, false December 2021 Cash Flows, false December 2021 Sensitivity Case, and false December 2021 Sensitivity Case Cash Flows), the low end of value per share ranges derived from the DCF Analysis would have exceeded the Merger Consideration and indicated that the Merger Consideration was unfair and inadequate.

161.    Qatalyst's Fairness Opinion was also false and misleading because it was based in part on a *Selected Transactions Analysis* that failed to include the most probative transaction for the analysis, namely, Citrix's purchase of Wrike from Vista in January 2021. As noted, Citrix acquired Wrike from Vista for $2.25 billion when Wrike was projected to grow its SaaS ARR of $140 million in 2022 by 30 percent to between $180 million and $190 million in 2021, yielding a multiple of 16x *trailing* annual SaaS recurring revenue. That omission was likely intentional since it indicates that selling Citrix to Elliott and Vista for only $16.5 billion (including the assumption of Citrix debt)—a multiple of only 4.1x Citrix's *trailing* SaaS ARR in 2021—is highly unfair and inadequate.

162.    Finally, the Qatalyst Fairness Opinion was false and misleading because it used an inflated discount rate range of 8.0% to 9.5% (based on a methodology not fully disclosed in the Proxy) to further depress the value of Citrix. Notably, a DCF analysis performed by online research firm Simply Wall Street uses a discount rate of 6.77% (based on a fully disclosed methodology) in March 2022 to value Citrix at $171.55 per share:

## Share Price vs. Fair Value

Below are the data sources, inputs and calculation used to determine the intrinsic value for Citrix Systems.

| Data Point | Source | Value |
|---|---|---|
| Valuation Model | | 2 Stage Free Cash Flow to Equity |
| Levered Free Cash Flow | Average of 9 Analyst Estimates (S&P Global) | See below |
| Discount Rate (Cost of Equity) | See below | 6.8% |
| Perpetual Growth Rate | 5-Year Average of US Long-Term Govt Bond Rate | 1.9% |

| Data Point | Calculation/ Source | Result |
|---|---|---|
| Risk-Free Rate | 5-Year Average of US Long-Term Govt Bond Rate | 1.9% |
| Equity Risk Premium | S&P Global | 4.2% |
| Software Unlevered Beta | Simply Wall St/ S&P Global | 0.99 |
| Re-levered Beta | = 0.33 + [(0.66 * Unlevered beta) * (1 + (1 - tax rate) (Debt/Market Equity))]<br>= 0.33 + [(0.66 * 0.994) * (1 + (1 - 21.0%) (27.99%))] | 1.143 |
| Levered Beta | Levered Beta limited to 0.8 to 2.0 (practical range for a stable firm) | 1.143 |
| Discount Rate/ Cost of Equity | = Cost of Equity = Risk Free Rate + (Levered Beta * Equity Risk Premium)<br>= 1.92% + (1.143 * 4.24%) | 6.77% |

163.    The higher discount rate of 8.0% to 9.5% used by Qatalyst (according to an undisclosed methodology) depressed the value range for Citrix's shares. Raising discount rates

drives down the resulting value range. Citrix Shareholders are entitled to further disclosure on how Qatalyst derived its excessively high discount rate range.

**F.      Statements in the Proxy That the Transaction Committee Consisted of Independent and Disinterested Directors Were False and Misleading**

164.      On October 21, 2021, the Board formed the Transaction Committee consisting of Defendants Caldwell, Demo, Knowling, Sacripanti and Sherman. The Proxy stated that the Transaction Committee consisted of "independent and disinterested directors." The Proxy stated, for example:

> [T]he Citrix Board determined, as a matter of convenience and efficiency . . . to form a *Transaction Committee of independent and disinterested directors* to monitor and direct the process and procedures related to the review and evaluation of the October 18th Proposal and any other proposals that the Company may receive with respect to a strategic transaction . . . .

Proxy at 30.

165.      The above statement was false and misleading because, as shown above, Defendants Caldwell, Knowling and Sacripanti had past ties to Elliott or Visa, which rendered them incapable of making independent decisions in the best interests of Citrix and its stockholders free of extraneous considerations related to the interests of Elliott and Vista. This meant that a majority of the Transaction Committee—involved in such critical tasks as price negotiations—was not independent of Elliott and Vista.

