**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 0:22-CV-62327-RAR**

GEORGE MESSIHA and JUAN A. VARGAS,
Individually and on Behalf of All Others
Similarly Situated,

       Plaintiff,

   v.

CITRIX SYSTEMS, INC., ROBERT M.
CALDERONI, NANCI E. CALDWELL,
MURRAY J. DEMO, THOMAS E. HOGAN,
MOIRA A. KILCOYNE, ROBERT E.
KNOWLING, JR., PETER J. SACRIPANTI,
and J. DONALD SHERMAN,

       Defendants.

## <u>DEFENDANTS' MOTION TO DISMISS THE AMENDED COMPLAINT AND SUPPORTING MEMORANDUM OF LAW</u>

## <u>TABLE OF CONTENTS</u>

<b>Page</b>

PRELIMINARY STATEMENT ................................................................................ 1

BACKGROUND ................................................................................................... 4

I.     FACTUAL BACKGROUND ......................................................................... 4

     A.    Citrix Experiences Business and Financial Challenges in 2021. ......................... 5

     B.    The Citrix Board Commences a Strategic Review Process. ................................ 6

     C.    The September 2021 and December 2021 Financial Projections ......................... 6

     D.    Conclusion of the Merger Negotiations ............................................................... 8

II.    THE PROXY ................................................................................................. 9

III.   PLAINTIFFS' CLAIMS .............................................................................. 10

ARGUMENT ...................................................................................................... 10

I.     THE PLEADING STANDARD FOR SECTION 14(a) CLAIMS................................ 10

II.    THE AC FAILS TO ALLEGE ANY ACTIONABLE MISSTATEMENT. ................. 12

     A.    The AC Does Not Adequately Allege Any Actionable Misstatement Concerning the December 2021 Projections........................................................ 12

          1.    The December 2021 Projections and Related Statements Are Forward-Looking Statements Immunized by the PSLRA. ..................... 13

               a.    The Challenged Statements Are Forward-Looking. .................... 13

               b.    The Challenged Statements Are Immune Because They Were Accompanied by Meaningful Cautionary Language. ........ 14

               c.    The Challenged Statements Are Immune Because Plaintiffs Do Not Allege a Strong Inference of Actual Knowledge. ........... 15

          2.    The Statements About the December 2021 Projections Are Not Adequately Alleged to Be False or Misleading. ..................................... 17

               a.    The AC Does Not Adequately Allege Subjective Falsity............ 18

               b.    The AC Does Not Adequately Allege Objective Falsity. ............ 19

           3.    The Statements About the December 2021 Projections Did Not Render the Proxy Materially Misleading. ................................................. 20

     B.    The AC Does Not Adequately Allege Any Actionable Misstatement Concerning the Board's and Qatalyst's Opinions that the Merger Was Fair. ..................................................................................................................... 21

     C.    The Alleged Omissions Concerning Conflicts of Interest and Citrix's Publicly Reported Historical Financial Results Do Not Render the Proxy Materially Misleading and Are Not Actionable................................................. 24

|  | 1. | There Were No Undisclosed or Material Conflicts of Interest. ............... 24 |
|  | 2. | There Were No Material Omissions Concerning Citrix's Publicly Disclosed Q2 and Q3 2021 Financial Results........................................ 26 |

III. THE AC DOES NOT SATISFY RULE 9(b). ................................................................. 27

IV. THE AC DOES NOT ADEQUATELY ALLEGE LOSS CAUSATION. ..................... 29

V. THE § 20(a) CONTROL PERSON CLAIM SHOULD ALSO BE DISMISSED. ......... 30

CONCLUSION ..................................................................................................................... 30

## **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*In re Analogic Corp. Shareholder Litig.*,
   2019 WL 4804800 (D. Mass. Sept. 30, 2019) .............................................................. *passim*

*Adams v. Standard Knitting Mills, Inc.*,
   623 F.2d 422 (6th Cir. 1980) ...............................................................................11

*Appel v. Berkman*,
   180 A.3d 1055 (Del. 2018) ...............................................................................26

*Arnold v. McFall*,
   839 F. Supp. 2d 1281 (S.D. Fla. 2011) ............................................................27, 28

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...............................................................................12

*In re Bemis Co. Sec. Litig.*,
   512 F. Supp. 3d 518 (S.D.N.Y. 2021)........................................................14, 15, 17

*Bryant v. Avado Brands, Inc.*,
   187 F.3d 1271 (11th Cir. 1999) ...............................................................................4

*Carvelli v. Ocwen Fin. Corp.*,
   2018 WL 4941110 (S.D. Fla. Apr. 30, 2018) .........................................................30

*Carvelli v. Ocwen Fin. Corp.*,
   934 F.3d 1307 (11th Cir. 2019) ...............................................................................20

*Chu v. Sabratek Corp.*,
   100 F. Supp. 2d 827 (N.D. Ill. 2000) ...................................................................27

*City of Hialeah Emps.' Ret. Sys. v. FEI Co.*,
   289 F. Supp. 3d 1162 (D. Or. 2018) .................................................3, 14, 15, 23

*Davison v. Ventrus Biosciences, Inc.*,
   2014 WL 1805242 (S.D.N.Y. May 5, 2014) .........................................................20

*Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*,
   595 F. Supp. 2d 1253 (M.D. Fla. 2009)...............................................................11

*Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*,
   594 F.3d 783 (11th Cir. 2010) ...........................................................................13, 30

*Flannery v. Genomic Health, Inc.*,
   2021 WL 3615540 (Del. Ch. Aug. 16, 2021) ........................................................22

*Garfield v. Shutterfly, Inc.*,
   857 F. App'x 71 (3d Cir. 2021) ........................................................................11

*Golub v. Gigamon Inc.*,
   372 F. Supp. 3d 1033 (N.D. Cal. 2019) ...................................................... *passim*

*Gray v. Wesco Aircraft Holdings, Inc.*,
   454 F. Supp. 3d 366 (S.D.N.Y. 2020)......................................................... *passim*

*Highland Legacy Ltd. v. Singer*,
   2006 WL 741939 (Del. Ch. Mar. 17, 2006)..........................................................25

*In re JP Morgan Chase Sec. Litig.*,
   363 F. Supp. 595 (S.D.N.Y. 2005) ......................................................................12

*Kahn v. M&F Worldwide Corp.*,
   88 A.3d 635 (Del. 2014) ......................................................................................25

*Karp v. First Connecticut Bancorp*,
   69 F.4th 223 (4th Cir. 2023) ...............................................................................30

*Kinnett v. Strayer Educ., Inc.*,
   2012 WL 933285 (M.D. Fla. Jan. 3, 2012)..........................................................20

*Koppel v. 4987 Corp.*,
   167 F.3d 125 (2d Cir. 1999)................................................................................24

*Kuebler v. Vectren Corp.*,
   13 F.4th 631 (7th Cir. 2021) ..........................................................................23, 30

*Laborers' Loc. #231 Pension Fund v. PharMerica Corp.*,
   2019 WL 4645583 (W.D. Ky. Sept. 24, 2019) .....................................................27

*Lee v. Frost*,
   2021 WL 3912651 (S.D. Fla. Sept. 1, 2021) .....................................11, 12, 27, 29

*Libov v. Readix, Inc.*,
   2011 WL 13216996 (S.D. Fla. Sept. 8, 2011) ......................................................27

*Mack v. Resolute Energy Corp.*,
   2020 WL 1286175 (D. Del. Mar. 18, 2020) .........................................................24

*Magnum Constr. Mgmt., LLC v. WSP USA Sols., Inc.*,
   522 F. Supp. 3d 1202 (S.D. Fla. 2021) ...............................................................29

*In re Mindbody, Inc. Sec. Litig.*,
    489 F. Supp. 3d 188 (S.D.N.Y. 2020)................................................................25, 26

*Mizzaro v. Home Depot, Inc.*,
    544 F.3d 1230 (11th Cir. 2008) ...................................................................................12

*Mogensen v. Body Cent. Corp.*,
    15 F. Supp. 3d 1191 (M.D. Fla. 2014).......................................................................5, 13

*Montanio v. Keurig Green Mountain, Inc.*,
    237 F. Supp. 3d 163 (D. Vt. 2017).............................................................................19

*OFI Asset Mgmt. v. Cooper Tire & Rubber*,
    834 F.3d 481 (3d Cir. 2016).......................................................................................17

*In re Om Grp., Inc. S'holders Litig.*,
    2016 WL 5929951 (Del. Ch. Oct. 12, 2016) .............................................................25

*Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*,
    918 F.3d 312 (4th Cir. 2019) ...............................................................................11, 20

*Patel v. Duncan*,
    2021 WL 4482157 (Del. Ch. Sept. 30, 2021) ...........................................................25

*In re Premiere Techs. Inc.*,
    2000 WL 33231639 (N.D. Ga. Dec. 8, 2000)...........................................................11

*Ridler v. Hutchinson Tech. Inc.*,
    216 F. Supp. 3d 982 (D. Minn. 2016)........................................................................23

*Savior Assocs. v. Goncalves*,
    2013 WL 3026257 (S.D. Fla. Apr. 8, 2013) ..............................................................10

*SEC v. Shanahan*,
    646 F.3d 536 (8th Cir. 2011) .....................................................................................11

*SIG, Inc. v. AT & T Digital Life, Inc.*,
    971 F. Supp. 2d 1178 (S.D. Fla. 2013) ......................................................................29

