**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 22-CV-62327-RAR**

**JUAN A. VARGAS**, *individually and*
*on behalf of all others similarly situated,*

      Plaintiffs,

v.

**CITRIX SYSTEMS, INC.**, *et al.*,

      Defendants.

_____/

### ORDER GRANTING IN PART AND DENYING IN PART
### DEFENDANTS' MOTION TO DISMISS

      **THIS CAUSE** comes before the Court upon Defendants' Motion to Dismiss, [ECF No. 42] ("Motion").[1]   This case involves a putative class action brought by Juan A. Vargas and George Messiha ("Lead Plaintiffs"), alleging violations of the federal securities laws by Defendants Citrix Systems, Inc., Robert M. Calderoni, Nanci E. Caldwell, Murray J. Demo, Thomas E. Hogan, Moira A. Kilcoyne, Robert E. Knowling, Jr., Peter J. Sacripanti, and J. Donald Sherman.  *See generally*, Amended Complaint [ECF No. 34].  On March 8, 2023, the Court appointed Lead Plaintiffs as co-lead plaintiffs, and approved Lead Plaintiffs' selection of Pomerantz LLP and Wohl & Fruchter LLP as co-lead counsel, and Miller Shah LLP as Liaison Counsel.  [ECF No. 27].  The Court having carefully reviewed the pleadings, the record, and relevant caselaw, having held oral argument on January 25, 2024, [ECF No. 49], and being otherwise fully advised, it is hereby

      **ORDERED AND ADJUDGED** that Defendants' Motion is **GRANTED IN PART** and **DENIED IN PART** as set forth herein.

---

[1] The Motion is fully briefed and ripe for adjudication.  *See* Pl.'s Resp. in Opp'n to Defs.' Mot. ("Resp."), [ECF No. 45]; Reply to Pl.'s Resp. in Opp'n to Defs.' Mot. ("Reply"), [ECF No. 47].

## BACKGROUND

Citrix is a cloud computing enterprise software company.  In early 2021, it began to transition its business model from perpetual licenses for software installed on customer computers to recurring subscription fees for access to software hosted on remote computers, a/k/a the "cloud" (a model known as "Software-as-a-Service," or "SaaS").  Am. Compl. ¶¶ 3–5, 49.  In 2022, Citrix negotiated a merger with affiliates of Vista Equity Partners Management LLC ("Vista") and Elliott Investment Management L.P. ("Elliott") in which Vista and Elliott would pay Citrix stockholders $104 per share in cash (the "Merger Agreement").  Am. Compl. ¶¶ 2, 26, 119–120.

After the Board of Directors approved the merger, Citrix filed a purportedly false and misleading Schedule 14A Proxy Statement pursuant to section 14(a) of the Securities Exchange Act of 1934 ("Exchange Act"), [ECF No. 43-2] ("Proxy"), along with supplemental disclosures, [ECF No. 43-7] ("Supplemental Disclosures"), and shareholders subsequently voted in favor of the Merger Agreement.  Am. Compl. ¶¶ 30–31, 129.  Plaintiffs' claims arise out of the content contained in the Proxy and, specifically, the disclosures' reliance on allegedly false projections to justify the merger.  Am. Compl. ¶¶ 136–172.  Defendants Robert M. Calderoni, Nanci E. Caldwell, Murray J. Demo, Thomas E. Hogan, Moira A. Kilcoyne, Robert E. Knowling, Jr., Peter J. Sacripanti, and J. Donald Sherman ("Individual Defendants") served as directors of Citrix when the Board approved the merger and disseminated the Proxy statements.  Am. Compl. ¶¶ 39–46.  In 2015, Defendant Calderoni was appointed Chairman of the Board and named Interim President and CEO in the course of the transaction process.  Am. Compl. ¶¶ 39; 55.

A brief recap of relevant events at Citrix prior to the merger is in order.  Citrix developed a metric known as SaaS Annual Recurring Revenue ("SaaS ARR") to monitor the shifting business model that represented the recurring dollar value of all subscription-based contracts

normalized to a one-year period.  Am. Compl. ¶¶ 3–5, 49–50.  Plaintiffs aver that the metric became particularly important to assessing the health of the company.  Am. Compl. ¶¶ 5–7, 13, 59–68.

Elliott acquired a stake in Citrix in 2015 and worked with the company's management to improve Citrix's profitability before exiting its position in Citrix in early 2020.  Am. Compl. ¶¶ 51–58.  Plaintiffs allege that Calderoni and senior executives from Elliott began a close working relationship that included overlapping board memberships and Elliott's initial attempt to take Citrix private in 2021.  Am. Compl. ¶¶ 51–58.  In August 2021, Elliott advised the Board that it had acquired a 10% stake in Citrix and advocated to take Citrix private.  Am. Compl. ¶ 69.  And in September 2021, Citrix launched a sales process wherein Elliott submitted an initial indication of interest ("IOI") proposing to acquire Citrix for $124.00 to $130.00 per share in cash.  Am. Compl. ¶ 73.  The Board then asked management to prepare preliminary projections ("September 2021 Projections").  Am. Compl. ¶ 74.