166.      Further, because the Proxy did not disclose the past ties of Defendants Caldwell, Knowling and Sacripanti to Elliott and Vista, Citrix stockholders were misled into concluding that those directors were independent of Elliott and Vista. This was a material omission since the Transaction Committee handled, among other tasks, price negotiations with Elliott and Vista.

**G.      Omissions in the Proxy Concerning Past Ties Between Defendant Calderoni and Elliott Rendered Statements Misleading**

167.      The Proxy, as supplemented by the Supplemental Disclosures, purported to fully

disclose all of the past ties between Board members and Elliott:

> *Moira J. Kilcoyne was currently a director of Elliott Opportunity II Corp., a special purpose acquisition company sponsored by an affiliate of Elliott*, and Thomas E. Hogan was currently a Managing Director of Vista, which was among the financial sponsors that the Citrix Board determined to potentially contact in connection with the strategic process given Vista's investment focus in enterprise software, data and technology enabled organizations and in light of Vista's prior ownership of Wrike. *It was determined that, given Ms. Kilcoyne's current relationship with an Elliott affiliate and Mr. Hogan's current relationship with Vista and the potential conflicts or the appearance of potential conflicts that could arise as a result of these relationships, Ms. Kilcoyne and Mr. Hogan would recuse themselves from further Board meetings or deliberations regarding a potential transaction with Elliott or Strategic Buyer A or alternatives thereto*. As a result, Ms. Kilcoyne and Mr. Hogan (who were not in attendance for any portion of this meeting related to the strategic process) did not participate in further Board or committee meetings or deliberations regarding a potential transaction with Elliott or Strategic Buyer A or any alternatives thereto.
>
> In addition, the Citrix Board discussed *certain past relationships identified by the directors, including the past service of Mr. Cohn on the Citrix Board including service on the operations committee and nominating and corporate governance committee, and on a CEO search committee (disbanded in January 2016), which overlapped with certain of Citrix's current directors*, *the past service of Mr. Cohn on the Board of Directors of LogMeIn, Inc. (the company that acquired Citrix's GoTo family of service offerings) which overlapped with certain of Citrix's current directors, and a prior 18-month consulting relationship between Mr. Calderoni and Elliott that occurred during 2018 and 2019. It also was noted that a family member of Mr. Calderoni works for Elliott in a non-investment, administrative role*. The Citrix Board determined that these relationships did not present a conflict with respect to the consideration of a potential strategic transaction with Elliott or any alternatives thereto.

Proxy at 23-24.

168.      The above statement was misleading because it purported to disclose all past ties

between Board members and Elliott but failed to disclose past ties between Defendant Calderoni

and Elliott arising out Calderoni's involvement with Juniper and EMC—companies in which

Elliott held interests and adopted an activist stance. Defendant Calderoni previously served as a

director of Juniper where he worked with Elliott after Elliott reached an agreement with Juniper in February 2014 to obtain two seats on Juniper's board of directors and implement a plan to improve operations.  Defendant Calderoni also served as a senior advisor to Silver Lake Partners, a private equity firm that announced in October 2015 it would participate in the $67 billion purchase by Dell Computers of EMC, in which Elliott held a 2.2% stake and which Elliott had been pressuring since October 2014 to spin off assets. The Proxy's purported disclosure of all past ties between Defendant Calderoni and Elliott was thus rendered misleading by that omission.

### H.    Statements in the Proxy That the Merger Was "In the Best Interests" of Citrix Shareholders Were False and Misleading

169.    The Proxy repeatedly stated that the Transaction Committee and the Board concluded that the Merger was "in the best interests" of Citrix shareholders, "advisable" and "fair." For example:

> After careful consideration, the members of Citrix's board of directors . . . declared that the Merger Agreement, the Merger and the other transactions contemplated by the Merger Agreement were advisable and *in the best interests of the Company's stockholders* . . . .

Proxy, Opening Letter to Stockholders at 1; Proxy at iii, 12.