*In re Smurfit-Stone Container Corp. S'holder Litig.*,
    2011 WL 2028076 (Del. Ch. May 20, 2011)............................................................22

*Tellabs, Inc. v. Makor Issues & Rts., Ltd.*,
    551 U.S. 308 (2007).....................................................................................................12

*Trahan v. Interactive Intelligence Grp., Inc.*,
    308 F. Supp. 3d 977 (S.D. Ind. 2018)..........................................................18, 19, 21, 22, 30

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991) ................................................................................10, 18, 21

*In re W. Nat'l Corp. S'holders Litig.*,
    2000 WL 710192 (Del. Ch. May 22, 2000) ................................................29

*Weinberger v. Rio Grande Indus., Inc.*,
    519 A.2d 116 (Del. Ch. 1986) ....................................................................25

**Statutes**

15 U.S.C. § 78u-4 ....................................................................................1, 11, 12, 29

15 U.S.C. § 78u-5 ..........................................................................................1, 3, 13

Section 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a) ........................ *passim*

Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78t(a) ............................10, 30

**Other Authorities**

17 C.F.R. § 229.1004 ............................................................................................26

17 C.F.R. § 240.14a-9 ..........................................................................................10

Fed. R. Civ. P. 9(b) .......................................................................1, 4, 11, 27, 29

Fed. R. Civ. P. 12(b)(6) .........................................................................................1

Defendants Citrix Systems, Inc. ("Citrix" or the "Company"), Robert M. Calderoni, Nanci E. Caldwell, Murray J. Demo, Thomas E. Hogan, Moira A. Kilcoyne, Robert E. Knowling, Jr., Peter J. Sacripanti, and J. Donald Sherman (together with Citrix, "Defendants") move to dismiss the Amended Class Action Complaint (ECF No. 34) ("AC") with prejudice for failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78u-4 and 78u-5.

Citrix is a cloud computing enterprise software company. Over the course of 2021, Citrix faced a number of business challenges and repeatedly missed its public revenue guidance. In July 2021, Citrix lowered its guidance range for 2021 annual revenue from $3.38–3.42 billion to $3.22–3.25 billion (a decline of $160–170 million). In November 2021, Citrix lowered its annual revenue guidance again to $3.19–3.20 billion (a decline of $30–50 million). Citrix's stock price performed poorly, declining from around $135 per share in January 2021 to $80 in early December 2021.

Despite these challenges, Citrix generated value for stockholders by negotiating a merger with affiliates of Vista Equity Partners Management LLC ("Vista") and Elliott Investment Management L.P. ("Elliott"). In the merger agreement—the product of months of negotiation—Vista and Elliott agreed to pay Citrix stockholders $104 per share in cash, a 30% premium over the unaffected five-day volume-weighted average stock price as of December 7, 2021 (the last day prior to market speculation about a transaction). Citrix filed a proxy statement (as supplemented, the "Proxy") informing stockholders about the merger, including 12 pages of disclosure about the financial projections presented to Citrix's board of directors ("Board") during the merger process and financial analyses prepared by Citrix's financial advisor, Qatalyst Partners LP ("Qatalyst"). Stockholders overwhelmingly approved the deal, with over 90% of voted shares cast in favor.

Plaintiffs are Citrix stockholders dissatisfied with the amount of the merger consideration,

which they believe was too low. But Plaintiffs have not filed a claim designed to value their shares, such as a Delaware appraisal action. Instead, Plaintiffs have brought a disclosure-based claim under Section 14(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), alleging the Proxy was materially misleading. The gravamen of the AC is that, in Plaintiffs' opinion, Citrix's Board did not really believe the merger was fair and generated certain financial projections in December 2021 (the "December 2021 Projections") to trick investors into approving the merger.

Section 14(a) cannot give Plaintiffs the relief they seek because their claims are not about disclosure. Based on information ***that Citrix itself disclosed in the Proxy***, Plaintiffs have developed their own opinions about the fairness of the merger, asserting that the Board and Qatalyst should have used more optimistic projections presented to the Board in September 2021 (the "September 2021 Projections") in analyzing the deal and providing an opinion that the consideration given to stockholders was fair. But Plaintiffs' opinions are not facts. And the basis for their opinions—the September 2021 Projections—was disclosed in the Proxy. That Plaintiffs reached a different conclusion than the Board and the financial advisor based on the Proxy itself only shows the thoroughness and honesty of Citrix's disclosure.

Plaintiffs' theory is not new. Similar Section 14(a) claims have been brought across the country alleging that proxy statements were misleading because they endorsed "false" financial projections the board did not believe in. When faced with indistinguishable facts, courts have dismissed these claims at the pleading stage. *See, e.g.*, *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366, 377, 397 (S.D.N.Y. 2020) (dismissing Section 14(a) claim alleging that "the circumstances under which the [lower] Updated Management Projections were prepared and the relationship of those projections to the [higher] Initial Management Projections render them

'illegitimate'"), *aff'd*, 847 F. App'x 35 (2d Cir. 2021).[1] The Court should do the same here.

**First**, Plaintiffs fail to allege any actionable misstatements or omissions. Plaintiffs' claims rest on an assertion that the December 2021 Projections were unreasonable and therefore misleading. These claims are barred by the PSLRA's safe harbor for forward-looking statements, 15 U.S.C. § 78u-5, because the Proxy included copious cautionary language and because Plaintiffs do not adequately allege actual knowledge of falsity. Independent of the safe harbor, these are statements of opinion that must be both subjectively and objectively false to be actionable, yet the AC does not allege either. And the December 2021 Projections did not render the Proxy materially misleading, because Plaintiffs' preferred September 2021 Projections were also disclosed.

The AC fares no better in attacking opinion statements about the fairness of the merger. This attack is derivative of the AC's challenge to the December 2021 Projections and fails for the same reasons. Here too, Supreme Court precedent requires Plaintiffs to show that opinions about the fairness of the merger were both subjectively false (*i.e.*, that the Board and Qatalyst did not actually believe the merger was fair) and objectively false (*i.e.*, that the merger was objectively unfair). Here too, the AC has alleged neither. Nor has the AC alleged the Proxy was materially misleading in light of its copious disclosure of all facts and reasons supporting the Board's opinion.

---

[1] *See also Golub v. Gigamon Inc.*, 372 F. Supp. 3d 1033, 1042, 1052 (N.D. Cal. 2019) (dismissing Section 14(a) claim alleging that defendants "should have . . . used the [higher] refreshed or Updated Case B Projections as the basis for the fairness opinion," and that "because the deal was described as fair based upon the Updated Case C Projections . . . shareholders were misled about the long term value of the company"); *In re Analogic Corp. Shareholder Litig.*, 2019 WL 4804800, at *5, *13 (D. Mass. Sept. 30, 2019) (dismissing Section 14(a) claim whose "general theme" was "that the [lower] Case 2B Projections were manufactured only after it became apparent that the Board and the Committee needed to make an offer of $84.00 per share look attractive because the Board was under pressure to sell"); *City of Hialeah Emps.' Ret. Sys. v. FEI Co.*, 289 F. Supp. 3d 1162, 1170, 1179–80 (D. Or. 2018) (dismissing Section 14(a) claim grounded in theory that certain "Higher Projections" were more accurate and "that the inputs and assumptions relied upon for the fairness analysis—the Lower Projections—were inaccurate or misleading").

The AC also quibbles with alleged omissions in the Proxy concerning purported conflicts of interest (which were not actually conflicts at all) and Citrix's 2021 quarterly financial results. These alleged omissions were immaterial, and such "tell-me-more" claims are routinely dismissed.

**Second**, even though the AC sounds in fraud, it fails to allege fraud with particularity as required by Rule 9(b). The AC does not allege how Plaintiffs were misled by the Proxy. The AC also fails to allege what the defendants obtained as a consequence of the fraud, relying on attenuated connections to Elliott or Vista and commonplace change-in-control compensation. And it relies on improper group pleading with sweeping assertions against "the Board" and "Qatalyst."

**Finally**, the AC does not adequately allege loss causation, another requirement under the PSLRA. Plaintiffs do not allege that there was an alternative deal Citrix could have signed that would have resulted in more money to stockholders. And given that the merger consideration represented a 30% premium over Citrix's unaffected stock price, there is no plausible allegation that Citrix would have done better as a standalone company—especially given Citrix's operational challenges and declining stock price throughout 2021. The Court should dismiss the AC in full.

## BACKGROUND

## I.      FACTUAL BACKGROUND

Citrix is an enterprise software company that provides digital workspaces to allow its customers' workforces to work from anywhere. AC ¶ 49. For several years, Citrix has been evolving its business model away from "selling perpetual licenses towards subscription, or recurring contracts" for its services, and to "focus[] on delivering cloud-based solutions" rather than on-premises software. 2021 10-K (Ex. 2) at 6; Proxy at 21.[2] Potential consequences of this

---

[2] "Ex." refers to exhibits to the accompanying Declaration of Deborah S. Birnbach. The Court may consider the exhibits attached to the Birnbach Declaration, which are referenced in the AC, filed with the U.S. Securities and Exchange Commission ("SEC"), and/or otherwise publicly available. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276 (11th Cir. 1999) (considering documents

shift have included "near-term reduction in revenue and revenue growth as more customers move away from perpetual licenses to subscriptions." 2021 10-K (Ex. 2) at 16. Citrix's disclosures included an operational metric called SaaS ['Software-as-a-Service'] annualized recurring revenue, or SaaS ARR. AC ¶ 50. This metric "represents the contracted recurring value of all cloud subscriptions normalized to a one-year period." *Id.*

### A.     Citrix Experiences Business and Financial Challenges in 2021.

While this transition represented a promising new direction, Citrix encountered execution challenges in 2021. On April 29, 2021, Citrix announced results for the first quarter of 2021 in a letter to investors. Q1 2021 Letter (Ex. 3).[3] Even though the transition was "progressing well," "revenue came in below our expectations" due to "supply chain challenges" and "lower-than-anticipated on-premises term average contract duration." *Id.* at 2. Citrix announced full-year 2021 revenue guidance of $3.38 to $3.42 billion, and Q2 2021 revenue guidance of $840 to $850 million. *Id.* at 10. In response, Citrix's stock price dropped approximately 7.5% to $128.02. Proxy at 22.