On October 18, 2021, Elliott submitted a revised IOI of $125.00 per share in cash.  Am. Compl. ¶ 81.  As a result, on October 21, 2021, the Board formed a five-member Transaction Committee to review proposals to acquire Citrix and make a recommendation to the Board.  Am. Compl. ¶¶ 82–83.  Directors Ms. Kilcoyne and Mr. Hogan were recused due to their relationships with Elliott and Vista.  Am Compl. ¶ 28; Proxy at 23–24.

In Q1 and Q2, Citrix reported accelerating SaaS ARR, growing 70% year-over-year in Q1 2021 to $943 million, and 74% year-over-year in Q2 2021 to more than $1 billion.  Am. Compl. ¶¶ 63, 65.  The accelerating cloud transition impacted near-term revenue, and in Q2 2021, Citrix reported revenue of $812 million that fell short of guidance.  Am. Compl. ¶¶ 66–67.  Despite "accelerating" growth in SaaS ARR, Citrix lowered its 2021 full-year guidance to $3.22 to $3.25 billion—a decrease of $160–170 million—and noted difficulties in the shifting model.

Q2 2021 Letter, [ECF No. 43-5].  Citrix's stock price dropped 14% to $99.00.  Proxy at 22.  Yet, Citrix reported SaaS ARR accelerating 75% year-over-year to $1.1 billion in Q3 2021, and revenue also beat guidance.  Am. Compl. ¶¶ 12–13, 85, 89.  Describing Q3 2021 results, Defendant Calderoni expressed optimism as to the strength of the transitioned business.  Am. Compl. ¶¶ 85, 86, 89, 92, 95, 96.

On December 5, 2021, Elliott (joined by Vista) submitted an IOI of $110.00 per share, and management prepared the "December 2021 Projections" that purportedly rolled forward the September 2021 Projections to reflect Q3 and Q4 results.  Am. Compl. ¶ 99.  These projections forecasted increasingly larger percentage declines in revenue, gross profit, income, and EBITDA for 2022 through 2026 as compared to the September 2021 Projections—inconsistent with the positive Q3 2021 results, as Plaintiffs allege.  Am. Compl. ¶¶ 19–20, 99–106.  The Transaction Committee approved the December 2021 Projections for use by Qatalyst Partner LP ("Qatalyst"), its financial advisor, in its financial analyses.  Am. Compl. ¶¶ 106–08.  Qatalyst, in turn, prepared sensitivity cases that allegedly assumed even lower revenue growth rates, without considering accelerating SaaS ARR ("Sensitivity Cases").  Am. Compl. ¶¶ 108–09.

On January 15, 2022, the Transaction Committee submitted a counteroffer of $120.00 to Elliott and Vista and requested a "go shop" provision to allow Citrix to solicit additional bids after signing an agreement.  Am. Compl. ¶¶ 116–17; Proxy at 35–36.  The bidders rejected the counteroffer, and the Transaction Committee countered again with $112.00.  Am. Compl. ¶ 117.  Elliott and Vista offered, instead, $103.51.  Am. Compl. ¶ 118.  The Transaction Committee successfully negotiated an increase to $104.00, and the deal price was announced on January 31, 2022.  Am. Compl. ¶¶ 119–20.  Defendants assert the $104 price represented a premium of approximately 30% over the unaffected five-day volume-weighted average price of Citrix stock as of December 7, 2021 (the last day prior to market speculation about a transaction).  Proxy at 1.

Upon the Transaction Committee's recommendation, the Board (excluding the two recused members) voted unanimously to approve the transaction, and the parties signed the Merger Agreement.  On March 16, 2022, Citrix filed the Proxy with the Securities and Exchange Commission ("SEC") that disclosed risks regarding the merger, background on the negotiations, the September and December 2021 Projections (along with warnings against attaching undue importance to them), Qatalyst's fairness opinion and financial analyses (with similar warnings), and potential conflicts of interest affecting Citrix's Board and management.  Proxy at 23–24, 56–65.  And, on April 13, 2022, Citrix supplemented the Proxy with additional disclosures that described the lawsuits filed after the announcement of the merger.  *See* Supplemental Disclosure, [ECF No. 43-7], at 4.  On April 21, 2022, Citrix stockholders voted to approve the merger, which closed on September 30, 2022.  Am. Compl. ¶¶ 129–30.

In the Amended Complaint, Plaintiffs, individually and on behalf of all others similarly situated, allege a violation of section 14(a) of the Exchange Act and SEC Rule 14a-9 for various misstatements and omissions in the Proxy (Count I), as well as violations of section 20(a) of the Exchange Act against the Individual Defendants (Count II).

## **LEGAL STANDARD**

"Section 14(a) of the Securities Exchange Act and Rule 14a–9 collectively prohibit the use of false statements in proxy solicitations associated with registered securities."  *Edward J. Goodman Life Income Tr. v. Jabil Cir., Inc.*, 594 F.3d 783, 796 (11th Cir. 2010) (citing 15 U.S.C. § 78n(a); 17 C.F.R. § 240.14a–9).  Claims brought under the Exchange Act are subject to multiple, heightened pleading standards: "(1) the federal notice pleading requirements in Federal Rule of Civil Procedure 8(a)(2)"; "(2) the special fraud pleading requirements in Federal Rule of

Civil Procedure 9(b)"[2]; and "(3) the additional pleading requirements in the Private Securities Litigation Reform Act of 1995 ('PSLRA')." *In re Galectin Therapeutics, Inc. Sec. Litig.*, 843 F.3d 1257, 1269 (11th Cir. 2016).