> The members of the Citrix Board . . . deem[ed] the Merger Agreement, the Merger and the other transactions and agreements contemplated by the Merger Agreement to be advisable, fair to and *in the best interests of the Company and its stockholders* . . . .

Proxy at v.

> Following consideration of the execution challenges that Citrix is facing, the risks associated with Citrix's business model transition, Citrix's historical and projected financial performance, and market dynamics, the Transaction Committee agreed that it was in the *best interests of Citrix and its stockholders* to proceed with a transaction with Vista and Elliott on the terms proposed . . . .

Proxy at 37.

> [T]he Transaction Committee unanimously adopted resolutions recommending to the Citrix Board that the Citrix Board: (1) declare that the Merger Agreement, the

> Merger and the other transactions contemplated by the Merger Agreement were advisable and *in the best interests of the Company's stockholders* . . . .

Proxy at 37-38.

> Thereafter, based upon the unanimous recommendation of the Transaction Committee, the members of the Citrix Board . . . unanimously adopted resolutions: (1) declaring that the Merger Agreement, the Merger and the other transactions contemplated by the Merger Agreement were advisable and *in the best interests of the Company's stockholders* . . . .

Proxy at 38.

> The Citrix Board carefully reviewed and considered the proposed Merger in consultation with Citrix's senior management and legal and financial advisors and, upon the unanimous recommendation of the Transaction Committee, the Citrix Board: (1) declared that the Merger Agreement, the Merger and the other transactions contemplated by the Merger Agreement were advisable and *in the best interests of the Company's stockholders* . . . .

Proxy at 38.

> Members of the Citrix Board and the Transaction Committee . . . reach[ed] the determination to approve the Merger Agreement and to declare that the Merger Agreement, the Merger and the other transactions contemplated by the Merger Agreement were advisable and *in the best interests of Citrix and its stockholders* . . . ."

170.   The above statements were false and misleading because, for the reasons set forth above, the Transaction Committee and the Board did not genuinely believe the December 2021 Projections and the December 2021 Sensitivity Cases, and thus knew that the Merger Consideration was inadequate and unfair, and thus could not have genuinely believed that the Merger was in "advisable," "fair" or "in the best interests" of Citrix and its stockholders.

**I.    Misstatement in the Proxy That the December 2021 Projections Represented Management's Best Currently Available Estimate of Citrix's Future Financial Performance Were False and Misleading**

171.   The Proxy stated that in preparing the Fairness Opinion, Qatalyst was "advised by Citrix's management" that the December 2021 Projections "had been reasonably prepared on a

basis *reflecting the best currently available estimates and judgments of the management of Citrix of the future financial performance of Citrix and other matters covered thereby*."  (Proxy at 42.)

172.    The above statement in the Proxy was false and misleading because the December 2021 Projections had not been prepared on a basis "reflecting the best currently available estimates and judgment of the management of Citrix of the future financial performance of Citrix." To the contrary, the best available estimates and judgments of Citrix management concerning the future financial performance of Citrix at the time the December 2021 Projections were set forth in the Q3 2021 Letter, which, as set forth above, showed that, among other things, SaaS ARR was accelerating, the transition to a cloud-based model was making strong progress, and revenue headwinds were mitigating. Further, Defendant Calderoni further shared his views concerning the future financial performance on the Q3 2021 Conference Call, on which he stated, among other things, that (i) Citrix is a business with "a lot of tailwinds" that "should fuel growth for some time," (ii) "a lot of metrics" for Citrix "are very, very encouraging," and (iii) any narrative "questioning the health and strength of the business" is "misinformed."

## VI.    LOSS CAUSATION

173.    Defendants' material misrepresentations and omissions in the Proxy caused actual economic loss to Citrix shareholders as measured by the difference between the inadequate and unfair Merger Consideration and the higher true value of Citrix's shares. In particular, in the Proxy, the Board recommended that Citrix stockholders approve the Merger based on false and misleading statements and omissions (as identified above), including the false and misleading Fairness Opinion, which was premised in material part on the false December 2021 Projections and a false December 2021 Sensitivity Case, as well as inflated discount rates.  Had the projections prepared by Citrix senior management taken into account accelerating SaaS ARR growth, improving GAAP revenue and other positive trends in Citrix's financial performance in 2021,