On July 29, 2021, Citrix missed its quarterly revenue guidance, announcing second-quarter revenue of only $812 million. Q2 2021 Letter (Ex. 4) at 1. Despite "accelerating" growth in SaaS ARR, Citrix admitted it had "not delivered new SaaS subscription bookings at the rate or predictability we had anticipated" and was "taking several significant and immediate actions," such as a sales team reorganization, that "may cause short-term disruption before yielding tangible results." *Id.* at 2–3. Citrix lowered its 2021 full-year guidance to $3.22 to $3.25 billion—a decrease

---

"publicly filed with the SEC at the motion to dismiss stage"); *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1209 (M.D. Fla. 2014) (considering SEC filings and stock prices). Exhibit 1, the Proxy, will be cited as the "Proxy." Unless otherwise noted, internal quotations and citations have been omitted and emphasis has been added.

[3] The AC relies heavily on its self-serving characterization of these quarterly earnings letters. *See* AC ¶¶ 6–7, 12–15, 23, 29–30, 63–68, 74, 85–91, 106, 137–138, 141, 143–145, 147–149, 153–154, 156, 158, 172, 175.

of $160–170 million. *Id.* at 10. Citrix's stock price dropped 14% to $99.00. Proxy at 22.

**B.    The Citrix Board Commences a Strategic Review Process.**

In August 2021, against this backdrop of business challenges and a declining stock price, Citrix received a letter from Elliott (which owned an approximately 10% stake in Citrix) indicating an interest in a take-private transaction and expressing Elliott's "disappointment as to where Citrix stood" in light of "a combination of execution challenges, guidance misses, and a cloud transition that had missed expectations." Proxy at 22. Citrix began to explore a potential strategic transaction, including a sale of the company. *Id.* at 22–23. The Board engaged Qatalyst as its financial advisor, which began reaching out to other potential buyers. *Id.* at 22–24.

In early September, Citrix's Board "discussed past and current business relationships that certain directors had with Elliott or other potential participants in a strategic process" and determined that two directors (Ms. Kilcoyne and Mr. Hogan) should be recused due to relationships with Elliott and Vista (another potential bidder). *Id.* at 23–24. The Board concluded that other potential conflicts, such as "a prior consulting relationship between Mr. Calderoni and Elliott" and "that a family member of Mr. Calderoni works for Elliott in a non-investment, administrative role," did not warrant recusal. *Id.* at 24. In late October, the Board formed a Transaction Committee of independent and disinterested directors (Ms. Caldwell, Mr. Demo, Mr. Knowling, Mr. Sacripanti, and Mr. Sherman) empowered to monitor and direct the process and procedures related to proposals received and any other potential strategic transactions. *Id.* at 30.

Ultimately, Citrix discussed a potential transaction with five potential strategic buyers and fourteen financial sponsors. *Id.* at 23–25. As due diligence progressed, most of the bidders dropped out and no other bidder made an offer, much less one as high as Elliott and Vista's. *Id.* at 29–33.

**C.    The September 2021 and December 2021 Financial Projections**

On September 9, 2021, during the deal process, the Board directed management to prepare

long-range financial projections. Proxy at 24–25, 49. Management presented the September 2021 Projections to the Board two weeks later. Proxy at 26. After reviewing the "methodology, underlying assumptions (including the launch of a strategic cost improvement/restructuring program), and potential risks in achieving the projections, including the execution challenges that Citrix is facing, the risks associated with Citrix's business model transition, and market dynamics," the Board authorized the use of these projections in its strategic process. *Id.* at 26–27.

On October 4, 2021, Citrix's CEO resigned and Mr. Calderoni was appointed interim CEO. Proxy at 28. On November 4, 2021, Citrix announced its third-quarter 2021 financial results. Q3 2021 Letter (Ex. 5). While Citrix's quarterly revenue slightly exceeded its guidance from July 2021, Citrix acknowledged that, "[l]ooking back on the last few quarters, it is clear we have underperformed our expectations as we faced execution challenges which have overshadowed the excellent performance in our ARR metrics and cloud transition." *Id.* at 2. It further cautioned that, while "the go-to-market challenges facing us are all fixable, the headwinds will continue to impact our results in the near term relative to our prior expectations" and "we are moderating our fourth quarter reported revenue growth expectations." *Id.* at 3. Citrix again reduced its full-year 2021 revenue guidance, this time to $3.19 billion to $3.20 billion (a decline of $30–50 million). *Id.* at 9.

Citrix's stock price continued to decline throughout the sale process, reaching a low of around $78 in early December before market speculation regarding a potential transaction began to affect the price. Ex. 9 (stock price chart). On December 5, 2021, Elliott and Vista submitted a further revised indication of interest with a price of $110 per share. Proxy at 32.

On December 7, 2021, the Transaction Committee reviewed updated financial projections prepared by management for use in the strategic process. These projections "rolled forward the September Projections to reflect Citrix's actual results for the third quarter of fiscal year 2021, an

updated forecast for the fourth quarter of the fiscal year," and refinements to Citrix's restructuring program. Proxy at 33. The Transaction Committee "considered the execution challenges that Citrix is facing, the risks associated with Citrix's business model transition, and market dynamics" and approved the December projections for use by Qatalyst. *Id.* At this meeting, Qatalyst also reviewed "illustrative sensitivity scenarios" reflecting "lower revenue growth rates and operating margin assumptions," which were prepared by management "to allow the Transaction Committee to consider the December Projections in light of the execution challenges facing the Company." *Id.* This brief uses the term "December 2021 Projections" to include this sensitivity case, as well.

### D.   Conclusion of the Merger Negotiations

In late December, the Transaction Committee authorized a counteroffer to Elliott and Vista at $120 per share, which they did not accept. Proxy at 35. In late January, Elliott and Vista offered $103.51 per share, which the Transaction Committee negotiated up to $104. *Id.* at 36–37. In light of Citrix's steadily declining stock price, $104 represented a premium of approximately 30% over the unaffected five-day volume-weighted average price of Citrix stock as of December 7, 2021 (the last day prior to market speculation about a transaction). *Id.* at 1.

On January 30, 2022, the Transaction Committee and full Board held a joint meeting to consider the merger. *Id.* at 37. The Board received a presentation from Qatalyst, which presented various financial analyses and provided a fairness opinion. *Id.* The Transaction Committee recommended approval of the merger by the full Board, which (excluding the two recused members) then unanimously voted to approve it. The parties signed the Merger Agreement and announced the proposed transaction the following morning. *Id.* at 37–38. Citrix stockholders approved the transaction at a meeting on April 21, 2022, with over 90% of voted shares in favor. 4/22/22 Form 8-K (Ex. 7).

## II.     THE PROXY

On March 16, 2022, Citrix filed with the SEC a proxy statement informing stockholders about the merger. The Proxy disclosed, among other things: an extensive list of risks regarding the merger (Proxy at 9–10); 17 pages of background concerning the negotiations leading up to the merger (*id*. at 21–38); the reasons the Board recommended the merger along with factors weighing against the merger (*id*. at 38–41); the September 2021 and December 2021 Projections (*id*. at 49–53); Qatalyst's fairness opinion and financial analyses (*id*. at 41–49); and potential conflicts of interest affecting Citrix's Board and management (*id*. at 23–24, 56–65). On April 13, 2022, Citrix supplemented the Proxy with additional disclosure. *See* Supplemental Disclosure (Ex. 6).

When disclosing the September 2021 and December 2021 Projections, the Proxy warned investors at length against attaching undue importance to them. For example:

> The Financial Projections . . . are included solely to provide Citrix stockholders access to financial projections that were made available to the Citrix Board, the Transaction Committee and/or Vista and Elliott in connection with the proposed Merger, and are not included in this proxy statement to influence a Citrix stockholder's decision whether to vote to adopt the Merger Agreement or for any other purpose. . . .

> The Financial Projections summarized below, while presented with numerical specificity, were based on numerous variables and assumptions that necessarily involve judgments with respect to, among other things, future economic, competitive, regulatory and financial market conditions, all of which are difficult or impossible to predict and many of which are beyond Citrix's control. The Financial Projections also reflect assumptions that are subject to change . . . .

Proxy at 49–50. The Proxy contained similar warnings about Qatalyst's financial analyses:

> [T]he ranges of valuations resulting from any particular analysis described above should not be taken to be Qatalyst Partners' view of the actual value of Citrix. In performing its analyses, Qatalyst Partners made numerous assumptions with respect to industry performance, general business, economic, market and financial conditions and other matters, many of which are beyond Citrix's control. Any estimates contained in Qatalyst Partners' analyses are not necessarily indicative of future results or actual values, which may be significantly more or less favorable than those suggested by such estimates. . . . This analysis does not purport to be an appraisal or to reflect the price at which Citrix common stock might actually trade at any time.