While the Eleventh Circuit has examined claims under section 10(b) of the Exchange Act that are instructive for purposes of outlining the triple-layered pleading standard here, similar claims concerning disclosures in a merger Proxy under section 14(a) have yet to arise. *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1332 (11th Cir. 2019) (affirming dismissal of claims alleging violations of § 10(b) of the Exchange Act and Rule 10b-5); *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915 (11th Cir. 2020) (reversing dismissal of securities-fraud claims brought under Rule 10b-5 and § 20(a)). To sustain a claim under section 14(a) and the PSLRA, a plaintiff claiming that a proxy statement contained a material misrepresentation or omission must allege "that the proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction."[3] *Edward J. Goodman Life Income Tr.*, 594 F.3d at 796–97 (quoting *Mills v. Elec. Auto–Lite Co.*, 396 U.S. 375, 385 (1970)); *see also Bond Opportunity Fund v. Unilab Corp.*, 87 F. App'x 772, 773 (2d Cir. 2004). In other words, the transaction at issue must be the source of the plaintiff's injury. *Id.* (citing

---

[2] Rule 9(b) applies where a complaint "sounds in fraud." *In re Columbia Pipeline, Inc.*, 405 F. Supp. 3d 494, 506 (S.D.N.Y. 2019) ("[W]hen plaintiffs assert Section 14(a) claims grounded in alleged fraudulent conduct, they are subject to heightened pleading requirements, even if they disclaim reliance on a fraud theory." (cleaned up)); *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 144–45 (3d Cir. 2004) (holding Rule 9(b) and the PSLRA's heightened pleading requirements apply to section 14(a) claims, at least where such claims are based on allegations of fraud). Plaintiffs do not disclaim that the Amended Complaint is subject to Rule 9(b) and allege fraud throughout the Amended Complaint. *See generally* Am. Compl.; *see also* Resp. at 27–29.

[3] *See Biver v. Nicholas Fin., Inc.*, No. 8:14-CV-250-T-33TGW, 2014 WL 2441891, at *4 (M.D. Fla. May 30, 2014) ("Although not requiring scienter, a section 14(a) claim requires an allegation that the defendant negligently drafted the proxy statement."); *Baum v. Harman Int'l Indus., Inc.*, 408 F. Supp. 3d 70, 79 (D. Conn. 2019) ("Under Rule 14a-9, [a] plaintiff [ ] need not demonstrate that the omissions and misrepresentations resulted from knowing conduct undertaken by the director defendants with an intent to deceive." (quoting *Wilson v. Great Am. Indus. Inc.*, 855 F.2d 987, 995 (2d Cir. 1988))).

*Koppel v. 4987 Corp.*, 167 F.3d 125, 137 (2d Cir. 1999) (noting that both transaction causation and loss causation are components of a section 14(a) claim)).

Next, Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud or mistake"—which in the securities-fraud context, requires a plaintiff to allege, specifically (1) which statements or omissions were made in which documents or oral representations; (2) when, where, and by whom the statements were made (or, in the case of omissions, not made); (3) the content of the statements or omissions and how they were misleading; and (4) what the defendant received as a result of the fraud. *FindWhat Inv. Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011).

Lastly, under federal notice pleading standards, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "For purposes of this analysis, all well-pleaded facts are accepted as true, and the reasonable inferences therefrom are construed in the light most favorable to the plaintiff." *FindWhat*, 658 F.3d at 1296 (quotation marks omitted). And, while a court normally limits the scope of its review to the plaintiff's complaint, a document that is central to the case and not in dispute is properly considered in resolving a motion to dismiss. *See Ehlert v. Singer*, 245 F.3d 1313, 1317 n.4 (11th Cir. 2001) (citing *Harris v. Ivax Corp.*, 182 F.3d 799, 802 n.2 (11th Cir. 1999)). Indeed, the pendency of a securities fraud case permits judicial notice of a required public filing with the SEC, but only to determine the content of the document. *Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1276 (11th Cir. 1999) (approving the Second Circuit's practice of "judicially noticing relevant documents legally required by and publicly filed with the SEC at the motion to dismiss stage").

## ANALYSIS

Defendants maintain that Plaintiffs' various section 14(a) claims warrant dismissal for failure to state a claim under the multilayered pleading requirements for securities fraud claims. As explained below, claims regarding the December 2021 Projections are protected by the PSLRA's safe harbor as forward-looking statements that were accompanied by meaningful cautionary language in the Proxy. Defendants' accompanying statements of opinion—that the transaction was in the best interest of shareholders and the projections were based on the best currently available estimates—are likewise immunized by the PSLRA. The Court also finds that omissions regarding the Board's conflicts of interest are immaterial and thus insufficient to state a claim.

The only remaining actionable statements or omissions concern the description of quarterly financial results regarding SaaS ARR. Said allegations substantiate a valid claim because the Amended Complaint adequately alleges their materiality. Lastly, the Amended Complaint has sufficiently pleaded loss causation at this stage of the proceedings and satisfies the heightened pleading standard set forth under Rule 9(b). The Court addresses each argument in turn.