those projections would have yielded more accurate cash flows. In turn, had more accurate cash flows been used as inputs in Qatalyst's DCF Analysis (instead of the false December 2021 Cash Flows and false December 2021 Sensitivity Cash Flows), and had Qatalyst used reasonable discount rates, the DCF Analysis would have indicated that the value of Citrix's shares substantially exceeded $104.00 per share, and Qatalyst could not have opined that the Merger Consideration was fair. In turn, if Qatalyst could not opine that the Merger Consideration was fair, the Board could not have recommended that Citrix shareholders approve the Merger, and Citrix, Elliott and Vista could not have consummated the Merger unless Elliott and Vista were willing to submit a bid higher than $104.00 per share. That is to say, but for the false December 2021 Projections and December 2021 Sensitivity Case, and inflated discounted rates used by Qatalyst, Qatalyst could not have issued the Fairness Opinion; the Board could and would not have recommended that Citrix shareholders vote for the Merger; the requisite percentage of Citrix shareholders would not have voted for the Merger; and Citrix shareholders would not have been cashed out of their shares for at an inadequate and unfair price.

174.    Additionally, the multiple paid by Citrix to Vista to acquire Wrike in January 2021 serves as further evidence that the Merger Consideration undervalued Citrix. When it was acquired by Citrix, Wrike was growing its SaaS ARR at a rate of 30% per year. Wrike's 2020 SaaS ARR was $140 million, and thus Citrix paid a multiple of 16.1x trailing SaaS ARR to acquire Wrike from Vista (i.e., $2.25 billion/$140 million).

175.    As set forth in the Q1 2021, Q2 2021 and Q3 2021 Letters, Citrix grew SaaS ARR in 2021 at a rate of over 70% to over $4 billion. A multiple of 16.1x trailing 2021 SaaS ARR would value Citrix's SaaS ARR alone at $64 billion, without taking into account other non-SaaS revenue streams. While there may be other considerations that would reduce that figure (such as market

conditions), the gap between what Citrix paid Vista for Wrike (a SaaS business), and what Vista and Elliott paid to acquire Citrix's SaaS and other business lines just one year later is so vast, that a reasonable inference arises that Citrix stockholders did not get full value from the Merger, and would not have voted for the Merger had they been fully informed in the Proxy concerning the numerous positive trends in Citrix's business, including without limitation, accelerating SaaS ARR.

## VII.   CLASS ACTION ALLEGATIONS

176.   Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of a class ("Class") consisting of all individuals and entities that were Citrix common shareholders of record as of the close of business on September 30, 2022 ("Class Period"), when the Merger closed.  Excluded from the Class are defendants and their affiliates, immediate families, legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

177.   Plaintiff's claims are properly maintainable as a class action under Rule 23 of the Federal Rules of Civil Procedure.

178.   The Class is so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through discovery, the Proxy discloses that, as of the close of business on March 8, 2022, there were 125,913,152 shares of Citrix common stock outstanding and eligible to vote on the Merger. All members of the Class may be identified from records maintained by Citrix or its transfer agent and may be notified of the pendency of this action by mail, using forms of notice similar to that customarily used in securities class actions.

179.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of the federal securities laws specified above.

180.     Plaintiff will fairly and adequately protect the interests of the Class, and has no interests antagonistic to or in conflict with those of the Class that Plaintiff seeks to represent. Plaintiff has retained competent counsel experienced in securities class action litigation of this nature.

181.     Questions of law and fact are common to the Class and predominate over questions affecting any individual Class member, including, *inter alia*:

> (i)      Whether Defendants have violated Section 14(a) of the Exchange Act and Rule 14a-9 promulgated thereunder;

> (ii)     Whether the Individual Defendants have violated Section 20(a) of the Exchange Act; and

> (iii)    Whether Plaintiff and the other members of the Class are entitled to damages, and in what amount.

182.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy. Plaintiff knows of no difficulty to be encountered in the management of this action that would preclude its maintenance as a class action.

183.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class. Therefore, final injunctive relief on behalf of the Class as a whole is appropriate.

## COUNT I

### (Against All Defendants for Violations of Section 14(a) of the Exchange Act and Rule 14a-9)

184.    Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein.