9

*Id.* at 48.

### III.   PLAINTIFFS' CLAIMS

As is routine in mergers and acquisitions, after the announcement of the merger and the filing of the Proxy, 11 lawsuits were filed in March and April 2022 challenging the disclosures in the Proxy. *See* Supplemental Disclosure (Ex. 6) at 2. While Defendants believed that these lawsuits were without merit and that no additional information needed to be disclosed, Citrix issued supplemental disclosures (which were incorporated into the Proxy) to moot these claims in order to avoid the nuisance and expense of potential further litigation, without admitting any of this information was material. *See id.* All of the plaintiffs in these 11 lawsuits (which included one of the current Plaintiffs, George Messiha) dropped their claims in light of Citrix's supplemental disclosures. This action was filed in December 2022, over seven months after approval of the merger. On May 8, 2023, Plaintiffs filed the AC, alleging that Citrix made false and misleading statements in the Proxy, in violation of Sections 14(a) and 20(a). The claims relate primarily to the December 2021 Projections, alleging that Defendants created the projections to deceive investors to vote for the merger. *See* AC ¶¶ 137–139, 150–172. The AC also alleges the Proxy failed to disclose certain information concerning purported conflicts of interest (AC ¶¶ 72, 83, 164–168) and Citrix's 2021 publicly disclosed quarterly financial results (AC ¶¶ 97, 140–149).

### <u>ARGUMENT</u>

### I.   THE PLEADING STANDARD FOR SECTION 14(a) CLAIMS.

"Section 14(a) and the corresponding administrative regulation, 17 C.F.R. § 240.14a-9 (Rule 14a-9), prohibit soliciting proxies 'by means of materially false or misleading statements.'" *Savior Assocs. v. Goncalves*, 2013 WL 3026257, at *3 (S.D. Fla. Apr. 8, 2013) (quoting *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1087 (1991)). "To state a claim under Section 14(a) of the Exchange Act and Rule 14a-9, a plaintiff must allege that the defendant prepared a proxy

statement containing a material misstatement or omission that caused the plaintiff's injury." *Edward J. Goodman Life Income Tr. v. Jabil Circuit, Inc.*, 595 F. Supp. 2d 1253, 1290 (M.D. Fla. 2009), *aff'd*, 594 F.3d 783 (11th Cir. 2010). The plaintiff must allege that the misstatements or omission rendered the proxy, as a whole, "materially misleading." *See Paradise Wire & Cable Defined Benefit Pension Plan v. Weil*, 918 F.3d 312, 321 (4th Cir. 2019) (affirming dismissal of Section 14(a) claim where alleged omissions "did not render the Proxy materially misleading"). In evaluating a Section 14(a) claim, the Court considers the Proxy in its entirety. *See Analogic*, 2019 WL 4804800, at *9 (considering entire proxy on motion to dismiss).[4]

The claims in the AC are subject to multiple heightened pleading standards. First, under the PSLRA, an Exchange Act claim must "specify each statement alleged to be misleading; the reason or reasons why the statement is misleading; and, if an allegation regarding the statement or omission is made on information and belief, the complaint must 'state with particularity all facts on which that belief is formed.'" *Lee v. Frost*, 2021 WL 3912651, at *3 (S.D. Fla. Sept. 1, 2021) (quoting 15 U.S.C. § 78u-4(b)(1)).

Second, Rule 9(b) applies because the AC "sounds in fraud." *Lee*, 2021 WL 3912651, at *4. The gravamen of the AC is that Citrix's directors, motivated by a desire to help Elliott and to obtain accelerated vesting of their equity awards, consciously generated false projections with the goal of persuading investors to approve a merger they knew was unfair. *See, e.g.*, AC ¶¶ 11, 18, 19, 25; *see also Garfield v. Shutterfly, Inc.*, 857 F. App'x 71, 79 (3d Cir. 2021) (Section 14(a)

---

[4] There is judicial disagreement about the culpability standard for Section 14(a) claims, with some courts requiring only negligence and some requiring scienter (*i.e.*, knowing or reckless misconduct). *Compare, e.g.*, *In re Premiere Techs. Inc.*, 2000 WL 33231639, at *8 n.5 (N.D. Ga. Dec. 8, 2000) (negligence), *with SEC v. Shanahan*, 646 F.3d 536, 547 (8th Cir. 2011) (scienter), *and Adams v. Standard Knitting Mills, Inc.*, 623 F.2d 422, 428 (6th Cir. 1980) (same). The Court need not address that issue in this case, because Plaintiffs' claims fail regardless of which standard applies.

claim sounded in fraud where "the gravamen of the Complaint is that management was 'aware of the truth' and proceeded to intentionally deceive shareholders"). Accordingly, Plaintiffs must allege "(1) precisely what statements were made in what documents or oral representations or what omissions were made, and (2) the time and place of each such statement and the person responsible for making (or, in the case of omissions, not making) same, and (3) the content of such statements and the manner in which they misled the plaintiff, and (4) what the defendants obtained as a consequence of the fraud." *Lee*, 2021 WL 3912651 at *4.

Third, where a claim requires scienter, there must be a "strong inference" of scienter under the PSLRA. *Lee*, 2021 WL 3912651 at *3–4 & n.3 (quoting 15 U.S.C. § 78u-4(b)(2)); *see also In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 636 (S.D.N.Y. 2005) (requiring strong inference of scienter where Section 14(a) claim sounded in fraud). Under this demanding test, the Court is required to "balance opposing inferences," permitting the claim to proceed only if an inference of fraud is "'cogent and at least as compelling as any opposing inference one could draw from the facts alleged.'" *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1239 (11th Cir. 2008) (quoting *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007)).

Finally, Section 14(a) claims are also subject to the general pleading standard: the Court must disregard conclusory allegations and evaluate whether there is sufficient "factual content" to make an inference of liability not merely possible, but plausible. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Lee*, 2021 WL 3912651, at *3.

## II.     THE AC FAILS TO ALLEGE ANY ACTIONABLE MISSTATEMENT.

### A.     The AC Does Not Adequately Allege Any Actionable Misstatement Concerning the December 2021 Projections.

The AC attacks as false or misleading (i) the December 2021 Projections and (ii) a statement that Qatalyst was advised by Citrix's management that the December 2021 Projections

"had been reasonably prepared on a basis reflecting the best currently available estimates and judgments of the management of Citrix of the future financial performance of Citrix and other matters covered thereby." AC ¶¶ 150–158, 171–172. These claims fail for multiple reasons.

### 1. The December 2021 Projections and Related Statements Are Forward-Looking Statements Immunized by the PSLRA.

The PSLRA contains a safe-harbor that generally immunizes "forward-looking statements" identified as such from liability under the Exchange Act. *See* 15 U.S.C. § 78u-5(c)(1). The PSLRA defines forward-looking statements to include, among other things, "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items," "any statement of the assumptions underlying or relating to any statement" of financial projections, and "any report issued by an outside reviewer retained by an issuer, to the extent that the report assesses a forward-looking statement made by the issuer." 15 U.S.C. § 78u-5(*i*)(1)(A), (D), (E).

"The statute offers several ways for a defendant to avoid liability, all written in the disjunctive." *Edward J. Goodman Life Income Trust v. Jabil Circuit, Inc.*, 594 F.3d 783, 795 (11th Cir. 2010). "First, a defendant may avoid liability by showing that his statement was issued with meaningful cautionary language." *Id.* (citing 15 U.S.C. § 78u-5(c)(1)(A)(i)). Alternatively, "the defendant can avail himself of the safe harbor if the plaintiff fails to prove that the statement was made with actual knowledge that it was false." *Id.* (citing 15 U.S.C. § 78u-5(c)(1)(B). Both ways independently bar liability here.

#### a. The Challenged Statements Are Forward-Looking.

The December 2021 Projections are archetypal forward-looking statements, specifically identified as such in the Proxy.[5] *See* 15 U.S.C. § 78u-5(*i*)(1); *Body Cent. Corp.*, 15 F. Supp. 3d at

---

[5] *See* Proxy at 9–10 ("This proxy statement, and any documents to which Citrix refers to in this

1216 ("quarterly and annual forecasts . . . with projections of revenues and earnings per share, and predictions of future economic performance" are "unquestionably forward-looking").[6]

Equally forward-looking are statements that projections were reasonably prepared. As numerous courts have held, "an expression of 'present belief' in a forward-looking statement" falls within the safe harbor. *FEI*, 289 F. Supp. 3d at 1173.[7] Thus, in *Wesco*, the Court found forward-looking a statement that the projections "were reasonably prepared based on assumptions reflecting the best currently available estimates and judgments." 454 F. Supp. 3d at 387; *see* AC ¶ 171 (challenging nearly identical statement in Citrix's Proxy).

### b. The Challenged Statements Are Immune Because They Were Accompanied by Meaningful Cautionary Language.

All these statements are immunized by the safe harbor because the Proxy contained meaningful cautionary language. In addition to warning generally about the risks associated with the merger (*see* Proxy at 9–10), the Proxy contained cautionary language specifically warning that "[t]here can be no assurance that the financial results in the Financial Projections will be realized, or that future actual financial results will not materially vary from those estimated in the Financial Projections." *Id.* at 50. That was because, among other things, the projections:

- "were based on numerous variables and assumptions that necessarily involve judgments with respect to, among other things, future economic, competitive, regulatory and financial market conditions, all of which are difficult or impossible to predict and many of which are beyond Citrix's control";

---

proxy statement, contains 'forward-looking statements' within the meaning of [PSLRA].'"); *id.* at 42, 49 (specifically identifying the projections as "forward-looking statements").