I.      **Section 14(a) Claims**

a.  **December 2021 Projections and December 2021 Sensitivity Case[4]**

Plaintiffs argue that the December 2021 Projections and December 2021 Sensitivity Case contained in the Proxy were materially misleading given their failure to contemplate the accelerating rate of SaaS ARR. Specifically, the Amended Complaint alleges that the December

---

[4] Plaintiffs conceded at oral argument, [ECF No. 49], that the December 2021 Projections and Sensitivity Cases, Am. Compl. ¶¶ 150–158, and statements concerning Qatalyst's fairness opinion, Am. Compl. ¶¶ 159–163, are protected by the PSLRA. Nonetheless, the Court will examine the nature of the December 2021 Projections and Sensitivity Cases because they impact the analysis of Defendants' subsequent opinion statements—which are based on the December 2021 Projections and Sensitivity Cases.

Projections and unlevered cash flows based on the December 2021 Projections and a December 2021 Sensitivity Case were both subjectively and objectively false and misleading because they implied that the Company's current trajectory for revenue growth and financial performance was negative and deteriorating. Am. Compl. ¶¶ 153–54. Plaintiffs also assert that the Qatalyst Fairness Opinion was false and misleading. Am Compl. ¶¶ 159–62. Defendants retort, however, that the December 2021 Projections and Sensitivity Cases—and the statements that flowed from these projections—are protected by the PSLRA's so-called "safe harbor." Mot. at. 21.

The PSLRA immunizes a defendant from liability for a securities law violation based on "any forward-looking statement." 15 U.S.C. § 77z-2(c)(1). Under the PSLRA, forward-looking statements include those "containing a projection of revenues," those containing "earnings (including earnings loss) per share," and those "of future economic performance," as well as "any statement of the assumptions underlying" such statements. *Id.* § 78u-5(i)(1)(A), (C), (D). "The statute offers several ways for a defendant to avoid liability, all written in the disjunctive." *Edward J. Goodman Life Income Trust*, 594 F.3d at 795. "First, a defendant may avoid liability by showing that his statement was issued with meaningful cautionary language." *Id.* (citing 15 U.S.C. § 78u-5(c)(1)(A)(i)). Alternatively, "the defendant can avail himself of the safe harbor if the plaintiff fails to prove that the statement was made with actual knowledge that it was false." *Id.* ("[P]laintiff's inability to show knowledge of falsity is only relevant if the defendant is unable to produce meaningful cautionary statements or evidence of immateriality.") (citing 15 U.S.C. § 78u-5(c)(1)(B)).

The challenged statements, Am. Compl. ¶¶ 153–62, are quintessentially forward-looking[5], and the Proxy identified them as such. *See* Proxy at 9–10 ("This proxy statement, and

---

[5] The PSLRA defines "forward-looking statement" to include, among other things: (A) "a statement containing a projection of revenues, income (including income loss), earnings (including earnings loss) per share, capital expenditures, dividends, capital structure, or other financial items"; (B) "a statement of

any documents to which Citrix refers to in this proxy statement, contains 'forward-looking statements' within the meaning of [PSLRA].").  The December Projections and the Qatalyst Fairness Opinion—challenged namely for their reliance on the December Projections—are similarly forward-looking, dealing with projections of revenue.  15 U.S.C. § 78u–5(i)(1)(A), (C); *Body Cent. Corp.*, 15 F. Supp. 3d at 1216.

Further, these forward-looking projections are accompanied by meaningful cautionary language, which states there can be no assurance that the financial results will be realized.  Mot. at 14–15.  While boilerplate language will not suffice, the meaningful-cautionary-language obligation "does not require a listing of all factors"—it is enough that an issuer mention "important factors that could cause actual results to differ materially from those in the forward-looking statement."  *Harris*, 182 F.3d at 807 (affirming district court's dismissal of statements protected by the PSLRA without leave to amend).  Although undisputed, the cautionary language at issue here goes beyond "generalized warnings," *see* Proxy [ECF No. 43-2] at 50, and identifies important factors that could cause actual results to differ materially from those in the forward-looking statement—including how the financial projections reflect the uncertainty of assumptions on growth and transition rates of Citrix's products.  *Id.* at 803 (quoting 15 U.S.C. § 78u-5(c)(1)(A)(i)); *see Carvelli*, 934 F.3d at 1327 (finding the cautionary language accompanying the complained-of statements meaningful where "Ocwen disclosed a present problem (an administrative action against it), offered a forward-looking prediction (an

---

the plans and objectives of management for future operations, including plans or objectives relating to the products or services of the issuer"; (C) "a statement of future economic performance, including any such statement contained in a discussion and analysis of financial condition by the management or in the results of operations included pursuant to the rules and regulations of the Commission"; and (D) "any statement of the assumptions underlying or relating to" such statements. *Mogensen v. Body Cent. Corp.*, 15 F. Supp. 3d 1191, 1215 (M.D. Fla. 2014) (quoting 15 U.S.C. § 78u–5(i)(1)(A)–(D)).

expectation of a satisfactory outcome), and cabined its expectation with relevant cautionary language (the uncertainty that comes with agency actions and investigations).").

Accordingly, as the December 2021 Projections and Sensitivity Cases qualify for the PSLRA's safe harbor, these challenges are dismissed.