185.    SEC Rule 14a-9, 17 C.F.R. §240.14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides:

> No solicitation subject to this regulation shall be made by means of any Proxy, form of proxy, notice of meeting or other communication, written or oral, containing any statement which, at the time and in light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading.

186.    By virtue of their positions within the Company, and/or roles in the process of preparing, reviewing, and/or disseminating the Proxy, Defendants were or should have been aware of their duty not to make false and misleading statements in the Proxy, and not to omit material facts from the Proxy necessary to make statements made therein—in light of the circumstances under which they were made—not misleading.

187.    Yet, as specified above, in violation of Section 14(a) of the Exchange Act and Rule 14a-9, Defendants filed a Proxy that (i) made untrue statements of material fact in the Proxy, and (ii) omitted material facts necessary to make statements therein— in light of the circumstances under which they were made—not misleading, in order to induce Citrix shareholders to vote in favor of the Merger and related proposals. Defendants were at least negligent in filing the Proxy with these material misrepresentations and omissions.

188.    The Proxy was an essential link in the accomplishment of the Merger since it solicited Citrix shareholders to vote to approve the Merger, and the solicitation of such votes

enabled Defendants to consummate the Merger when Citrix shareholders voted to approve the Merger.

189.    The misrepresentations and omissions in the Proxy specified above are material insofar as there is a substantial likelihood that a reasonable Citrix stockholder would consider them important in deciding whether to vote in favor of the Merger and related proposals. In addition, a reasonable Citrix stockholder would view disclosures of the omitted facts specified above as significantly altering the "total mix" of information made available to Citrix shareholders.

190.    As a direct result of the Defendants' dissemination of the false and misleading Proxy, Plaintiff and other members of the Class were deprived of their right to be presented with accurate proxy materials while asked to vote on the Merger, were caused to vote in favor of the Merger, were caused to not exercise their appraisal rights, and were caused to sell their shares for less than the fair value of those shares.

191.    By reason of the misconduct detailed herein, the Defendants are liable pursuant to Section 14(a) of the Exchange Act and SEC Rule 14a-9 promulgated thereunder.

## COUNT II

### (Against the Individual Defendants for Violations of
### Section 20(a) of the Exchange Act)

192.    Plaintiff incorporates and repeats each and every allegation above as if fully set forth herein

193.    The Individual Defendants acted as controlling persons of Citrix within the meaning of Section 20(a) of the Exchange Act, as alleged herein.  By virtue of their positions as officers and/or directors of Citrix, and participation in, and/or awareness of Citrix's operations, and/or intimate knowledge of the contents of the Proxy filed with the SEC, they had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of

Citrix with respect to the Proxy, including the content and dissemination of the various statements in the Proxy that Plaintiff contends are materially false and misleading, and the omission of material facts specified above.

194.    Each of the Individual Defendants was provided with or had unlimited access to copies of the Proxy and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

195.    Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of Citrix, and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations alleged herein, and exercised same. In particular, the Proxy at issue references the unanimous recommendation of the Board to approve the Merger, and recommend that Citrix shareholders vote for the Merger. The Individual Defendants were thus directly involved in the making of the Proxy.

196.    In addition, as the Proxy sets forth at length, and as described herein, the Individual Defendants were involved in negotiating, reviewing, and approving the Merger.  The Proxy purports to describe the various issues and information that the Individual Defendants reviewed and considered in connection with such negotiation, review and approval. The Individual Defendants thus directly participated in the drafting of the Proxy.

197.    As set forth above, the Individual Defendants had the ability to exercise control over and did control a person or persons who have each violated Section 14(a), by their acts and omissions as alleged herein. By virtue of their positions as controlling persons, these Defendants are liable pursuant to Section 20(a) of the Exchange Act.

**PRAYER FOR RELIEF**

WHEREFORE, Lead Plaintiffs pray for judgment and relief as follows:

A.      Preliminarily determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure; appointing Plaintiffs as the Class Plaintiffs; and appointing Lead Counsel as Class Counsel;

B.      Awarding compensatory damages in favor of Plaintiff and other Class Members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including reasonable attorneys' fees and expert fees;

D.      Awarding Plaintiffs and the Class pre- and post-judgment interest on any damages recovered; and

E.      Granting such other and further relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiff demands a trial by jury on all claims and issues so triable.