[5] *See also Wesco*, 454 F. Supp. 3d at 387 (granting motion to dismiss Section 14(a) claim); *In re Bemis Co. Sec. Litig.*, 512 F. Supp. 3d 518, 532 (S.D.N.Y. 2021) (same); *Analogic*, 2019 WL 4804800, at *8 (same); *Gigamon*, 372 F. Supp. 3d at 1048 (same).

[6] *See also Wesco*, 454 F. Supp. 3d at 386 ("Here, each of the Management Projection Statements—to the extent that they are alleged to be false at all—constitutes a forward-looking statement."); *FEI*, 289 F. Supp. 3d at 1172 ("The Higher and Lower Projections are quintessential forward-looking statements, as financial projections and statements of future economic performance.").

[7] *See also Bemis*, 512 F. Supp. 3d at 532 (same); *Analogic*, 2019 WL 4804800, at *8 (same); *Gigamon*, 372 F. Supp. 3d at 1048 (same).

- "reflect assumptions that are subject to change, including, . . . growth rates, including growth of our core Virtual Desktop Infrastructure ('VDI') and desktop-as-a-service ('DaaS') businesses in line with expected market growth; market share, including maintenance of market share of our VDI business; market size and conditions; products and product mix; bookings and bookings mix; rate of transition from a perpetual license to a subscription-based business model; rate of transition of customers from on premises to cloud-based solutions; annual contract values; contract duration expansion; renewal rates; annualized recurring revenue; operating expenses; margins; net working capital; and effects of the Company's strategic cost improvement/restructuring program";

- may be affected by "industry and market dynamics; acceptance of Citrix's products and services; ability to transition customers to a subscription model and cloud-based solutions; competition, including from hyperscale providers of cloud platforms" and by Citrix's "ability to achieve strategic goals, objectives and targets over the applicable period, including, but not limited to, successful implementation of its strategic cost improvement/restructuring program and new product introductions, such as managed DaaS services"; and

- "do not take into account any circumstances, transactions or events occurring after the date on which the Financial Projections were prepared" (*id.*).

In the merger context, courts have found indistinguishable warnings adequate. *See FEI*, 289 F. Supp. 3d at 1174 ("That cautionary statement identified the factors that could result in 'materially better or worse' actual results, including the 'accuracy of certain accounting assumptions, changes in actual or projected cash flows, competitive pressures and changes in tax laws.'").[8]

**c.      The Challenged Statements Are Immune Because Plaintiffs Do Not Allege a Strong Inference of Actual Knowledge.**

In addition, and independently, these statements are immune because the AC fails to allege that Defendants actually knew, at the time of the Proxy, the statements were false or misleading. The AC does not allege actual knowledge even under Rule 8, much less the PSLRA's "strong inference" standard. *See Wesco*, 454 F. Supp. 3d at 381 ("where scienter is at issue, as under the

---

[8] *See also Wesco*, 454 F. Supp. 3d at 392 (proxy contained "extensive and specific discussion of a large number of company-specific factors that the Company indicated could cause its results" to differ); *Gigamon*, 372 F. Supp. at 1049 (similar); *Bemis*, 512 F. Supp. 3d at 532–33 (similar).

'actual knowledge' prong of the safe harbor . . . , the plaintiff must 'state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind'").

The AC does not contain *any* contemporaneous allegations about what any Defendant knew that contradicted the December 2021 Projections, only Plaintiffs' subjective opinion that the September 2021 Projections were better. The best Plaintiffs can offer is cherry-picked statements from Citrix's 2021 quarterly earnings letters, which according to Plaintiffs painted a rosy picture of Citrix's future. AC ¶¶ 6–7, 23, 63, 65–68. But this self-serving characterization ignores the negative results and commentary in these letters, which are replete with terms like "disruption," "headwinds," "challenges," and "underperform[ance]" (Q2 2021 Letter (Ex. 4) at 2–3; Q3 2021 Letter (Ex. 5) at 2–3.) It ignores that Citrix's annual revenue guidance was reduced by a combined $190–220 million in July 2021 and November 2021. *See supra* Background Sections I.A, I.C. And it ignores that Citrix's stock price fell steadily over 2021, from around $135 in January 2021, to around $110 in September 2021, to around $80 in early December 2021. Ex. 9 (stock price chart). Such mixed results cannot support Plaintiffs' claims. *See Wesco*, 454 F. Supp. 3d at 397 (rejecting inference of actual knowledge where, "[a]lthough there were positive trends in revenue and profit in the second and third quarters . . . , these periods also saw year-over-year and quarterly decreases in margin and operating income").[9] Nor does the AC adequately allege any motive to defraud stockholders into approving the merger. *See infra* Section III. These allegations do not create even a plausible inference of actual knowledge, much less one that is "cogent and at least as compelling"

---

[9] The AC also alleges that Defendants should have updated the December 2021 Projections based on Citrix's revenue results for the fourth quarter of 2021. AC ¶¶ 15, 91. This allegation fails for the simple reason that the December 2021 Projections were accurate: Citrix's actual revenue for 2021 ($3.217 billion, *see* 2021 Form 10-K (Ex. 2) at 43) was very close to the 2021 revenue estimate in the December 2021 Projections ($3.212 billion, *see* Proxy at 51)—much closer than Plaintiffs' preferred September 2021 Projections (which projected $3.267 billion in 2021, *see id.*).

as the competing inference: "that the Updated Projections were prepared and relied upon because management and the Board believed they were the most accurate projections and more reasonable than the projections prepared months before." *Wesco*, 454 F. Supp. 3d at 400–01.

### 2. The Statements About the December 2021 Projections Are Not Adequately Alleged to Be False or Misleading.

Independent of the safe harbor, the statements about December 2021 Projections are not adequately alleged to be false or misleading. It is well established that projections in proxy statements are not actionable where "the only relevant statement of fact is that the projections were, in fact the projections that [management] provided to" someone else, and the projections were provided to that person. *OFI Asset Mgmt. v. Cooper Tire & Rubber*, 834 F.3d 481, 500–01 (3d Cir. 2016); *see also Bemis*, 512 F. Supp. 3d at 533–34 (projections not false where proxy stated they "were not included to 'induce' any shareholder to vote for the Transaction but rather were disclosed because the Board considered them in assessing the Transaction"). Here, the Proxy stated that the projections were "included solely to provide Citrix stockholders access to financial projections that were made available to the Citrix Board, the Transaction Committee and/or Vista and Elliott in connection with the proposed Merger, and are not included in this proxy statement to influence a Citrix stockholder's decision whether to vote to adopt the Merger Agreement or for any other purpose." Proxy at 49. Because the AC does not dispute that these projections were the ones actually presented to the Board, any attack on them necessarily fails.

Even if Plaintiffs could overcome that hurdle, the challenged statements would be, at best, matters of opinion that must be both subjectively and objectively false to be actionable. As courts have held, financial projections and statements of confidence in such projections are quintessential matters of opinion. *See, e.g.*, *Bemis*, 512 F. Supp. 3d at 539–40; *Wesco*, 454 F. Supp. 3d at 400; *Gigamon*, 372 F. Supp. 3d at 1050–51; *Analogic*, 2019 WL 4804800, at *9–10. Under Supreme

17

Court precedent, to be actionable under Section 14(a), statements of opinion must be subjectively and objectively false. *See Virginia Bankshares*, 501 U.S. at 1095; *Trahan v. Interactive Intelligence Grp., Inc.*, 308 F. Supp. 3d 977, 999 (S.D. Ind. 2018). The AC alleges neither.

### a.    The AC Does Not Adequately Allege Subjective Falsity.

Plaintiffs have not adequately alleged subjective falsity—*i.e.*, that the Board did not honestly believe the December 2021 Projections were a reasonable estimate of the Company's future. While the AC tries to impugn the Board's belief in multiple ways, all of these attempts fail.

*First*, the AC relies on timing: it asserts that, because the December 2021 Projections were presented to the Transaction Committee on December 7, after a bid from Elliott on December 5, the Transaction Committee must have decided to lower the September 2021 Projections to justify accepting Elliot's bid. AC ¶¶ 17–20. This ignores that, when the September 2021 Projections were prepared, management informed the Board of "potential risks in achieving the projections, including the execution challenges that Citrix is facing, the risks associated with Citrix's business model transition, and market dynamics." Proxy at 26–27; AC ¶ 77.[10] After the September 2021 Projections were prepared, those risks came to pass: multiple bidders dropped out, and Citrix lowered its annual revenue guidance. Proxy at 28–33; AC ¶ 91. Plaintiffs' theory also ignores that Citrix did not accept Elliott's bid, but rather continued to negotiate for almost two months. AC

---

[10] The Proxy thoroughly documented these challenges. *See* Proxy at 23 ("[T]he Citrix Board determined that, in light of Citrix's recent financial performance and stock price and the execution challenges facing the Company, it was in the best interests of the Company and its stockholders to request a specific proposal from Elliott . . . ."); *id.* at 33 ("As part of this discussion [regarding the December 2021 Projections], the Transaction Committee considered the execution challenges that Citrix is facing, the risks associated with Citrix's business model transition, and market dynamics."); *id.* at 37 ("Following consideration of the execution challenges that Citrix is facing, the risks associated with Citrix's business model transition, Citrix's historical and projected financial performance, and market dynamics, the Transaction Committee agreed that it was in the best interests of Citrix and its stockholders to proceed with a transaction with Vista and Elliott on the terms proposed").