### b.   Board and Qatalyst's Opinions on the Fairness of the Merger

Plaintiffs allege statements that the merger was "in the best interests" of Citrix shareholders, Am. Compl. ¶ 169, and the December 2021 Projections represented the "best currently available estimates" of future financial performance, Am. Compl. ¶¶ 171–72, are misleading for their reliance on analyses that did not account for Citrix's allegedly accelerating growth.  Am Compl. ¶ 170.  Defendants argue that the PSLRA safe harbor applies equally to these statements because they are derivative of the attacks on the December 2021 Projections and are similarly unactionable.  *See* Mot. at 21–22.  Plaintiffs argue in response that the statements are "present beliefs"—inherently not forward-looking statements that would be protected by the PSLRA—and the Amended Complaint adequately pleads that the "misstatements" were both subjectively and objectively false.  Resp. at 18–24.

The Amended Complaint asserts that, because the Board and Qatalyst did not honestly believe in the December 2021 Projections, they also could not have honestly believed the merger was fair.  Am. Compl. ¶¶ 160, 170.  As pleaded, the opinion statements are inexorably linked to the December 2021 Projections, and the essence of Plaintiffs' challenge is that each of these statements adopts or endorses the forecasts in reaching their conclusions.  Am. Compl. ¶¶ 170–72 ("The above statements were false and misleading because, for the reasons set forth above, the Transaction Committee and the Board did not genuinely believe the December 2021 Projections and the December 2021 Sensitivity Cases, and thus knew that the Merger Consideration was inadequate and unfair").  Untethering these opinion statements from the

projections would work an "end-run around the PSLRA's safe harbor provision." *City of Hialeah Employees' Ret. Sys. v. FEI Co.*, 289 F. Supp. 3d 1162, 1173 (D. Or. 2018) ("To take the view that an expression of present belief in a forward-looking statement is a present fact—and therefore not itself a forward looking statement—would work an end-run around the PSLRA's safe harbor provision").

The Court is particularly persuaded by the reasoning in an analogous case, *Gray v. Wesco Aircraft Holdings, Inc.*, 454 F. Supp. 3d 366 (S.D.N.Y. 2020), *aff'd*, 847 F. App'x 35 (2d Cir. 2021). There, the court found that statements that "endorse[d] or state[d] the speaker's belief in a certain future outlook" satisfied the PSLRA forward-looking requirement. *Id.* at 387.[6] The Amended Complaint similarly alleges that the "best interest" and "best estimate" statements were the result of the speaker's belief in the December 2021 Projection's outlook.

The court in *Gray* agreed with the conclusion reached by two other cases addressing "materially identical" claims: *City of Hialeah* and *Golub v. Gigamon Inc.*, 372 F. Supp. 3d 1033 (N.D. Cal. 2019). *Gray*, 454 F. Supp. 3d at 387. In both cases, the courts rejected similar claims, holding that the challenged statements were "forward-looking" because they were not properly characterized by plaintiffs as "statements of present or historical fact" outside the scope of the safe harbor. *Golub*, 372 F. Supp. 3d at 1047; *see also City of Hialeah*, 289 F. Supp. 3d at 1173. The court in *City of Hialeah* explained, and the courts in *Golub* and *Gray* echoed, that,

---

[6] Courts throughout the country have reached similar conclusions, as noted by the court in *Gray*. *See, e.g.*, *Gissin v. Endres*, 739 F. Supp. 2d 488, 507 n.108 (S.D.N.Y. 2010) (holding statements that "based on our current expectation of cash flows from operations and…investments…we feel we will be in a position to fund [anticipated] capital investments for the year" and "based on our current view and what we know now, yes, we think we'll be just fine" were forward looking); *NECA-IBEW Health & Welfare Fund v. Pitney Bowes, Inc.*, No. 3:09-CV-01740 VLB, 2013 WL 1188050, at *17 (D. Conn. Mar. 23, 2013) (finding, among other things, that the statement "we're comfortable with our [projection]" was forward looking); *see also Inst. Investors Grp. v. Avaya*, 564 F.3d 242, 255–56 (3d Cir. 2009) (determining that statements that the defendant-company was "on track" and "position[ed] . . . to meet our goals for the year" were forward-looking, as they "cannot meaningfully be distinguished from the future projection of which they are a part" and "express[ ] only defendants' continuing comfort with the earlier…projection.").

"[e]xpressing confidence or lack thereof in a given projection is not different from making a projection." *Golub*, 372 F. Supp. 3d at 1048 (quoting *City of Hialeah*, 289 F. Supp. 3d at 1173); *see also In re Analogic Corp. Shareholder Litig.*, No. 18-cv-11301, 2019 WL 4804800, at *8 (D. Mass. Sept. 30, 2019) (dismissing section 14 claim based on "best currently available" statements because such statements are forward-looking).

Here, Plaintiffs do not attack any of the present or historical facts stated by Defendants with respect to the December Projections. *See Gray*, 454 F. Supp. 3d at 289–90. Indeed, even the challenges to statements regarding the "best interests of Citrix and its stockholders" rely entirely on their endorsement of the immunized projections. Am. Compl. ¶ 170. Plaintiffs give no other reason for alleging that these statements are misleading outside of claiming that "the Board did not genuinely believe the December Projections and the December 2021 Sensitivity Cases, and thus knew that the Merger Consideration was inadequate and unfair." *Id.*; *see Gray*, 454 F. Supp. 3d at 390 ("To hold that such projections should be excepted from the PSLRA's coverage on the theory that management did not appropriately consider recent trends in the industry or the performance of the business would rip a large hole in that statute and deprive issuers and makers of such statements of the precise protection the safe harbor was intended to provide"). In other words, the statements in question are inextricable from the projections themselves. Accordingly, commensurate with the purposes of the PSLRA and its safe harbor, statements made in reliance on the December 2021 Projections and Sensitivity Cases, Am. Compl. ¶¶ 169–172, are dismissed from this action.