Dated:  May 8, 2023                                  Respectfully submitted,

                                                     **MILLER SHAH LLP**
                                                     */s/ Jayne A. Goldstein*
                                                     Jayne A. Goldstein (FBN 144088)
                                                     1625 N. Commerce Pkwy, Suite 320
                                                     Fort Lauderdale, FL 33326
                                                     Telephone: (954) 903-3170
                                                     Facsimile: (866) 300-7367
                                                     jagoldstein@millershah.com

                                                     *Liaison Counsel for the Proposed Class*

                                                     **POMERANTZ LLP**
                                                     Jeremy A. Lieberman (*pro hac vice pending*)
                                                     Austin P. Van (*pro hac vice pending*)
                                                     600 Third Avenue, 20th Floor
                                                     New York, NY 10016
                                                     Telephone: (212) 661-1100
                                                     Facsimile: (917) 463-1044
                                                     jalieberman@pomlaw.com
                                                     avan@pomlaw.com

                                                     Joshua E. Fruchter
                                                     (admitted *pro hac vice*)
                                                     **WOHL & FRUCHTER LLP**
                                                     25 Robert Pitt Drive, Suite 209G
                                                     Monsey, NY 10952
                                                     Telephone: (845) 290-6818
                                                     Facsimile: (718) 504-3773
                                                     jfruchter@wohlfruchter.com