¶¶ 98–124. These facts are indistinguishable from *Wesco*, where lower projections were prepared after negative news and bidder withdrawals, and before further negotiations occurred. *See* 454 F. Supp. 3d at 398. There, as here, the plaintiff "failed to allege facts supporting the strong inference that either Wesco's management or board did not hold the beliefs they professed." *Id.* at 400.

**Second**, while ignoring the disappointing results, the AC relies on cherry-picked statements of optimism from the second- and third-quarter earnings letters (AC ¶¶ 6–7, 23, 63, 65–68), such as "this is a business with a lot of tailwinds" and "a lot of metrics . . . are very, very encouraging." AC ¶ 23. But such puffery is immaterial. In *Interactive Intelligence*, the company made similarly optimistic statements about its business even as it lowered its projections during the course of merger negotiations. 308 F. Supp. 3d at 988, 990, 991. The court ignored this "puffery," declining to infer that "the Management Forecasts were not presented in good faith" simply "because [plaintiff] feels the Directors were qualitatively more hopeful than the quantitative Management Forecasts." *Id.* at 990–91. Moreover, Plaintiffs mischaracterize these letters, which were not positive but referred to "disruption," "headwinds," and "underperform[ance]." Q2 2021 Letter (Ex. 4) at 2–3; Q3 2021 Letter (Ex. 5) at 2–3. Other investors disagreed with Plaintiffs: Citrix's stock price slid throughout 2021. *See* Ex. 9 (stock price chart). Thus, the letters do not help Plaintiffs. *See Wesco*, 454 F. Supp. 3d at 398 (rejecting positive characterization of mixed financial results).

### b.      The AC Does Not Adequately Allege Objective Falsity.

The Plaintiffs have also failed to allege objective falsity. Plaintiffs' claim of objective falsity largely boils down to their own, more-optimistic opinion about Citrix's business prospects. While Plaintiffs are free to have their own opinion, it cannot support a Section 14(a) claim. *See Montanio v. Keurig Green Mountain, Inc.*, 237 F. Supp. 3d 163, 173 (D. Vt. 2017) ("To prove that a projection of future performance . . . is objectively false requires allegations of specific, provable facts to the contrary."). The AC alleges that the December Projections are false because they

"ignored the rapid growth in SaaS ARR, the beat in revenue guidance, and forecasted improvement in key profitability metrics, reflected in the Q3 2021 results." AC ¶ 100. These allegations "reflect Plaintiffs' subjective interpretation or opinion . . . and cannot support their claims." *Davison v. Ventrus Biosciences, Inc.*, 2014 WL 1805242, at *8 (S.D.N.Y. May 5, 2014); *see also Kinnett v. Strayer Educ., Inc.*, 2012 WL 933285, at *7 (M.D. Fla. Jan. 3, 2012) ("opinions do not transform non-fraudulent practices . . . into fraudulent or misleading actions"), *report and recommendation adopted*, 2012 WL 933275 (M.D. Fla. Mar. 20, 2012), *aff'd*, 501 F. App'x 890 (11th Cir. 2012). Indeed, Plaintiffs do not even allege that the December 2021 Projections were wrong, and they better predicted Citrix's 2021 revenues than the September 2021 Projections. (*See supra* note 9.)

### 3. The Statements About the December 2021 Projections Did Not Render the Proxy Materially Misleading.

The AC also fails to plead materiality. It theorizes that the December 2021 Projections were too low and thus misled investors about Citrix's future performance. But to support this theory, the AC points to ***other information that Citrix itself disclosed***, most notably the September 2021 Projections (*see* AC ¶ 103). This theory—that the Proxy is misleading in light of other facts the Proxy disclosed—cannot support a Section 14(a) claim. *See Analogic*, 2019 WL 4804800, at *9 (court considers "relevant entirety" of proxy and, "[i]n evaluating whether Defendants' representations were misleading, the Court must evaluate the statements within the proxy independently"). "[M]ateriality depends on whether a substantial likelihood exists that a reasonable investor would have viewed a misrepresentation or omission as significantly alter[ing] the 'total mix' of information made available." *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1317 (11th Cir. 2019). If the misstatements "did not render the Proxy materially misleading," dismissal should follow. *Paradise*, 918 F.3d at 321. Courts thus dismiss Section 14(a) claims where the proxy "provided [] shareholders with every projection and financial forecast" and "[r]easonable

shareholders could therefore appraise the merit of the projections on their own." *Analogic*, 2019 WL 4804800, at *13; *see also Wesco*, 454 F. Supp. 3d at 402 (dismissing where company "left it to the shareholders themselves to conduct their own analysis if they believed, contrary to the views of management and the board, that the Initial Management Projections were the better set of projections"). That is exactly what Plaintiffs did: they read the Proxy and came to their own opinion about the December 2021 Projections. That is not the basis for a Section 14(a) claim.

**B.     The AC Does Not Adequately Allege Any Actionable Misstatement Concerning the Board's and Qatalyst's Opinions that the Merger Was Fair.**

Next, the AC alleges that the following were false and misleading: (1) that, in the view of the Board, the merger was "fair," "advisable," and "in the best interests of the Company's stockholders" (AC ¶¶ 169-70); and (2) Qatalyst's opinion that the merger was fair (AC ¶ 159).

These claims about fairness are entirely derivative of Plaintiffs' attack on the December 2021 Projections and fail for the same reasons. The AC asserts that, because the Board and Qatalyst did not honestly believe in the December 2021 Projections, they also could not have honestly believed the merger was fair. AC ¶ 160, 170. Thus, all the grounds set forth above in Section II.A, including the PSLRA safe harbor, apply equally here. *See Wesco*, 454 F. Supp. 3d at 387 (dismissing challenge to statement about fairness of merger under PSLRA safe harbor where it was derivative of attack on projections protected by safe harbor); *Interactive Intelligence*, 308 F. Supp. 3d at 999 (dismissing identical claims where plaintiff "advances no ground for the subjective and objective falsity of these statements other than" claims that financial forecasts and analyses in proxy statement were false and misleading).

In addition, under Supreme Court precedent, these opinions about the fairness of the merger must be both objectively and subjectively false to be actionable. *Virginia Bankshares*, 501 U.S. at 1095–96. Again, the AC alleges neither.

While Plaintiffs assert that Citrix's directors undertook a conscious scheme to deceive investors about the fairness of the merger, the AC is devoid of factual content supporting that assertion and everything in the record points the other way. *See supra* Sections II.A.1.c, II.A.2.a; *infra* Section III. Just as in *Interactive Intelligence*, Plaintiffs' claim boils down to a contention that "the Directors *knew* that [Citrix] would be more valuable as a going concern than the value embodied in the Merger because the Directors expressed public *hopes* that [Citrix's business strategy] would be successful." 308 F. Supp. 3d at 999. As in that case, Plaintiffs' "speculation on these points is unfounded by any plausible factual allegation in the Amended Complaint." *Id.*[11]

The AC also does not raise any plausible inference that the merger was objectively unfair. The merger was the culmination of a five-month-long process involving interactions with 19 potential buyers and financial sponsors; the $104 per-share deal price represented a 30% premium over Citrix's unaffected stock price; no other buyers were willing make an offer; and the Board received a fairness opinion from its financial advisor.[12] *See* Proxy at 1, 22-36, 41. Those uncontested facts strongly support the objective fairness of the merger. *See Wesco*, 454 F. Supp. 3d at 405 (plaintiff failed to allege sale process was inadequate where proxy disclosed that committee "reached out to a large number of potential bidders," "negotiated aggressively with

---

[11] The AC also speculates that Qatalyst might have been motivated to issue a false fairness opinion because most of its fee was contingent on consummation of the merger and because it had previously worked on mergers adverse to Elliott and Vista. AC ¶¶ 21, 24, 54. Neither of these fully-disclosed, commonplace circumstances provides a basis to question Qatalyst's honesty. *In re Smurfit-Stone Container Corp. S'holder Litig.*, 2011 WL 2028076, at *23 (Del. Ch. May 20, 2011) ("Contingent fees for financial advisors in a merger context are somewhat 'routine' and previously have been upheld by Delaware courts."); *Flannery v. Genomic Health, Inc.*, 2021 WL 3615540, at *6, *24 (Del. Ch. Aug. 16, 2021) (allegations failed to "support a reasonable inference that Goldman was unable to deliver independent financial advice to the [seller's] Board" even where Goldman had performed work for buyer more than two years prior to retention by seller).

[12] The AC speculates that other suitors withdrew because they "perceived that the playing field was tilted in favor of Elliott and Vista." AC ¶ 76. But the AC's only support is the existence of so-called "conflicts," which as discussed below were illusory. *See infra* Section II.C.1.

[buyer]," and received an offer from only one bidder).