### c. Alleged Omission of the Board's Conflicts of Interest

The Amended Complaint alleges that the Proxy failed to disclose all ties between directors and acquirors that might be perceived as potential conflicts. Am. Compl. ¶¶ 72, 83, 164–68. The materiality standard applies where only potential or actual conflicts that a

reasonable investor would consider significant must be disclosed.  *Mindbody*, 489 F. Supp. 3d at 214.

The Proxy discloses that two board members recused themselves from participating in deliberations, in light of potential conflicts.  Proxy at 23–24, 56–65.  However, Plaintiffs allege that shareholders were not afforded the full picture of all board members' ties to Elliott or Vista, and the statement that the Transaction Committee was made up independent and disinterested directors was false and misleading.  However, these alleged omissions were not material, nor did they purport to render Defendants incapable of making independent decisions.  *TSC Industries v. Northway, Inc.*, 426 U.S. 438, 450 (1976) (requiring omissions be "so obviously important to an investor, that reasonable minds cannot differ on the question of materiality" to state a claim).

Plaintiffs point to overlapping board memberships and board memberships with companies that were at some point affiliated with Elliott/Vista as evidence of material omissions regarding the Transaction Committee's independence.  *See* Am. Compl. ¶ 83.  They also assert that Defendants' failure to disclose Defendant Calderoni's business with Juniper Networks, Inc. and Silver Lake Partners rendered the other disclosures regarding Calederoni's past ties to Elliott misleading. Am. Compl. ¶ 168.   These allegations are tenuous—the purported omissions describing an "extensive past working relationship" are nearly a decade old—and do not rise to the requisite level of materiality.  The Proxy discloses that Defendant Calderoni had an 18-month consulting arrangement with Elliott in 2018–2019 and a family member of Calderoni worked with Elliott in an administrative role.   Proxy at 23–24.   "Even if some of the omitted relationships were 'potential' conflicts of interest, Plaintiffs have not alleged why they would be material to shareholders when Defendants had already disclosed the two far more significant conflicts."  *Mindbody*, 489 F. Supp. 3d at 215; *see also Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (requiring that allegations of a material omission allege that it is substantially likely that

a reasonable investor would view the information "as having significantly altered the total mix of information made available.").

Allegations concerning "past ties between other Board members and Elliott" are similarly insignificant and Plaintiffs' support for the claim that board service with portfolio companies of an activist investor can be a source of conflict is inapposite. Resp. at 17. In the cited authority, *Goldstein v. Denner*, the court dismissed allegations of undisclosed conflicts of a director who served on a board of a company founded by a portfolio company of an investor as insufficient to support a reasonable inference that he acted for some improper purpose. No. 2020-cv-1061, 2022 WL 1671006, at *50–51 (Del. Ch. May 26, 2022). The court otherwise found claims concerning the disclosure of overlapping board membership against another director reasonably conceivable because they were supported by allegations of financial rewards and the temporal proximity of board appointments. *Id.* at *49. The court noted that whether a complaint pleads enough to call a director's judgment into question "will always be a matter of degree[.]"

Allegations regarding Defendants Caldwell, Knowling, and Sacripanti's past ties to Elliott and Vista would not call into question the independence of the challenged directors. Plaintiffs fail to advance supporting facts that would put a director's loyalty at issue, such as the form of reward or proximity of board appointments. Am. Compl. ¶¶ 83, 164–66; *Orman v. Cullman*, 794 A.2d at 27 n.55 (Del. Ch. 2002) ("Although mere recitation of the fact of past business or personal relationships will not make the Court automatically question the independence of a challenged director, it may be possible to plead additional facts concerning the length, nature or extent of those previous relationships that would put in issue that director's ability to objectively consider the challenged transaction."). Therefore, the allegations regarding Board members' conflicts of interest are dismissed. Am. Compl. ¶¶ 164–168.

### d. Omissions of Accelerating SaaS ARR

Plaintiffs allege that the Proxy omitted positive growth trends of SaaS ARR in 2021—the metric that "represents the contracted recurring value of all cloud subscriptions normalized to a one-year period." Am. Compl. ¶¶ 5, 50. Specifically, while Citrix filed Supplemental Disclosures on April 13, 2022 revealing its SaaS ARR growth in Q1 of 2021, Plaintiffs allege that the company failed to appropriately disclose accelerating SaaS ARR growth in Q2 and Q3 of 2021. Am. Compl. ¶¶ 140–41; *see also* Am. Compl. Ex. B. (Comparison of Sept. 2021 Projections vs. Dec. 2021 Sensitivity Case).