                                                     *Lead Counsel for the Proposed Class*

# EXHIBIT A

**EXHIBIT A: Comparison of Sept 2021 Projections ("Sept 21P") vs. Dec 2021 Projections ("Dec 21P")**

| Revenue | | | Revenue | | | Revenue | | | Revenue | | | Revenue | | | Revenue | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sept 21P | Dec 21P | | Sept 21P | Dec 21P | | Sept 21P | Dec 21P | | Sept 21P | Dec 21P | | Sept 21P | Dec 21P | | Sept 21P | Dec 21P | |
| 2021E | 2021E | % Δ | 2022E | 2022E | % Δ | 2023E | 2023E | % Δ | 2024E | 2024E | % Δ | 2025E | 2025E | % Δ | 2026E | 2026E | % Δ |
| 3,267 | 3,212 | (1.7%) | 3,494 | 3,409 | (2.4%) | 3,938 | 3,765 | (4.4%) | 4,209 | 4,040 | (4.0%) | 4,465 | 4,241 | (5.0%) | 4,692 | 4,423 | (5.7%) |
| **Non-GAAP Gross Profit** | | | **Non-GAAP Gross Profit** | | | **Non-GAAP Gross Profit** | | | **Non-GAAP Gross Profit** | | | **Non-GAAP Gross Profit** | | | **Non-GAAP Gross Profit** | | |
| Sept 21P | Dec 21P | | Sept 21P | Dec 21P | | Sept 21P | Dec 21P | | Sept 21P | Dec 21P | | Sept 21P | Dec 21P | | Sept 21P | Dec 21P | |
| 2021E | 2021E | % Δ | 2022E | 2022E | % Δ | 2023E | 2023E | % Δ | 2024E | 2024E | % Δ | 2025E | 2025E | % Δ | 2026E | 2026E | % Δ |
| 2,730 | 2,687 | (1.6%) | 2,931 | 2,878 | (1.8%) | 3,305 | 3,186 | (3.6%) | 3,542 | 3,439 | (2.9%) | 3,749 | 3,609 | (3.7%) | 3,944 | 3,766 | (4.5%) |
| **Non-GAAP Operating Income** | | | **Non-GAAP Operating Income** | | | **Non-GAAP Operating Income** | | | **Non-GAAP Operating Income** | | | **Non-GAAP Operating Income** | | | **Non-GAAP Operating Income** | | |
| Sept 21P | Dec 21P | | Sept 21P | Dec 21P | | Sept 21P | Dec 21P | | Sept 21P | Dec 21P | | Sept 21P | Dec 21P | | Sept 21P | Dec 21P | |
| 2021E | 2021E | % Δ | 2022E | 2022E | % Δ | 2023E | 2023E | % Δ | 2024E | 2024E | % Δ | 2025E | 2025E | % Δ | 2026E | 2026E | % Δ |
| 850 | 836 | (1.6%) | 1,048 | 1,008 | (3.8%) | 1,263 | 1,194 | (5.5%) | 1,405 | 1,350 | (3.9%) | 1,525 | 1,451 | (4.9%) | 1,644 | 1,548 | (5.8%) |
| **Non-GAAP Net Income** | | | **Non-GAAP Net Income** | | | **Non-GAAP Net Income** | | | **Non-GAAP Net Income** | | | **Non-GAAP Net Income** | | | **Non-GAAP Net Income** | | |
| Sept 21P | Dec 21P | | Sept 21P | Dec 21P | | Sept 21P | Dec 21P | | Sept 21P | Dec 21P | | Sept 21P | Dec 21P | | Sept 21P | Dec 21P | |
| 2021E | 2021E | % Δ | 2022E | 2022E | % Δ | 2023E | 2023E | % Δ | 2024E | 2024E | % Δ | 2025E | 2025E | % Δ | 2026E | 2026E | % Δ |
| 647 | 644 | (0.5%) | 779 | 746 | (4.2%) | 958 | 902 | (5.8%) | 1,086 | 1,041 | (4.1%) | 1,187 | 1,126 | (5.1%) | 1,291 | 1,213 | (6.0%) |
| **Non-GAAP EBITDA** | | | **Non-GAAP EBITDA** | | | **Non-GAAP EBITDA** | | | **Non-GAAP EBITDA** | | | **Non-GAAP EBITDA** | | | **Non-GAAP EBITDA** | | |
| Sept 21P | Dec 21P | | Sept 21P | Dec 21P | | Sept 21P | Dec 21P | | Sept 21P | Dec 21P | | Sept 21P | Dec 21P | | Sept 21P | Dec 21P | |
| 2021E | 2021E | % Δ | 2022E | 2022E | % Δ | 2023E | 2023E | % Δ | 2024E | 2024E | % Δ | 2025E | 2025E | % Δ | 2026E | 2026E | % Δ |
| 1,050 | 1,033 | (1.6%) | 1,259 | 1,216 | (3.4%) | 1,478 | 1,407 | (4.8%) | 1,626 | 1,567 | (3.6%) | 1,750 | 1,673 | (4.4%) | 1,875 | 1,775 | (5.3%) |

# EXHIBIT B

**EXHIBIT B: Comparison of Sept 2021 Projections ("Sept 21P") vs. December 2021 Sensitivity Case ("Sens.")**

| Revenue | | | Revenue | | | Revenue | | | Revenue | | | Revenue | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Sept 21P | Sens. | | Sept 21P | Sens. | | Sept 21P | Sens. | | Sept 21P | Sens. | | Sept 21P | Sens. | |
| 2022E | 2022E | % Δ | 2023E | 2023E | % Δ | 2024E | 2024E | % Δ | 2025E | 2025E | % Δ | 2026E | 2026E | % Δ |
| 3,494 | 3,344 | (4.3%) | 3,938 | 3,626 | (7.9%) | 4,209 | 3,819 | (9.3%) | 4,465 | 3,932 | (11.9%) | 4,692 | 4,022 | (14.3%) |
| Non-GAAP Operating Income | | | Non-GAAP Operating Income | | | Non-GAAP Operating Income | | | Non-GAAP Operating Income | | | Non-GAAP Operating Income | | |
| Sept 21P | Sens. | | Sept 21P | Sens. | | Sept 21P | Sens. | | Sept 21P | Sens. | | Sept 21P | Sens. | |
| 2022E | 2022E | % Δ | 2023E | 2023E | % Δ | 2024E | 2024E | % Δ | 2025E | 2025E | % Δ | 2026E | 2026E | % Δ |
| 1,048 | 988 | (5.7%) | 1,263 | 1,099 | (13.0%) | 1,405 | 1,185 | (15.7%) | 1,525 | 1,249 | (18.1%) | 1,644 | 1,307 | (20.5%) |