In the face of these facts, the AC alleges nothing that calls into question the objective fairness of the merger. The AC relies primarily on its misguided attack on the December 2021 Projections. AC ¶¶ 160, 170. The AC also quibbles with aspects of Qatalyst's analyses, specifically the discount rate used in the DCF analysis and the exclusion of the Wrike transaction from the Selected Transactions Analysis—details disclosed in the Proxy. AC ¶¶ 160–162. Such quibbles with Qatalyst's disclosed assumptions cannot support an inference that the merger was unfair. *See FEI*, 289 F. Supp. 3d at 1179 ("The discount rate in a discounted cash flow analysis reflects a financial analyst's judgment, and disagreement over the rate does not form the basis of a § 14(a) claim. . . . If [the advisor] did apply a higher discount rate than is consistent with industry standards, any 'shoddy' analysis was available for shareholders to observe and consider in their decision.").[13]

Ultimately, any claim of objective fairness is no different from the one rejected in *Gigamon*. There too, the plaintiff challenged the Board's and the financial advisor's conclusion that the merger was fair based on projections that were allegedly too low. *See* 372 F. Supp. 3d at 1042. There too, the plaintiff sought to rely on generalized optimism about the company's business prospects, while ignoring challenges the business had faced. *Id.* at 1051-52. The *Gigamon* court rejected plaintiff's claim of objective falsity, *see id.*, and this Court should do the same.

Finally, here too, the supposedly flawed opinions about fairness do not render the Proxy materially misleading. The Proxy contained all the information that Plaintiffs needed to evaluate the fairness of the merger, including the September 2021 projections and Qatalyst's fairness

---

[13] *See also Kuebler v. Vectren Corp.*, 13 F.4th 631, 643–44 (7th Cir. 2021) ("Shareholders are not entitled to the disclosure of every financial input used by a financial advisor so that they may doublecheck every aspect of both the advisor's math and its judgment."); *Ridler v. Hutchinson Tech. Inc.*, 216 F. Supp. 3d 982, 990 (D. Minn. 2016) ("[P]laintiffs point to no objective flaw in [the advisor]'s analysis, but only to a disagreement over subjective valuation methodology.").

analyses. As a result, "[r]easonable shareholders could therefore appraise the merit of the [merger] on their own." *Analogic*, 2019 WL 4804800, at *13. Ultimately, Plaintiffs can point to nothing more than their own opinion that the merger was unfair. Permitting Plaintiffs to state a Section 14(a) claim on that basis would improperly transform the statute from one governing disclosure to one governing directors' fiduciary duties. *See Koppel v. 4987 Corp.*, 167 F.3d 125, 133 (2d Cir. 1999) (Section 14(a) claims cannot rest on allegations that "constitute no more than state law breach of fiduciary duty claims under a thin coat of federal paint").

### C. The Alleged Omissions Concerning Conflicts of Interest and Citrix's Publicly Reported Historical Financial Results Do Not Render the Proxy Materially Misleading and Are Not Actionable.

The AC further alleges that the Proxy failed to disclose certain information concerning (1) purported conflicts of interest (AC ¶¶ 72, 83, 164–168) and (2) Citrix's 2021 publicly disclosed quarterly financial results (AC ¶¶ 97, 140–149). None of the allegedly omitted information was material. Rather, these are classic "tell-me-more" claims that courts routinely reject under Section 14(a). *See, e.g.*, *Mack v. Resolute Energy Corp.*, 2020 WL 1286175, at *9 (D. Del. Mar. 18, 2020) (stockholder not entitled to information "merely because he believes it would be useful").

### 1. There Were No Undisclosed or Material Conflicts of Interest.

The AC alleges that the Proxy failed to disclose supposed conflicts of interest. AC ¶¶ 72, 83, 164–168. But the Proxy contained extensive disclosure of potential conflicts. *See* Proxy at 23–24 (summary of potential conflicts considered by Board and recusal of Ms. Kilcoyne and Mr. Hogan); *id.* at 56–65 (summary of interests of directors and officers in the merger). To give a few examples: an Elliott representative had served on Citrix's Board and another board alongside current directors; Mr. Calderoni had an 18-month consulting arrangement with Elliott in 2018–2019; and a family member of Mr. Calderoni worked with Elliott in an administrative role. Proxy at 23–24.

The AC alleges Citrix should have disclosed more but points to coincidences, not conflicts. Most of them are past board seats on companies with a connection to Vista or Elliott: Mr. Knowling was a director of Convergys from late 2017 until late 2018, when Elliott acquired a 4.9% stake; Ms. Caldwell was a director of TIBCO before it became a Vista portfolio company; Mr. Calderoni served on the board of Juniper in February 2014 when Elliott reached an agreement to obtain two board seats; and Mr. Calderoni was an advisor to Silver Lake Partners, which participated in the October 2015 purchase by Dell of EMC, in which Elliott had a 2.2% stake. AC ¶¶ 83, 165, 168.

These so-called "conflicts" were not conflicts at all, but immaterial information that Citrix had no duty to disclose. "[O]nly potential or actual conflicts that a reasonable investor would consider significant must be disclosed." *In re Mindbody, Inc. Sec. Litig.*, 489 F. Supp. 3d 188, 214 (S.D.N.Y. 2020).[14] Overlapping board service is commonplace and does not create any conflicting financial interest. *See, e.g.*, *Patel v. Duncan*, 2021 WL 4482157, at *20 (Del. Ch. Sept. 30, 2021) (rejecting allegation that directors' "overlapping board service at other companies" gave rise to a conflict of interest or showed lack of independence), *aff'd*, 277 A.3d 1257 (Del. 2022). "Bare allegations that directors are friendly with . . . or have past business relationships with the proponent of a transaction or the person they are investigating are not enough to rebut the presumption of independence." *Kahn v. M&F Worldwide Corp.*, 88 A.3d 635, 649 (Del. 2014), *overruled on other grounds by Flood v. Synutra Int'l, Inc.*, 195 A. 3d 754 (Del. 2018).[15]

---

[14] *See also In re Om Grp., Inc. S'holders Litig.*, 2016 WL 5929951, at *15 (Del. Ch. Oct. 12, 2016) ("Not every fact tending remotely to suggest that a board member's interest might differ in some respect from that of the stockholders amounts to a material omission. Plaintiffs must allege facts from which the Court may reasonably infer that there is a substantial likelihood that a reasonable shareholder would consider the omission important in deciding how to vote.").

[15] *See also Highland Legacy Ltd. v. Singer*, 2006 WL 741939, at *5 (Del. Ch. Mar. 17, 2006) (allegation that directors "served together on a few boards of unaffiliated companies" did not call into question their impartiality); *see also Om*, 2016 WL 5929951, at *15 (that director "was Chairman and CEO of a company partially owned by [buyer]" was not material); *Weinberger v.*

Ultimately, the incremental disclosures that Plaintiffs seek would have done nothing to apprise stockholders of any useful information concerning conflicts facing Citrix's fiduciaries. *See Mindbody*, 489 F. Supp. 3d at 215 ("Even if some of the omitted relationships were 'potential' conflicts of interest, Plaintiffs have not alleged why they would be material to shareholders when Defendants had already disclosed the two far more significant conflicts"). Thus, this claim fails.

### 2. There Were No Material Omissions Concerning Citrix's Publicly Disclosed Q2 and Q3 2021 Financial Results.

Plaintiffs also quibble with how the Proxy characterized the quarterly earnings letters from July and November 2021. AC ¶¶ 97, 141–149. These quibbles fail to state a claim.

The AC does not and cannot dispute that the challenged statements were true: they accurately reflected the text of the earnings letters, which referred to "disruption," "challenges," and "underperform[ance]." Q2 2021 Letter (Ex. 4) at 2–3; Q3 2021 Letter (Ex. 5) at 2–3. Plaintiffs simply prefer a glass-half-full approach. *See* AC ¶¶ 141–149. But even the AC admits that Citrix missed revenue targets in 2021 and lowered its annual financial guidance. *Id.* ¶ 140. And as Citrix's stock price showed, the market did not share Plaintiffs' positive view. *See* Ex. 9 (stock price chart). These negative factors contributed to the Board's decision and had to be disclosed. *See* 17 C.F.R. § 229.1004(a)(2)(iii) (requiring disclosure of the "reasons for engaging in the transaction"); *Appel v. Berkman*, 180 A.3d 1055, 1063 (Del. 2018) ("[B]oard disclosures soliciting votes in favor of a transaction do not solely say that the board recommends the transaction, they instead provide detailed reasons why the board is making that recommendation."); Proxy at 38–41 (disclosing reasons for merger, including Citrix's stock price and "execution challenges that Citrix is facing").

Moreover, contrary to Plaintiffs' allegations, the Proxy ***did*** disclose positive results from

---

*Rio Grande Indus., Inc.*, 519 A.2d 116, 122–23 (Del. Ch. 1986) (failure to disclose that three directors of seller were directors of corporation 25–30% owned by buyer not material).

2021. Citrix's Form 10-K, which the Proxy incorporated (*see* Proxy at 108), disclosed positive annual results more current than the allegedly omitted quarterly results. Plaintiffs complain that the Proxy failed to disclose quarterly "year-over-year growth in SaaS ARR [*i.e.*, Annual Recurring Revenue]" and "accelerating SaaS ARR." AC ¶¶ 141, 143-145, 148-149. But the Form 10-K (and thus the Proxy) disclosed that annual "Subscription revenue increased 39.4% to $1.55 billion" and annual "SaaS revenue increased 58.5% to $857.3 million." 2021 10-K (Ex. 2) at 38; *see Laborers' Loc. #231 Pension Fund v. PharMerica Corp.*, 2019 WL 4645583, at *7 (W.D. Ky. Sept. 24, 2019) (proxy statement not misleading in light of disclosure in 10-K incorporated by reference). No further disclosure would have been material. Investors were not misled simply because the Proxy did not repeat each of the statements in Citrix's quarterly letters, or because the Proxy did not adopt Plaintiffs' positive spin. *See, e.g.*, *Chu v. Sabratek Corp.*, 100 F. Supp. 2d 827, 834 (N.D. Ill. 2000) ("A plaintiff cannot credibly claim to be misled by a company's attempt to hide negative information when that same information is publicly available via alternate channels.").