A plaintiff asserting a claim for a material omission under Rule 14-9 must show "a substantial likelihood exists that a reasonable investor would have viewed a misrepresentation or omission as significantly alter[ing] the 'total mix' of information made available." *Carvelli*, 934 F.3d at 1317. The Eleventh Circuit has analyzed the "modern test" for determining materiality, created by the Supreme Court. *S.E.C. v. Morgan Keegan & Co.*, 678 F.3d 1233, 1245–46 (11th Cir. 2012). Materiality is an "objective" inquiry involving the significance of an omitted or misrepresented fact to a reasonable investor. *Id.* (citing *TSC Industries*, 426 U.S. at 445). However, a plaintiff cannot plead "the materiality of the alleged misstatements or omissions…in a conclusory or general fashion." *In re JP Morgan Chase Sec. Litig.*, 363 F. Supp. 2d 595, 626 (S.D.N.Y. 2005) (citation omitted).

Plaintiffs allege that the Proxy, as supplemented by additional disclosures, omits SaaS ARR growth trends in Q2 and Q3 of 2021 from various statements on quarterly results. Am. Compl. ¶¶ 140–149. Defendants argue that Plaintiffs seek disclosures regarding the quarterly financial results that are immaterial or already disclosed in the Proxy. Mot. at 26–27. However, Plaintiffs have sufficiently established that the omission is material, alleging that the metric is—

as described by Defendant Calderoni—best aligned with the company's business transition and strategy.  Am. Compl. ¶¶ 5, 7, 14.  Further, "[b]y voluntarily revealing one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not so incomplete as to mislead."  *FindWhat*, 658 F.3d at 1305.  Thus, by disclosing negative factors regarding quarterly results, Defendants were obligated to similarly disclose material positive trends as well.  *FindWhat*, 658 F.3d at 1305 (explaining "a defendant may not deal in half-truths"); *see also In re Jan. 2021 Short Squeeze Trading Litig.*, 620 F. Supp. 3d 1231, 1263 (S.D. Fla. 2022) (noting that "halftruths" are literally true statements that create a materially misleading impression).

Defendants argue that prior positive characterizations in the quarterly earnings letters and calls constitute immaterial puffery.  Mot. at 19.  However, the statements regarding SaaS ARR growth in Q2 and Q3 2021 were numerically specific and verifiable.  *See* Am. Compl. ¶¶ 65, 85, 89; *Mogensen*, 15 F. Supp. 3d at 1211 (puffery consists of "generalized, non-verifiable, vaguely optimistic statements.").  And the Eleventh Circuit has determined that allegedly misleading statements like those here—such as describing sales metrics as "impressive" and indicating "solid green numbers"—are material in nature.  *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 925 (11th Cir. 2020) (citing *Carvelli*, 934 F.3d at 1319).  These, the Eleventh Circuit described, are "far from the 'generalized, vague, nonquantifiable statements of corporate optimism' that constitute nonactionable puffery."  *Id.* (reversing dismissal of 10b-5 claims concerning statements on two sales metrics that the company purportedly touted as important measures of growth and sales).  The Amended Complaint alleges that Citrix described SaaS ARR as the "best" metric and indicator of the trajectory of the business and goes on to identify numerous specific indicators of accelerating growth that the company previously recognized— far more specific than the mere corporate optimism that Defendants assert.  Am. Compl. ¶¶ 5,

12–16, 141–149. Similar to *Luczak*, Plaintiffs have demonstrated that SaaS ARR rates were significant metrics and, in turn, a material omission from the Proxy.[7] As such, Plaintiffs have sufficiently pleaded that the omissions of accelerating SaaS ARR from statements on Q2 and Q3 quarterly reports were material and not puffery.[8]

## II.    Rule 9(B)

Defendants assert that the Amended Complaint fails to allege how Plaintiffs were misled by the Proxy or how the alleged fraud benefited Defendants. Mot. at 27–28. Securities fraud claims, "like other types of fraud claims, have always been subject to Fed. R. Civ. P. 9(b)'s heightened pleading requirements, which require a complaint 'to state with particularity the circumstances constituting fraud.'" *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1237 (11th Cir. 2008) (quoting Fed. R. Civ. P. 9(b)). Under Rule 9(b), "it is sufficient to plead the who, what, when, where, and how of the allegedly false statements and then allege generally that those statements were made with the requisite intent." *Id.* at 1237. Here, the Amended Complaint makes a sufficient showing by detailing the benefits that Defendants stood to gain from the consummation of the merger. Am. Compl. ¶¶ 132–35. Further, the Amended Complaint sufficiently explains how the statements and omissions would have misled shareholders into concluding that Citrix's progress in transitioning its business was stalling, Am. Compl. ¶ 141,

---

[7] Defendants also argue that the Proxy disclosed positive results from 2021 by incorporating Citrix's Form 10-K. Mot. at 26–27. However, "investors are not generally required to look beyond a given document to discover what is true and what is not." *Miller v. Thane Int'l, Inc.*, 519 F.3d 879, 887 (9th Cir. 2008); *see also Aaron v. Trump Org., Inc.*, No. 09-cv-2493, 2011 WL 2784151, at *5 (M.D. Fla. July 15, 2011) (explaining "the fact that omitted information is publicly available does not defeat materiality as to a seller's omission") (cleaned up). Even within a series of related filings, material facts cannot be "buried," but instead must be clearly disclosed in context. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, 618 F. Supp. 2d 311, 325 (S.D.N.Y. 2009) (noting investors "should not be called upon to piece together buried information from distinct parts of financial statements") (cleaned up).