## III.    THE AC DOES NOT SATISFY RULE 9(b).

To satisfy Rule 9(b), the AC must allege, among other things, "the content of such statements and the manner in which they misled the plaintiff" and "what the defendants obtained as a consequence of the fraud." *Lee*, 2021 WL 3912651 at *4. In addition, "a plaintiff may not lump multiple defendants together because this constitutes impermissible 'group pleading.'" *Libov v. Readix, Inc.*, 2011 WL 13216996, at *1 (S.D. Fla. Sept. 8, 2011). These requirements "protect[] defendants against spurious charges of immoral and fraudulent behavior." *Arnold v. McFall*, 839 F. Supp. 2d 1281, 1287 (S.D. Fla. 2011). The AC does not meet them.

*First*, the AC does not allege how Plaintiffs were misled by the Proxy. Rather, the AC shows Plaintiffs were not misled. The AC's attack on the projections and the fairness of the merger is ***based on the Proxy itself***. It is obvious that Plaintiffs could and did "appraise the merit of the

projections on their own." *Analogic*, 2019 WL 4804800, at *13. They were not misled. *See Arnold*, 839 F. Supp. 2d at 1287 (dismissing where the plaintiff "fail[ed] to allege any facts that support his allegation that this statement was misleading or a misrepresentation of material fact").

  **Second**, the AC fails to plead how the alleged fraud benefited Defendants. The AC relies on purported conflicts of interest, but none of them remotely suggest that any Defendant received any benefit as the result of the supposed fraud. Indeed, the Company formed an independent and disinterested Transaction Committee to oversee the deal process, and it was the Transaction Committee—not the full Board—that met with management about the challenged projections. AC ¶ 99. While the AC claims the Transaction Committee was infected by so-called "conflicts," there is no explanation of how the Transaction Committee members received anything of benefit due to these "conflicts." *See supra* Section II.C.1. And with respect to the full Board, the only two directors with potential conflicts recused themselves from discussions about the merger. AC ¶ 28.

  The AC also points to accelerated vesting of equity awards and a change-in-control payment to Mr. Calderoni (AC ¶¶ 131–135) pursuant to the preexisting terms of the equity awards and Mr. Calderoni's executive agreement signed when he became interim CEO (*see* Proxy at 58, 60–61). But the vesting of equity awards incentivized the Board to pursue the highest price. *See Analogic*, 2019 WL 4804800, at *13 ("[T]he allegations suggest that the Individual Defendants' interests aligned with Analogic's shareholders, as they themselves owned stock in Analogic and it would have been in their interest to maximize the value of that stock."). Moreover, the non-employee directors' equity awards would have vested according to their own terms in July 2022. *See* 4/16/21 Proxy (Ex. 8) at 34. It is well recognized that these commonplace arrangements do not suggest a motive to defraud. *See Wesco*, 454 F. Supp. 3d at 396 ("lucrative golden parachute"

was "a generalized incentive commonly available" insufficient to infer motive).[16]

     ***Finally***, the AC engages in improper group pleading. It makes sweeping, unparticularized statements about what the "Transaction Committee," the "Board," and "Qatalyst" did, without specifying exactly who did what. *See, e.g.*, AC ¶ 19 ("the Board, as well as the Transaction Committee, were conflicted, and instead asked Citrix senior management to quickly prepare a new set of depressed projections"); AC ¶ 29 ("the Transaction Committee (and by extension, the full Board), aided and abetted by Qatalyst, found a way to justify acceptance of Elliott's and Vista's 'best and final offer'"). "Such group pleading is not permitted under Rule 9(b)." *Magnum Constr. Mgmt., LLC v. WSP USA Sols., Inc.*, 522 F. Supp. 3d 1202, 1209 (S.D. Fla. 2021).[17]

## IV.    THE AC DOES NOT ADEQUATELY ALLEGE LOSS CAUSATION.

     Finally, the AC fails to adequately allege that any purportedly false or misleading statements "caused the loss for which the plaintiff seeks to recover damages," a requirement in the PSLRA for all Exchange Act claims. 15 U.S.C. § 78u-4(b)(4); *Lee*, 2021 WL 3912651, at *13 (dismissing Section 14(a) claim because "Plaintiffs have failed to show loss causation").

     The AC asserts in conclusory fashion that Plaintiffs suffered a loss because the "true value" of Citrix stock was higher than the merger consideration. AC ¶ 173. But there are no facts to support this assertion. There were no competing offers on the table. AC ¶ 76. And the market (which was apprised of Citrix's financial results) valued the stock at far ***less*** than the merger consideration before speculation about a potential merger became public. Proxy at 1. Plaintiffs

---

[16] *See also In re W. Nat'l Corp. S'holders Litig.*, 2000 WL 710192, at *12 (Del. Ch. May 22, 2000) ("a $4.5 million cash severance payment coupled with accelerated vesting of certain options to an executive chairman of a large corporation does not strike me as so far beyond the pale that it would give rise to an improper motive to accomplish a merger").

[17] *See also SIG, Inc. v. AT & T Digital Life, Inc.*, 971 F. Supp. 2d 1178, 1187 (S.D. Fla. 2013) ("in cases involving multiple defendants, the complaint must inform each defendant of his or her alleged role in the fraud").

therefore fail to adequately allege that any misrepresentations caused them economic harm.

When faced with such inadequate allegations of loss causation, multiple courts have dismissed Section 14(a) claims. Here too, *Wesco* is directly on point. In *Wesco*, the plaintiff alleged his shares were "worth significantly more than the Merger Consideration" based on a set of earlier, more-optimistic financial projections. 454 F. Supp. 3d at 404. The court rejected this contention, holding that the "true alternative to the merger consideration" was the stock price prior to the announcement of the deal—not "[e]quity in an independent company that achieved" the higher projections. *Id.* at 405. The Second Circuit affirmed. 847 F. App'x 35. Other courts have reached similar conclusions. *See Kuebler*, 13 F.4th at 645–47 (dismissing on loss causation where "plaintiffs do not even allege the existence of a viable superior offer").[18]

## V.     THE § 20(a) CONTROL PERSON CLAIM SHOULD ALSO BE DISMISSED.

"The complaint must adequately allege primary liability for another Securities Exchange Act violation in order to state a claim for secondary liability under section 20(a)." *Jabil Circuit*, 594 F.3d at 797. Because the Section 14(a) claim fails, the Section 20(a) claim should also be dismissed. *See id.* (dismissing Section 20(a) claim due to failure "to properly plead [plaintiffs'] fraud and proxy solicitation claims").

## <u>CONCLUSION</u>

For the foregoing reasons, the AC should be dismissed in its entirety with prejudice.[19]

---

[18] *See also Interactive Intelligence*, 308 F. Supp. 3d at 1000 (rejecting loss causation where plaintiff "alleged no more than a speculative possibility that he was economically injured"); *Karp v. First Connecticut Bancorp*, 69 F.4th 223, 235 (4th Cir. 2023) (rejecting loss causation at summary judgment where there was no superior offer and it was therefore "unclear how the shareholders would have realized the $35.51 price had the proxy statement included the cash-flow projections— or whether they even would have rejected the merger in that case").

[19] *See Carvelli v. Ocwen Fin. Corp.*, 2018 WL 4941110, at *8 (S.D. Fla. Apr. 30, 2018) (dismissing complaint with prejudice because of incurable infirmities), *aff'd*, 934 F.3d 1307 (11th Cir. 2019).

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b)(2), Defendants respectfully request oral argument on their Motion to Dismiss the Amended Complaint. Defendants respectfully submit that oral argument would assist the Court in light of the nature of Plaintiffs' allegations, the application of the PSLRA's safe harbor for forward-looking statements, and the heightened pleading requirements imposed by Rule 9(b) and the PSLRA. Defendants estimate that one hour would be sufficient for oral argument.

Dated: July 12, 2023

**TRENAM, KEMKER, SCHARF, BARKIN, FRYE, O'NEILL & MULLIS, P.A.**

 /s/ Amy L. Drushal
Amy L. Drushal
Florida Bar Number 546895
101 Kennedy Blvd., Ste 2700
Tampa, FL 33602
Tel: (813) 223-7474
Fax: (813) 229-6553
adrushal@trenam.com/lbehr@trenam.com

and

**GOODWIN PROCTER LLP**

Deborah S. Birnbach (*pro hac vice*)
Justin D. Ward (*pro hac vice* pending)
Jordan Benson (*pro hac vice*)
100 Northern Avenue
Boston, MA 02210
Tel: (617) 570-1000
Fax: (617) 523-1231
dbirnbach@goodwinlaw.com
jward@goodwinlaw.com
jbenson@goodwinlaw.com

*Counsel for Defendants Citrix Systems, Inc., Robert M. Calderoni, Nanci E. Caldwell, Murray J. Demo, Thomas E. Hogan, Moira A. Kilcoyne, Robert E. Knowling, Jr., Peter J. Sacripanti, and J. Donald Sherman*

31

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of July, 2023, I electronically filed the foregoing with the Clerk of Court by using the Court's CM/ECF system, which will furnish a copy to all counsel of record.

/s/ Amy L. Drushal
Attorney