[8] As Plaintiffs admit, Defendants provided supplemental disclosures on SaaS ARR growth in Q1. Resp. at 3, 11, 16. Accordingly, to the extent the Amended Complaint advances claims concerning statements or omissions as to Q1, *see* Am. Compl. ¶¶ 140–41, such claims are dismissed.

and how the statements and omissions would have misled shareholders into concluding that Q2 and Q3 2021 results were exclusively disappointing, Am. Compl. ¶¶ 145, 149.  Thus, dismissal on this ground is not warranted.

### III.   Loss Causation

A material misstatement or omission and loss causation are two separate, independent elements of a private section 14(a) claim.  *See Grace v. Rosenstock*, 228 F.3d 40, 47 (2d. Cir. 2000) ("loss causation…must be proven in the context of a private action under § 14(a)") (citing *Wilson v. Great American Industries, Inc.*, 979 F.2d 924, 931 (2d Cir. 1992)).  To sufficiently plead loss causation, Plaintiffs "can allege that they would not have invested had they known the truth, and that the untruth was in some reasonable direct way responsible for the loss." *Friedman v. Hammer*, No. 19-62481, 2020 WL 2559549, at *3 (S.D. Fla. May 20, 2020) (finding that plaintiffs met the criteria where the complaint alleged that plaintiffs "would not have agreed to purchase the securities and invest in TRC Funding but for Defendants' misleading statements and failure to disclose material facts").

To plead loss causation, a plaintiff need not show that the defendant's misconduct was the "sole and exclusive cause" of his injury, but rather only that the defendant's misconduct was a "substantial" or "significant contributing cause." *FindWhat*, 658 F.3d at 1309.  Further, loss causation pleading need not satisfy the heightened standards of Rule 9(b) or the PSLRA. *Maverick Fund, Ltd. v. Mohawk Indus., Inc.*, 4:21-CV-00118-VMC, 2023 WL 2887603, at *6 (N.D. Ga. Mar. 31, 2023); *see also Skypoint Advisors, LLC. v. 3 Amigos Prods. LLC.*, No. 218CV356FTM29MRM, 2019 WL 4600409, at *8 (M.D. Fla. Sept. 23, 2019).

Defendants argue that the Amended Complaint alleges loss in a conclusory fashion and note there were no competing offers;[9] they also point out that the market valued the stock at less than the merger consideration before speculation about a potential merger became public. Mot. at 29. Plaintiffs argue that featuring a benchmark transaction—Citrix's acquisition of another SaaS business—provides sufficient factual support to show that the deal price undervalued Citrix and caused losses for its shareholders. Opp. at 26–27. But such issues are beyond the scope of a motion to dismiss. *See Eastwood Enters., LLC v. Farha*, No. 807-CV-1940-T-33EAJ, 2009 WL 3157668, *5 (M.D. Fla. Sept. 28, 2009) (noting "loss causation is a fact-based inquiry that is generally not proper to resolve on a motion to dismiss"); *see also Lormand v. US Unwired, Inc.*, 565 F.3d 228, 267 n.35 (5th Cir. 2009) ("[S]everal circuit courts and district courts point out that it is often inappropriate to use a Rule 12(b)(6) motion as a vehicle to resolve disputes over 'loss causation.'"). Further, the Amended Complaint alleges that but for the allegedly material misrepresentations and omissions in the Proxy, Citrix shareholders would not have voted for the Merger and cashed out their shares. Am. Compl. ¶ 173.

## IV. Section 20(a) Claims

Count II seeks to hold the individual defendants liable as "control persons" under section 20(a) of the Exchange Act. 15 U.S.C. § 78t. Defendants seek to dismiss this claim solely on the ground that no primary violation has been adequately pleaded. Because the Court finds that primary violations have been alleged, the dismissal of allegations regarding control persons in Count II is not warranted. *In re Pattern Energy Grp. Inc. Sec. Litig.*, No. CV 20-275-MN-JLH, 2022 WL 263312, at *9 n.7 (D. Del. Jan. 27, 2022), *report and recommendation adopted*, No. CV 20-275 (MN) (JLH), 2022 WL 957761, at *8 (D. Del. Mar. 30, 2022) (declining to dismiss section 20(a) claim that was not fairly raised in the briefing).

---

[9] To plead loss causation, plaintiff need *not* plead the immediate availability of a more favorable alternative transaction. *Gray*, 454 F. Supp. 3d at 406.

## CONCLUSION

Accordingly, it is hereby **ORDERED AND ADJUDGED** that the Motion, [ECF No. 42], is **GRANTED IN PART** and **DENIED IN PART**.  The following allegations remain:

1.  Misstatements and Omissions That Rendered Statements in the Proxy About the Q2 and Q3 2021 Results Misleading, Am. Compl. ¶¶ 140-141;

2.  Misstatements and Omissions That Rendered Statements in the Proxy About the Q2 2021 Results Misleading, Am. Compl. ¶¶ 142-145; and

3.  Misstatements and Omissions in the Proxy About the Q3 2021 Results Were Misleading, Am. Compl. ¶¶ 146-149.

Defendants shall file their answer to the remaining allegations in the Amended Complaint on or before **February 21, 2024**.

**DONE AND ORDERED** in Miami, Florida, this 3rd day of February, 2024.

_____

**RODOLFO A. RUIZ II**
**UNITED STATES DISTRICT JUDGE**